UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN GRAY,<br><br>                      Plaintiff,<br><br>    -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>                      Defendants. | Civil Action No: 07 Civ. 9790<br>(SHS) (DCF) |

**[ADDITIONAL CAPTIONS APPEAR FOLLOWING SIGNATURE BLOCKS]**

## DECLARATION OF JAMES KELLY-KOWLOWITZ

I, James Kelly-Kowlowitz, declare, under penalty of perjury, as follows:

1.    I am an attorney with the law firm of Wolf Popper LLP ("Wolf Popper"), one of Plaintiff's counsel in the above-captioned action, and am admitted to the bar of the State of New York and the Bar of the United States District Court for the Southern District of New York.

2.    I submit this Declaration in support of the motion by Stephen Gray, Samier Tadros and James Bolla (collectively, the "Gray Plaintiffs") for (1) Consolidation, (2) Appointment of Lead Plaintiffs and Leadership Structure, and (3) Entry of [Proposed] Pretrial Order No. 1, and in Opposition to the Motion of Plaintiffs Shaun Rose and Mark Geroulo for the Appointment of Interim Lead Plaintiffs, Co-lead Counsel and Liaison Counsel.

3.    Wolf Popper and Harwood Feffer have been at the forefront of the instant litigation since Plaintiff Gray filed the first ERISA action, on November 5, 2007, after an approximately month-long investigation, and have since dedicated substantial resources advancing its prosecution. The Gray Plaintiffs' attorneys and staff (including a full time private

investigator, two certified public accountants, and a financial analyst) have extensively

investigated Citigroup's alleged wrongdoing, reviewed court actions and pleadings, as well as

media and other reports, and communicated with Citigroup's general counsel regarding the

preservation of documents. In addition, as is their standard practice in ERISA cases, the Gray

Plaintiffs' counsel have: in mid-November, negotiated an agreement with Defendants' counsel

for the production of plan-related documents, under ERISA §104(b), which they received from

defendants in early December; sent defendants a letter requesting preservation of further

documents; sent a FOIA request to the SEC, as well as one to the Department of Labor; and have

communicated with a number of aggrieved plan participants, and conducted further factual

research in preparation for drafting the consolidated complaint. Furthermore, the Gray Plaintiffs'

counsel have already retained a financial/damages consultant, Financial Markets Analysis, LLC.

    4.    Stephan Gray, Samier Tadors, and James Bolla collectively owned approximately

9,521 shares of Citigroup common stock through the Citigroup 401(k) Plan, as of January 1,

2007. Citigroup stock fell from $55.70 on December 29, 2006 to $28.24 as of January 4, 2008 –

amounting to a $27.46 decline. Based on the Gray Plaintiffs holdings, they lost $261,446 from

the decline in Citigroup common stock alone. In addition, the Dow Jones Industrial Average

rose approximately 3% since January 1, 2007. Accordingly, if the Gray Plaintiff's retirement

assets were prudently invested as of January 1, 2007, they were likely to have at least earned an

additional 3%, or $15,900 dollars (based on the approximately $530,000 they had invested in

Citigroup common stock as of January 1, 2007). This does not include the alternative measure of

damages typically applied in ERISA cases, which measures damages against the best performing

funds in the 401(k) plan. Accordingly, it is clear that the Gray Plaintiff's have lost over

$275,000.

5.    Attached hereto as Exhibit A is a true and correct copy of the order appointing

plaintiffs' counsel in the *In re Citigroup Pension Plan ERISA Litigation*, Master File 05 Civ.

5296 (SAS)(S.D.N.Y.).

6.    Attached hereto as Exhibit B is a true and correct copy of plaintiffs' memorandum

of law requesting the appointment of Schiffrin, Barroway, Topaz & Kessler ("Schiffrin") as a

member of the executive committee in the *In re Citigroup Pension Plan ERISA Litigation*.

7.    The *In re Citigroup Pension Plan ERISA Litigation* action is being actively

litigated.  Attached hereto as Exhibit C is a true and correct copy of an order, dated November

20, 2007, adjudicating remedies.  The order notes that Schiffrin appeared at the hearing on behalf

of the plaintiffs in that litigation (p. 13).

8.    Attached hereto as Exhibit D is a true and correct copy of an order in *Cooper v.*

*The IBM Personal Pension Plan*, Civil No. 99-829 (S.D. Ill.), noting (on page 3) that if the

district court's ruling were upheld on appeal, IBM's liability pursuant to its settlement would be

$1,714,293,000.

9.    Attached hereto as Exhibit E is a true and correct copy of the "Notice of Class

Action Settlement" in *In re Citigroup ERISA Litig.*, No. 03-CV-2932 (S.D.N.Y.).

10.    Attached hereto as Exhibit F is a true and correct copy of a press release, dated

August 5, 2002, issued by Schiffrin in which the firm announced a federal securities class action

filed against Citigroup.

11.    Attached hereto as Exhibit G is a true and correct copy of the complaint filed in

*Gray v. Citigroup, Inc., et. al.*, No.: 07-CV-9790(SHS)(S.D.N.Y.).

12.    Attached hereto as Exhibit H is a true and correct copy of the complaint filed in *Rose v. Citigroup, Inc., et. al.*, No.: 07-CV-10294(DC)(S.D.N.Y.).

13.    Attached hereto as Exhibit I is a true and correct copy of the complaint filed in *Hammerschlag v. Citigroup Inc., et. al.*, No.: 07-CV-10258(SHS)(S.D.N.Y.).

14.    Attached hereto as Exhibit J is a true and correct copy of the complaint filed in *Geroulo v. Citigroup, Inc., et. al.* No.: 07-CV-10472(SHS)(S.D.N.Y.).

15.    Attached hereto as Exhibit K is a true and correct copy of the transcript of the settlement fairness hearing in *In re Royal Dutch/Shell Transport ERISA Litig.*, 04-CV-1398-JWB-SDW (D.N.J.).

16.    Attached hereto as Exhibit L is a true and correct copy of the complaint filed in *Bolla v. Citigroup, Inc., et. al.* No.: 07-CV-10461(SHS)(S.D.N.Y.).

17.    Attached hereto as Exhibit M is a true and correct copy of § 21.271 and § 21.61 of the *Manual for Complex Litigation* (4th ed. 2004).

18.    Attached hereto as Exhibit N is a true and correct copy of a Bloomberg.com article dated December 27, 2007, and entitled "Citigroup May Cut Dividend by 40%, Goldman Sachs Says," and a true and correct copy of an announcement on December 13, 2007, by Citigroup entitled "Citi Commits Support Facility for Citi-Advised SIVs."

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct, this 4th day of January, 2008.

James Kelly-Kowlowitz

| | |
|---|---|
| SHAUN ROSE,<br><br>    Plaintiff,<br><br>   -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>    Defendants. | Civil Action No: 07 Civ. 10294 (DC) |
| MEREDITH TRANBERG,<br><br>    Plaintiff,<br><br>   -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>    Defendants. | Civil Action No: 07 Civ. 10341 (SHS)(DCF) |
| ANTON K. RAPPOLD,<br><br>    Plaintiff,<br><br>   -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>    Defendants. | Civil Action No: 07 Civ. 10396 (SHS)(DCF) |
| SAMIER TADROS,<br><br>    Plaintiff,<br><br>   -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>    Defendants. | Civil Action No: 07 Civ. 10442 (UA) |

Doc. 159481

| | | |
|---|---|---|
| STEPHAN FIORINO, | | Civil Action No: 07 Civ. 10458 (SHS)(DCF) |
| | Plaintiff, | |
| -against- | | |
| CITIGROUP INC., *ET AL.*, | | |
| | Defendants. | |

| | | |
|---|---|---|
| JAMES BOLLA, | | Civil Action No: 07 Civ. 10461 (SHS)(DCF) |
| | Plaintiff, | |
| -against- | | |
| CITIGROUP INC., *ET AL.*, | | |
| | Defendants. | |

| | | |
|---|---|---|
| MARK GEROULO, | | Civil Action No: 07 Civ. 10472 (SHS) (DCF) |
| | Plaintiff, | |
| -against- | | |
| CITIGROUP INC., *ET AL.*, | | |
| | Defendants. | |

| | | |
|---|---|---|
| ALAN STEVENS, | | Civil Action No: 07 Civ. 11156 (SHS)(DCF) |
| | Plaintiff, | |
| -against- | | |
| CITIGROUP INC., *ET AL.*, | | |
| | Defendants. | |

Doc. 159481

| | |
|---|---|
| STEVEN GOLDSTEIN,<br><br>          Plaintiff,<br><br>    -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>          Defendants. | Civil Action No: 07 Civ. 11158 (SHS)(DCF) |
| CHRIS SOUTHARD,<br><br>          Plaintiff,<br><br>    -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>          Defendants. | Civil Action No: 07 Civ. 11164 (SHS)(DCF) |
| WILLIAM WOODWARD, *ET AL.*,<br><br>          Plaintiff,<br><br>    -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>          Defendants. | Civil Action No: 07 Civ. 11207 (UA) |
| FRANCIA BRICK,<br><br>          Plaintiff,<br><br>    -against-<br><br>CITIGROUP INC., *ET AL.*,<br><br>          Defendants. | Civil Action No: 07 Civ. 11369 (UA) |

Doc. 159481

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
MICHAEL LONECKE, individually and on :
behalf of all others similarly situated,
                                                          :
                            Plaintiff,                    :    05 Civ. 5296
                                                          :
       - against -                                        :
                                                          :
CITIGROUP PENSION PLAN, Plans            :
Administration Committee of Citigroup,   :
Inc., and Citigroup, Inc.,                                :
                                                          :
                            Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
RAYMOND DUFFY, Individually and On  :    05 Civ. 6026
Behalf of All Others Similarly Situated,   :
                                                          :
                            Plaintiff,                    :
                                                          :
       - against -                                        :
                                                          :
CITIGROUP, INC., The Citigroup Pension  ,:
Plan, and the Plans Administration        :
Committee of Citigroup, Inc.                              :
                                                          :
                            Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/7/05

**ORDER**

1

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                      :
ANNE NELSON, ROBERT S. FASH,                          :
and CRAIG A. HARRIS, Individually and                 :     05 Civ. 7272
on Behalf of All Others Similarly Situated            :
                                                      :
                    Plaintiffs,                       :
                                                      :
    - against -                                       :
                                                      :
THE CITIGROUP PENSION PLAN, and                       :
THE PLANS ADMINISTRATION                              :
COMMITTEE OF CITIGROUP, INC.,                         :
as Plan Administrator                                 :
                    Defendants.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    CONSOLIDATION

On August 23, 2005, counsel for plaintiffs in the above-captioned

actions moved to consolidate these three cases. Defendants do not oppose this

motion. These actions are hereby consolidated. Any new case filed in or

transferred to this Court arising out of the same operative facts shall be

consolidated with these actions pursuant to Federal Rule of Civil Procedure 42(a).

Such cases shall be consolidated into the first-filed action, *Lonecke v. Citigroup*

*Pension Plan*, No. 05 Civ. 5296.

Every pleading filed in these actions shall bear the following caption:

```
- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                  :
```

**In re CITIGROUP PENSION PLAN**          :          **MASTER FILE: 05 Civ. 5296**
**ERISA LITIGATION**                                 :
                                                  :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

When a pleading or other court paper filed in these actions is intended to apply to all actions herein, the words "All Actions" shall appear immediately after the words "THIS DOCUMENT RELATES TO" in the caption set forth above. When a pleading or other court paper is intended to apply to fewer than all such actions, the filing party shall indicate the action to which the filing relates by including each specific case name and docket number immediately after the words "THIS DOCUMENT RELATES TO:" in the caption above.

A Master Docket is hereby established for this action, including actions subsequently consolidated herein pursuant to this Order. When a pleading is filed and the caption shows that it is applicable to "All Actions," the Clerk shall file such pleading in the Master File and note such filing in the Master Docket. No further copies need be filed or other docket entries made. When a paper is filed and the caption shows that it is applicable to fewer than All Actions, the

3

Clerk shall file the original of the paper in the Master File and a copy in the file of each separate action to which it applies and shall note such filing in the Master Docket and in the docket of each separate action. The party filing such paper shall supply the Clerk with sufficient copies of any such paper to permit compliance with this paragraph.

A Master File is hereby established for these proceedings. The Master File shall be No. 05 Civ. 5296. The original of this Order shall be filed by the Clerk in the Master File. The Clerk shall maintain a separate file for each of the subsequently filed actions and filings shall be made in accordance with the regular procedures of the Clerk, except as modified by this Order. The Clerk shall file a copy of this Order in each such separate file. The Clerk shall mail a copy of this Order to counsel of record in each of the subsequently filed actions.

When a case that arises out of the same operative facts as these actions is filed in or transferred to this Court, it shall be consolidated with these actions as described above, and the Clerk shall: (1) file a copy of this Order in the separate file for such action; (2) mail a copy of this Order to the counsel of record in such action; and (3) make the appropriate entry in the Master Docket. The Court requests the assistance of counsel in calling to the attention of the Clerk the filing or transfer of any case that might properly be consolidated as part of this

4

litigation.

This Order shall apply to each class action assigned to the undersigned alleging claims similar to those set forth in these actions and brought on behalf of participants in or beneficiaries of the Plan. This Order shall apply to each such case which is subsequently filed in or transferred to this Court, and which is assigned to the undersigned, unless a party objecting to the consolidation of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten days after the date on which the Clerk mails a copy of this Order to counsel for that party. The provisions of this Order shall apply to such action pending the Court's ruling on the application.

Unless a plaintiff in a subsequently filed or transferred case is permitted by the Court to use a separate complaint, defendants shall not be required to answer, plead or otherwise move with respect to that complaint. If a plaintiff in any such case is permitted to use a separate complaint, each defendant shall have thirty days from the date the Court grants such permission within which to answer, plead or otherwise move with respect to that complaint.

Plaintiffs' counsel shall file a Consolidated Complaint within fourteen days of the date of this Order, unless otherwise agreed by the parties. The

5

Consolidated Complaint, subject to further amendment following discovery, shall

be the operative complaint and shall supersede all complaints filed in any of the

actions consolidated herein. Pending filing and service of the Consolidated

Complaint, defendants shall have no obligation to move, answer, or otherwise

respond to any of the complaints in the actions consolidated herein or any actions

subsequently consolidated with them. Unless otherwise agreed by the parties and

approved by the Court, Defendants shall answer or otherwise respond to the

Consolidated Complaint within forty-five days of the date the Consolidated

Complaint is served on them.

## II.   APPOINTMENT OF LEAD COUNSEL

The plaintiffs' motion for consolidation also includes a motion to

appoint co-lead counsel. Plaintiffs' Memorandum of Law contemplates that all

the named plaintiffs will be represented by co-lead counsel.[1] There being no

opposition, plaintiffs' counsel are appointed as co-lead counsel as outlined in their

Memorandum of Law, subject to future objections.[2] An initial conference for this

---

[1]      *See* Plaintiffs' [Proposed] Case Management Order at 2 (proposed caption for consolidated case lists as plaintiffs "Anne E. Nelson, Robert S. Fash, Craig A. Harris, Michael Lonecke, and Raymond Duffy, individually and on behalf of all others similarly situated.").

[2]      *See* Memorandum of Law in Support of Plaintiffs' Motion to Consolidate Citigroup Cash Balance ERISA Cases and for Entry of the Case

6

consolidated action will be held on September 26, 2005 at 4:30 p.m.[3]

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
September 6, 2005

_____

Management Order at 5-6 (outlining the responsibilities of proposed lead counsel).

[3]    This conference replaces the currently-scheduled conference for
*Duffy v. Citigroup, Inc.* at the same date and time.

7

## -Appearances -

**For Plaintiffs:**

Edgar Pauk, Esq.
144 E. 44th Street, Suite 600
New York, New York 10017
(212) 983-4000

Brad N. Friedman, Esq.
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

William D. Frumkin, Esq.
399 Knollwood Road, Suite 310
White Plains, New York 10603
(914) 328-0366

Richard S. Schiffrin, Esq.
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**For Defendants:**

Myron Rumeld, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3021

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNE E. NELSON, ROBERT S. FASH, and CRAIG A. HARRIS, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE CITIGROUP PENSION PLAN, and THE PLANS ADMINISTRATION COMMITTEE OF CITIGROUP, INC., as Plan Administrator,<br><br>        Defendants. | Civil Action No. 05-CV-7272 (SS)<br><br>**CLASS ACTION** |

| | |
|---|---|
| Michael Lonecke, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>Citigroup Pension Plan, Plans Administration Committee of Citigroup, Inc., and Citigroup, Inc.,<br><br>        Defendants. | Civil Action No. 05-CV-5296 (SS)<br><br>**CLASS ACTION** |

1

|  |  |
|---|---|
| Raymond Duffy, Individually and On Behalf of ) All Others Similarly Situated, ) ) Plaintiff, ) ) v. ) ) CITIGROUP, INC., THE CITIGROUP ) PENSION PLAN, and the PLANS ) ADMINISTRATION COMMITTEE of ) CITIGROUP INC., ) ) Defendants. ) | **Civil Action No. 05-CV-6026 (SS)** <br><br> **CLASS ACTION** |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO CONSOLIDATE CITIGROUP CASH BALANCE ERISA CASES AND FOR ENTRY OF THE CASE MANAGEMENT ORDER

Plaintiffs Anne E. Nelson, Robert S. Fash, Craig A. Harris, Michael Lonecke, and Raymond Duffy (collectively "Plaintiffs") submit this Memorandum of Law in Support of Plaintiffs' Motion to Consolidate Citigroup Cash Balance ERISA cases and for entry of the Case Management Order.

### INTRODUCTION

The actions captioned above were filed against Citigroup, Inc. ("Citigroup" or the "Company"), Plans Administration Committee of Citigroup, Inc., and/or The Citigroup Pension Plan (the "Plan"), a defined benefit "cash balance" pension plan established and sponsored by Citigroup as a benefit for its employees (these cases are collectively referred to herein as the "ERISA cases"). All three actions are similar and arise from the creation, amendment and modification of the Plan and the resultant alleged violations of relevant terms of the Employee

2

Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs seek a monetary judgment, and declaratory and injunctive relief pursuant to section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.

Plaintiffs seek an order formally consolidating the ERISA cases, appointing a leadership structure for the consolidated case, and setting forth a preliminary schedule for the proceedings. Defendants have advised that they will not oppose this application.

## ARGUMENT

Given the substantial similarity of the parties and claims in the above-captioned actions, plaintiffs have followed the guidance of the *Manual for Complex Litigation, Third Edition* (2002) ("*Manual*") and submit for the Court's approval a proposed form of the Case Management Order which provides for the consolidation of these related actions; establishes efficient procedures for the filing and docketing of papers; proposes an organization of Plaintiffs' counsel; sets forth a preliminary schedule of proceedings; and otherwise eliminates wasteful and duplicative litigation.

Plaintiffs respectfully submit that the Case Management Order should be entered by the Court. The proposed order will not only promote the orderly and efficient conduct of this action, but is also consistent with the recommendations of the *Manual*.

- **A.    Consolidation of Related Actions**

According to the Federal Rules of Civil Procedure, "[w]hen actions involving a common question of law or fact are pending before the Court it may order a joint hearing or trial of any or all of the matters at issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delays." Fed. R. Civ. P. 42(a).

Consolidation of the above-captioned actions is demonstrably appropriate. Each action involves common questions of law and fact, namely allegations that the Plan violated ERISA's

minimum accrual standards, negatively affecting plaintiffs' and other plan participants' benefits under the Plan. Consolidating these cases will expedite pretrial proceedings and reduce duplicative efforts. Moreover, consolidation will streamline and simplify the discovery phase, pretrial motions (including class certification), and administrative management, as well as generally reduce the waste, confusion and delay that would inevitably arise from prosecuting related actions separately.

- **B.    Orderly Procedures for Captioning and Filing Documents**

In addition to providing for consolidation, the proposed order establishes orderly procedures for the captioning, filing and docketing of papers in these related actions, and in any cases that may hereafter be filed in or transferred to this Court. These procedures include the establishment of a uniform caption and master docket for the filing of documents relating to the consolidated actions.

Such procedures, designed to enhance efficiency, are particularly necessary and appropriate in complex class action litigation such as this. *See Manual* § 21.12.

- **C.    Organization of Plaintiffs' Counsel**

The Case Management Order further implements the procedures suggested by the *Manual* for complex, multi-party cases such as this by designating lead counsel for plaintiffs. See *Manual* § 20.22. Plaintiffs respectfully submit that such designation will promote the orderly progress of this litigation, and ensure that plaintiffs are able to prosecute this litigation in an efficient and coordinated fashion.

**D.    Proposed Co-Lead Counsel**

Plaintiffs propose the following as Lead Counsel:

**Edgar Pauk**[1]
144 East 44th Street, Suite 600
New York, New York 10017
Telephone: (212) 983-4000
Facsimile: (212) 808-9802

  and

**Milberg Weiss Bershad & Schulman LLP**[2]
One Pennsylvania Plaza
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

**E. Responsibilities of Co-Lead Counsel**

As suggested by the *Manual*, plaintiffs' Co-Lead Counsel, in full consultation with Co-

Executive Counsel for Plaintiffs, is charged with the responsibility for the day-to-day conduct of

the litigation and for carrying out the Orders of the Court concerning the conduct of the

litigation. Indeed, plaintiffs' Co-Lead Counsel is:

> charged with major responsibility for formulating (after consultation with
> other counsel) and presenting positions on substantive and procedural
> issues during litigation, …[for] presenting written and oral arguments and
> suggestions to the court, working with opposing counsel in developing and
> implementing a litigation plan, initiating and organizing discovery
> requests and responses, conducting the principal examination of
> deponents, employing experts, arranging for support services, and seeing
> that schedules are met.

*Manual* at § 20.221. Plaintiffs' Co-Lead Counsel is also charged with responsibility for

monitoring the time and expenses of all plaintiffs' counsel to ensure that this litigation is

conducted efficiently and without duplication. Defendants reserve their right to object to any

application for fees and/or costs, inter alia, for failure to satisfy this condition.

---

[1] *See* resume of Edgar Pauk, attached as Exhibit A hereto.
[2] *See* firm resume of Milberg Weiss Bershad & Schulman LLP attached as Exhibit B hereto.

Co-Lead Counsel, in order to fully utilize the resources and expertise of all Plaintiffs'

counsel and effectively and efficiently prosecute this consolidate action, shall perform each of

the above duties in full consultation with Co-Executive Committee Counsel for Plaintiffs.

**F.      Proposed Co-Executive Committee Counsel**

Plaintiffs propose the following as Co-Executive Committee Counsel:

**Sapir & Frumkin LLP**[3]
399 Knollwood Road, Suite 310
White Plains, New York 10603
Telephone: (914) 328-0366
Facsimile: (914) 682-9128

and

**Schiffrin & Barroway, LLP**[4]
6135 Barfield Road, Suite 101
Atlanta, Georgia 30328
Telephone: (404) 847-0085

**G.      Responsibilities of Co-Executive Committee Counsel**

Plaintiffs' Co-Executive Committee Counsel shall aid, counsel and consult with Co-Lead

Counsel in the fulfillment of the latter's duties and responsibilities as described above. Further,

Plaintiffs' Co-Executive Committee shall assist the Lead Counsel in facilitating coordination and

communications among counsel for the parties and with the Court and otherwise assist in the

coordination of discovery, presentations at pretrial conferences, and other pretrial activities.

As set forth herein, and as demonstrated by their attached firm resumes, proposed Co-

Lead and Co-Executive Committee Counsel have substantial and extensive experience in

complex litigation such as this, and have successfully represented plaintiffs in ERISA and other

complex class action litigation throughout the nation.

---

[3] *See* Sapir & Frumkin LLP firm resume, attached as Exhibit C hereto.
[4] *See* Schiffrin & Barroway, LLP firm resume, attached as Exhibit D hereto.

**H.    Preliminary Schedule of Proceedings**

Finally, the proposed Case Management Order provides for Plaintiffs to file a Consolidated Complaint within 14 days of entry of the Case Management Order and for Defendants to answer or otherwise respond to the Consolidated Complaint within forty-five (45) days of the date the Consolidated Complaint is served on them. In the event defendants file a motion directed at the Consolidated Complaint, the Case Management Order requires that the parties shall meet and confer regarding a schedule for opposition and reply briefing and submit a proposed schedule for the Court's approval.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court consolidate these cases and enter the proposed Case Management Order.

DATED:  August 23, 2005

Respectfully submitted,

By:  _____/s_____
EDGAR PAUK (EP 1039)
144 East 44th Street, Suite 600
New York, New York 10017
Phone: (212) 983-4000
Facsimile: (212) 808-9808

7

MILBERG WEISS BERSHAD &
SCHULMAN, LLP


By: _____/s_____ _____
            Brad N. Friedman (BF-9309)
One Pennsylvania Plaza
New York, New York  10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

**[Proposed] Co-Lead Counsel for Plaintiffs**


William D. Frumkin (WF 2173)
399 Knollwood Road, Suite 310
White Plains, New York 10603
Telephone:  (914) 328-0366
Facsimile:  (212) 868-1229

Richard S. Schiffrin
Joseph H. Meltzer
Edward W. Ciolko
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, Pennsylvania  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**[Proposed] Co-Executive Committee
Counsel for Plaintiffs**

8

- 9 -

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                        :

In re CITIGROUP PENSION PLAN     :
ERISA LITIGATION                  :
                        :
                        :
                        :

THIS DOCUMENT RELATES TO:    :
ALL ACTIONS                    :
------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/20/07

**OPINION AND ORDER**

**MASTER FILE:  05 Civ. 5296
(SAS)**

## I.  INTRODUCTION

Michael Lonecke, Raymond Duffy, Anne Nelson, Robert S. Fash, and

Craig A. Harris, on behalf of themselves and a class of similarly situated

individuals ("plaintiffs"), filed consolidated actions against Citigroup Inc. and its

Plans Administration Committee ("defendants") alleging that the Citibuilder Cash

Balance Plan (the "Plan") violates the Employee Retirement Income Security Act

of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*  This ruling assumes

familiarity with the Court's previous ruling on the parties' cross-motions for

summary judgment.[1]   By Opinion and Order, the Court granted summary

judgment in plaintiffs' favor on Counts I, III, V, and VII of their Consolidated

---

[1]    *See In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323
(S.D.N.Y. 2006) ("*Citigroup I*").

Class Action Amended Complaint ("Complaint"), denied defendants' motion for summary judgment, and directed defendants to reform the Plan to comply with ERISA. This Court also granted plaintiffs' motion for class certification.[2]  On April 4, 2007, this Court denied defendants leave for an interlocutory appeal and clarified certain aspects of its summary judgment ruling.[3]  Now pending before the Court is plaintiffs' application requiring defendants to undertake certain remedial remedies.

## II.    BACKGROUND

Plaintiffs claim that the Plan fails to comply with ERISA's minimum accrual requirements.  Article 4.1(e) of the Plan provides that if a payout fails to comply with ERISA's accrual requirements, an additional amount sufficient to satisfy ERISA's "fractional test" would be paid.[4]  Participants in the Plan were notified in December 1999 (the "December 1999 § 204 Notice") that there would be changes in the Plan, but the mechanism underlying Article 4.1(e) was not explained.  A subsequent notice was sent in December 2000 (the "December 2000

---

[2]    *See In re Citigroup Pension Plan ERISA Litig.*, 241 F.R.D. 172 (S.D.N.Y. 2006).

[3]    *In re Citigroup Pension Plan ERISA Litig.*, No. 05 Civ. 5296, 2007 WL 1074912 (S.D.N.Y. Apr. 4, 2007) ("*Citigroup II*").

[4]    *See* Plan Article 4.1(e), Ex. 1 to Joint Stips.

§ 204 Notice," and collectively, the "Notices"), but this notice also failed to explain Article 4.1(e).

Plaintiffs allege in Counts I and II, respectively, that the Plan is impermissibly backloaded due to insufficient interest credits and that even if this backloading is cured, the Plan will produce an illegal accrual phenomenon known as a "whipsaw." In Count III, plaintiffs allege that the Plan's "fractional test" method of computing accrued benefits is precluded under ERISA and, in the alternative, the test is being wrongfully applied. In Counts IV and V, plaintiffs allege that the Plan discriminates based on age. Count VI has been withdrawn. In Count VII, Plaintiffs allege that defendants failed to provide Plan participants proper notice that the 2000 and 2002 cash balance amendments ("CBAs") would reduce the rate of future benefit accrual.

On August 25, 2006, the parties filed cross-motions for summary judgment on all counts. On December 11, 2006, this Court held that the Plan violated the requirements of section 204(b)(1) of ERISA and therefore granted plaintiffs' motion with regard to Counts I and III. This Court also held that the Notices failed to satisfy ERISA's notice requirements in that they did not describe the non-traditional method of complying with ERISA's accrual requirements contained in Article 4.1(e), and therefore granted plaintiffs' motion with regard to

3

Count VII. Finally, this Court held that the Plan was age discriminatory and therefore granted plaintiffs' motion with regard to Count V.

## III.  APPLICABLE LAW

### A.  Standard of Review

Section 502(a)(3) of ERISA permits any participant, beneficiary, or fiduciary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ."[5] This section "does not require district courts to grant particular relief; rather, it affords district courts the discretion to fashion appropriate equitable relief . . . ."[6]

### B.  Violations of the 133 1/3% Rule (Counts I, III)

As discussed in *Citigroup I*, the Plan is a cash balance plan, which is classified in this circuit as a defined benefit plan for ERISA purposes.[7] ERISA requires defined benefit plans to accrue benefits at a certain rate, and while it

---

[5]     29 U.S.C. § 1132(a)(1)(3).

[6]     *McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund*, 320 F.3d 151, 161 (2d Cir. 2003).

[7]     *See Citigroup I*, 470 F. Supp. 2d at 332.

4

provides three tests for determining whether benefit accrual is permissible, only one of those tests, the 133 1/3% Rule, is applicable to the Plan.[8]  Under the 133 1/3% Rule, a plan generally must provide that in no year may the participant accrue benefits that exceed 133 1/3% of the benefits accrued in any previous year.[9]

### C.    Whipsaws

ERISA requires that a participant's accrued benefits under a cash balance plan not fall below the actuarial equivalent of the participant's account.[10] Thus, a participant's accrued benefits are valued in terms of the annuity that those benefits would yield at retirement age.  If a participant receives that benefit earlier or in another form, the received benefit must be at least as valuable as that annuity.[11]  ERISA provides that the actuarial equivalent is determined by projecting the participant's account balance forward using the plan's stated "projection interest rate" and then discounting that number back to its present value using a statutory interest rate.[12]

---

[8]    *See id.* at 337; 29 U.S.C. § 1054(b)(1)(B).

[9]    ERISA § 204(b)(1)(B); 29 U.S.C. § 1054(b)(1)(B).

[10]    *See Citigroup I,* 470 F. Supp. 2d at 334-35.

[11]    *See Esden,* 229 F.3d at 163-64.

[12]    *See id.* at 159.  This provision ensures that where a plan offers an interest rate higher than the statutory rate, a participant who exits the plan before

5

Therefore, because the interest rate at which the account is projected forward is not necessarily the same as the rate used to discount the future sum back to its present value, the present value of an accrued benefit is not necessarily the same as the nominal dollar value of the benefit. If the projection interest rate exceeds the statutory interest rate, the actual value of an accrued benefit will exceed its nominal value. If such a plan awards participants the nominal value instead of the actual value, it violates ERISA.[13]

### D.    Age Discrimination (Count V)

ERISA requires that a defined benefit plan not reduce the "rate of an employee's benefit accrual . . . because of the attainment of any age."[14] In *Citigroup I*, this Court found that cash benefit plans violate this rule.[15] Under a

---

retirement benefits from that higher rate.

[13]     For example, assuming a 10% projection rate, a 8% statutory interest rate, and annual compounding, a $1000 nominal benefit has a present value of $1096.09 if the participant is sixty years old. This discrepancy arises because the $1000 is projected forward at a 10% rate for five years, to $1610.51, and then discounted at an 8% rate for five years, to $1096.09. If the participant exits the plan and receives only the nominal benefit, the participant has been illegally deprived of $96.09. This phenomenon is known as a "whipsaw." Of course, if the projection rate were the same as the statutory interest rate, the present value would be $1000.

[14]     ERISA § 204(b)(1)(H)(I), 29 U.S.C. § 1054(b)(1)(H)(i).

[15]     *Citigroup I*, 470 F. Supp. 2d at 340-45.

cash benefit plan, a participant's account is credited with a certain sum each year. The account also benefits from interest that accrues at a certain rate each year. Because a younger worker benefits from more time to earn interest than an older worker, an annual contribution is worth more to the younger worker than the equivalent contribution made to the older worker.

### E.    Ineffective Notice (Count VII)

A plan cannot be amended "in a way that reduces future benefit accruals without notice to plan participants."[16] The Second Circuit has explained that amendments to an ERISA plan become effective "at the moment when employees are properly informed" of the amendment.[17] In *Citigroup I*, this Court ruled that the Notices "never took legal effect" to the extent that they failed to disclose Article 4.1(e), which was an atypical and unanticipated method for addressing ERISA's minimum accrual rules.[18]

## IV.    DISCUSSION

### A.    Remedy for Minimum Accrual Violations

---

[16]    *Frommert v. Conkright*, 433 F.3d 254, 263 (2d Cir. 2006). *See also* ERISA § 204(h), 29 U.S.C. § 1054(h).

[17]    *Frommert*, 433 F.3d at 262-63.

[18]    *Citigroup I*, 470 F. Supp. 2d at 340.

7

As discussed in *Citigroup I*, the Plan violates the 133 1/3% Rule.[19] Plaintiffs and defendants agree that the proper remedy for the Plan's violation of the 133 1/3% Rule is the increase of payment credits as necessary to bring the Plan in compliance with the rule.[20] This proposal best ensures that participants in the Plan receive the benefits to which they are entitled. As a result, this Court orders defendants to increase pay credits as required.[21] To avoid further violation of ERISA, the Plan must make additional payments as required to avoid whipsaws.

Article 4.1(e) of the Plan provides that if a participant exits the Plan and the accrual would otherwise violate ERISA's accrual restrictions, the participant is entitled to an additional amount sufficient to bring the payment into compliance with ERISA's fractional rule.[22] Plaintiffs argue that the Court should award additional amounts to those participants who would have received them under Article 4.1(e) had the Court not ordered reformation of the plan.[23] However, by its terms, Article 4.1(e) only operates when a participant would otherwise

---

[19]    *Id.* at 337-38.

[20]    *See* Plaintiffs' Submission Regarding Remedies ("Pl. Sub."), at 2; Defendants' Memorandum Concerning Appropriate Equitable Remedies, at 13.

[21]    *See* Table Regarding Increases in Benefit Accrual, Ex. B to Pl. Sub.

[22]    *See* Plan Article 4.1(e), Ex. 1 to Joint Stipulations.

[23]    *See* Pl. Sub. at 4.

8

receive a sum insufficient to satisfy ERISA's minimum accrual requirements.[24]

Because the Court now orders that the Plan be reformed such that it complies with

those requirements, all participants will now receive payments that satisfy ERISA.

As a result, Article 4.1(e) is now irrelevant.[25] Any further award would be a

punitive measure that would violate both the intention and the language of that

Article.

**B.    Remedy for Notice Violations**

This Court held that the 2000 and 2002 CBAs "never took legal

effect" to the extent that they included the atypical benefit accrual system

described in Article 4.1(e).[26] Because participants did not receive fair notice of the

unorthodox (and illegal) approach taken by that article and by the Plan, they had

---

[24]    Plan Article 4.1(e).

[25]    In *Citigroup I*, I held that Article 4.1(e) never took effect because participants did not receive adequate notice of its addition to the plan. *Citigroup I*, 470 F. Supp. 2d at 339-40. However, ERISA provides that in the case of an "egregious failure" to provide adequate notice of an amendment, participants are entitled to receive the greater of what they would have received with and without the amendment. *See* ERISA § 204(h)(6), 29 U.S.C. § 1054(h)(6). This provision became effective on June 7, 2001, but plaintiffs argue that it was "implicit" before that date. *See* Pl. Sub. at 11 n.8. Because I find that plan participants are not entitled to any additional amounts under Article 4.1(e) even if it were effective, I need not determine whether plaintiffs' construction of the pre-June 7, 2001 statute is correct.

[26]    *Citigroup I*, 470 F. Supp. 2d at 340.

9

no reason to expect that their benefits would not accrue in accordance with
ERISA's requirements. Plan participants rightfully expected that their benefits
would accrue in accordance with the 133 1/3% Rule, and the Notices did not
inform them otherwise.

As discussed above, the Court now orders that the Plan retroactively
reform the accrual system to comply with the 133 1/3% Rule. Therefore, because
of the required reform, no further remedy is required.

## C.    Remedy for Age Discrimination Violations

This Court found that cash benefit plans such as the Plan discriminate
based on age in violation of ERISA.[27] Defendants argue that retroactive relief on
this count is inappropriate because it would impose a severe burden on the Plan, it
is unnecessary to ensure future compliance with ERISA, and its action appeared
reasonable at the time.

I note that several courts have disagreed with this Court's holding
that cash benefit plans discriminate based on age in violation of ERISA.[28] Indeed,

---

[27]    *Id.* at 343-44.

[28]    *See Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56 (3d Cir.
2007); *Drutis v. Rand McNally* & Co., No. 06 Civ. 6380, 2007 WL 2409762 (6th
Cir. Aug. 27, 2007); *In re J.P. Morgan Chase Cash Balance Litig.*, No. 06 Civ.
732, 2006 WL 3063424 (S.D.N.Y. Oct. 30, 2006); *Richards v. FleetBoston,* 427 F.
Supp. 2d 150 (D. Conn. 2006).

this issue is currently on appeal before the Second Circuit.[29]  In light of this

pending appeal, and in the interests of judicial economy, I reserve my rulings on

the proper remedy (if any) for the Plan's violation of ERISA's ban on age

discrimination.

---

[29]     *See Hirt v. Equitable Retirement Plan for Employees, Managers and Agents,* 441 F. Supp. 2d 516 (S.D.N.Y. 2006), *appeal docketed,* No. 06 Civ. 4757 (2d Cir. 2006).

## V.    CONCLUSION

Defendants are hereby directed to reform the Plan in accordance with this Court's rulings. The parties shall confer to determine how best to notify class members of this ruling and the pending ruling regarding plaintiffs' age discrimination claim, the expense of which shall be borne by defendants.[30] The parties shall determine whether different notices are appropriate for current and former Plan participants. Communications from defendants to members of the plaintiff class that concern this lawsuit shall be submitted to this Court for approval, on notice to plaintiffs' counsel. This Court will direct further relief when and if appropriate. A conference is scheduled for Friday, December 7, 2007, at 4:30pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          November 20, 2007

---

[30]    Plaintiffs' counsel has suggested that a paycheck insert might be an appropriate method of notification.

12

– **Appearances** –

**For Plaintiffs:**

Edgar Pauk, Esq.
144 E. 44th Street, Suite 600
New York, New York 10017
(212) 983-4000

Brad N. Friedman, Esq.
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

William D. Frumkin, Esq.
Sapir & Frumkin LLP
399 Knollwood Road, Suite 310
White Plains, New York 10603
(914) 328-0366

Richard S. Schiffrin, Esq.
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**For Defendants:**

Myron Rumeld, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3021

13

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KATHI COOPER, BETH HARRINGTON,  )
and MATTHEW HILLESHEIM,         )
Individually and on Behalf of All Those )
Similarly Situated,             )
                                )
            Plaintiffs,          )
                                )
vs.                             )     **CIVIL NO. 99-829-GPM**
                                )
THE IBM PERSONAL PENSION PLAN   )
and IBM CORPORATION,            )
                                )
            Defendants.          )

## MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

This matter is before the Court on Class Counsel's Motion for Award of Attorneys' Fees,

Costs and Incentive Awards ("Fee Request") (Doc. 352). Based upon the entire record in this case,

including the objections and other comments filed by the Class Members and the arguments

presented at the hearing held on August 8, 2005, the Court finds and orders as follows:

This litigation started November 1, 1999, and will continue for at least another year as the

parties continue to litigate two of the central issues before the United States Court of Appeals and

potentially the United States Supreme Court. IBM's 1995 implementation of a pension equity

formula and its 1999 implementation of a cash balance formula raise six difficult and novel issues.

It was clear when this case was filed that it would be hard fought and was likely to be ultimately

resolved by the Court of Appeals for the Seventh Circuit or perhaps the United States Supreme

Court. In fact, early in the case the Court observed at an oral argument that "I understand . . .

whatever I do here will be reviewed *de novo* in the Court of Appeals. And of the cases I have handled here, I believe that this case has the best chance of ending up in the United States Supreme Court. . . ." Transcript of Oral Arg. at 4:23-5:8 (Dec. 17, 2002).

On September 17, 2001, this Court certified the case as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of three Subclasses. Subclass 1 consists of Class Members who accrued benefits under the Pension Credit Formula adopted by the Plan effective January 1, 1995, but did not accrue any benefits under the Cash Balance Formula adopted by the Plan effective July 1, 1999. Subclass 2 is comprised of Class Members who accrued a benefit under the Cash Balance Formula adopted by the Plan effective July 1, 1999. There are more than 250,000 members of Subclasses 1 and 2. Subclass 3 consists of approximately 15,000 individuals who were participants in the Plan as of July 1, 1999, but did not complete five years of service such that they did not vest in their Plan benefit. The Subclass 3 claims were settled under the terms of a Settlement Agreement approved by the Court on January 10, 2005 (*see* Docs. 287, 288). IBM subsequently filed an interlocutory appeal challenging the certification of the case as a class action. This appeal was denied by the United States Court of Appeals for the Seventh Circuit. *See Cooper v. IBM*, No. 01-8034 (7th Cir. Nov. 19, 2001).

This Court is familiar with the complex and novel issues involved in this case, as well as the work of Class Counsel in prosecuting the claims for more than five years of this hard-fought litigation. This prosecution has included extensive discovery, expert witness depositions, and voluminous briefing on all of the factual and legal issues, as well as numerous court hearings.

On May 18, 2005, the parties entered into a Settlement Agreement ("Settlement"). Following a hearing on August 8, 2005, the Court approved that Settlement as fair and reasonable

and in the best interests of the Class following the required notice to Class Members.

The Settlement requires IBM to amend the Plan to provide additional pension benefits to eligible members of the Class which, when added to the amount of attorneys' fees awarded by the Court to Class Counsel, will total in value $314,293,000 as of November 1, 2006. While the Settlement provides that Defendants will appeal the Court's decision regarding liability on the Cash Balance Claim and the Always Cash Balance Claim, the Settlement resolves the issues regarding the remedies that should be awarded with respect to these claims in the event this Court's rulings are upheld on appeal. IBM agrees that if the Court's liability ruling in favor of the Class on the Always Cash Balance Claim is upheld on appeal, the Plan will be amended to provide additional pension benefits. The additional value of those benefits, including the attorneys' fees awarded by the Court to Class Counsel in connection with that claim, will be $620,000,000 (in addition to the guaranteed amount of $314,293,000). IBM also agrees that if the Court's liability ruling in favor of the Class on the Cash Balance Claim is upheld on appeal, the Plan will be amended to provide additional pension benefits which, along with the attorneys' fees awarded by the Court to Class Counsel in connection with that claim, will total $1,714,293,000.

Notably, the Settlement provides that any benefit provided to a participant as a result of the Settlement Agreement is an independent Plan obligation separate, apart from, and in addition to any other benefit accrued by a participant before the Settlement Date under the Cash Balance Formula, the Pension Credit Formula, or any formula under any other employee pension benefit plan sponsored by IBM. In addition, any pension benefit a participant would otherwise accrue under any Plan formula, or any other employee pension benefit plan sponsored by IBM based on service after the Settlement Date, will not be reduced or offset by and will not wear away any participant's

Settlement Benefit. Finally, IBM waives any defense or right to assert any precedent or policy that might preclude or prohibit the entry of retroactive relief.

Class Counsel seeks fees on a decreasing percentage as follows: (1) an amount equal to 29% of the amount of any Settlement Benefits recovered up to $250 million; (2) an amount equal to 25% of the amount of any Settlement Benefits recovered in excess of $250 million up to the amount of $750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $750 million up to the amount of $1,250 million; and (4) an amount equal to 17% of any Settlement Benefits recovered in excess of $1,250 million. If the Class prevails on all claims, the blended fee produced by the above percentages is 22.25%. Class Counsel also requests incentive awards of $40,000 for Ms. Cooper and $20,000 for Ms. Harrington to be paid out of the attorneys' fees and costs award. Class Counsel is not requesting any additional recovery to reimburse them for the expenses they already have incurred or will incur in the future but have agreed to reimburse themselves for those costs out of whatever fees are awarded by this Court.

In considering Class Counsel's Fee Request, this Court is guided by the numerous decisions of the Seventh Circuit requiring the Court to do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"); *see also Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (directing district court to determine fair attorneys' fees in class action by considering the probability of success at the outset of the litigation); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible."). Where, as here, it is "impossible

to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. Aon Corp.*, No. 04-3140, 2005 WL 1560331, at *1 (7th Cir. July 5, 2005).

Based on the evidence before the Court regarding the market for class counsel in cases of this type and a long line of ERISA decisions, it is appropriate to award Class Counsel a percentage of recovery fee in this case. *Florin*, 34 F.3d at 563; Mark Berlind, Attorney's Fees under ERISA: When is an Award Appropriate?, 71 Cornell L. Rev. 1037, 1060-61 (1986) ("Applying the common benefit doctrine reflects the statute's purpose. . . . Nothing in ERISA indicates that Congress intended to preempt the common benefit doctrine."). As the Ninth Circuit stated in *Staton v. Boeing Company*, 327 F.3d 938, 967 (9th Cir. 2003), "We conclude, as have the two other circuits that have addressed the issue, that there is no preclusion on recovery of common fund fees where a fee-shifting statute applies." *Citing Brytus v. Spang & Co.*, 203 F.3d 238, 246-247 (3rd Cir. 2000); *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998). This reasoning is appropriate here, where an award of attorneys' fees under ERISA's fee-shifting statute is not automatic and depends upon a variety of factors. *See, e.g., Quinn v. Blue Cross & Blue Shield Ass'n.*, 161 F.3d 472, 478 (7th Cir. 1998).

The Seventh Circuit has indicated that "the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court." *Florin*, 34 F.3d at 566. In exercising that discretion, the Seventh Circuit has noted that in common fund/benefit cases, "the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case." *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000); *see*

*also In re Continental Illinois Securities Litig.*, 985 F.2d 867 (7th Cir. 1992). Thus, "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class," particularly where that percentage of the benefit approach replicates the market. *Williams v. General Elec. Capital Auto Lease*, No. 94-C-7410, 1995 WL 765266, *9 (N.D. Ill. Dec. 26, 1995); *see also Long v. Trans World Airlines, Inc.*, 1993 WL 121824, *1 (N.D. Ill. Apr. 19, 1993). Here, a percentage of the benefit approach clearly best replicates the market.

The uncontested evidence in this case is that Plaintiffs could not afford to retain counsel on any basis other than a contingent fee. Cooper Dec. at ¶ 3. Class representative Kathi Cooper attests that she would not have hired Class Counsel on an hourly basis. *Id.* There is no reason to believe that any other Class Member would have been willing to pay hourly fees in the hope that the case would be successful and the fees paid ultimately recovered from IBM. Class Counsel, nationally recognized experts in ERISA pension benefit cases, attest that they have not and would not accept a similar case on any basis other than a contingency fee basis. Sprong Aff. at ¶ 6. The record before the Court establishes that no other capable counsel was willing to take the case on any basis. Cooper Dec. at ¶ 5; Carr Dec. at ¶¶ 8-14; Lewis Dec. at ¶¶ 11-14. Thus, the undisputed evidence is that the market for legal services for this litigation is a contingency fee. In fact, even the vast bulk of the objectors do not disagree that a percentage of the recovery approach is appropriate in this case, they merely dispute the appropriate percentage.

In determining what an appropriate percentage should be in the unique circumstances of this case, the Court has considered a number of factors. Class Counsel submitted affidavits and briefs setting forth a large number of other large ERISA class actions in which counsel have been awarded fees similar to or greater than the percentages requested here. In addition, this Court is personally

familiar with fees in a significant number of relatively similar cases that have been awarded in this District, and the Fee Request in this case is below the amount in many of those cases in spite of the fact that this case involved similar—or in all likelihood far more—risk.

While not dispositive, attorneys' fees from analogous class action settlements are indicative of what the market is for such representation and, therefore, what an appropriate fee should be here. As this Court noted in awarding Class Counsel 29% of the recovery in connection with the settlement of the claims on behalf of the Subclass 3 members, "we have a pretty substantial body of case law now built up on these complex cases and it seems as if 30 percent is just about the bench mark." Transcript of Final Approval Hearing, Subclass 3, at 4:9-11 (Jan. 1, 2005). Similarly, the Court notes that the Affidavit of Jeffrey Lewis, a nationally recognized expert in prosecuting complex ERISA litigation, indicates that his firm has regularly been awarded fees in the neighborhood of 25% of the recovery. Lewis Dec. at ¶ 17. Importantly, as Mr. Lewis's affidavit makes clear, those awards occurred in cases with substantially less risk than here. As Mr. Lewis attests, due to the extreme risk in this case, his firm declined to bring it or any other case raising these issues until after this Court's July 31, 2003 Order. Lewis Dec. at ¶ 14. The Court has reviewed the Declaration of Stephen Susman, a prominent trial counsel with vast experience in complex litigation, who attests that if he had been asked to undertake this case for an individual client or group of clients on a nonclass basis, he would have done so only if they had agreed to pay his expenses and also his standard 33 1/3 contingent fee. Susman Dec. at ¶ 6.

The Seventh Circuit's recent decision in *Taubenfeld v. Aon* indicates that it is also appropriate to consider the "quality of legal services rendered and the contingent nature of the case." *Taubenfeld*, No. 04-3140, 2005 WL 1560331, at *3. The quality of the legal work of all counsel in

this case has been exemplary. The quality of Class Counsel's legal work both in and out of the courtroom is ably demonstrated by the benefits conferred on the Class as a result of the Settlement. Even if the Class were to lose both of the issues on appeal, the Settlement would be one of the largest pension settlements in the nation's history. And in the event that the Class prevails on either or both of the issues on appeal, the Settlement is likely to be the largest pension settlement in history.

It is clear that the Settlement represents a solid achievement in terms of the benefits it provides Class Members compared to what they could have achieved by further litigation. For example, as noted by Defendants in their moving papers seeking approval of the Settlement, Class Counsel not only achieved record-breaking additional benefits for the Class but also achieved a "valuable guarantee that plaintiffs could not have obtained in litigation—an assurance from defendants that they will not offset or 'wear away' the supplemental benefits provided by the Settlement against pension benefits earned for future service to IBM." (*See* Doc. 353 – Defendants' Memorandum in Support of Joint Motion for Approval of Settlement – at 6.) While it is an extremely valuable benefit to the Class Members, it is not, as a mathematical matter, reflected in the value of the recovery, but it warrants consideration.

The degree of risk of nonpayment in this case was high at the outset. It is undisputed that at the time Class Counsel initiated this action no other qualified counsel in the country would do so. When this case was commenced in 1999, only two courts had considered legal challenges to cash balance plans, and both decisions were summary judgment orders rejecting the plaintiffs' claims. *See Esden v. Retirement Plan of the First National Bank of Boston*, 182 F.R.D. 432 (D. Vt. 1999); *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 66 F.Supp.2d 1328 (N.D. Ga. 1999).

Shortly after this case was filed, another district court rejected a claim that cash balance plans violate ERISA § 411(b)(1)(H). *See Eaton v. Onan Corp.*, 117 F.Supp.2d 812 (S.D. Ind. 2000). To date, Class Counsel are the only attorneys in the country who have prevailed on the claim that a pension equity formula or a cash balance plan formula violates ERISA § 411(b)(1)(H).

The Court is also aware from the voluminous briefing in this case that there was not only a high degree of risk in the litigation context, but there was also considerable additional risk that either regulatory or legislative action might eliminate any potential for success in the courtroom. In short, there can be no question that the risk of nonpayment in this case was extraordinarily high, much higher than in the other large pension cases of which this Court is aware. In addition to facing an uphill legal and political battle, it was equally clear that anyone representing Plaintiffs would be required to overcome a well-financed adversary and prominent defense counsel with abundant financial and legal resources at their disposal.

In determining an appropriate percentage of the recovery to award, this Court is mindful of the directive in *Synthroid I* that,

> the district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed). The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers *never* wait until after recovery is secured to contract for fees.

*Synthroid I*, 264 F.3d at 718 (emphasis in original).

All of the evidence before the Court indicates that in the event the IBM employees had been required as a group to negotiate the terms of a fee contract with Class Counsel at the outset of the

case, the fee percentage contained in the resulting contract would have been equal to—and more likely higher than—the Fee Request before this Court.

This Court has also considered data from so-called class-counsel auctions. The Court notes that in *In re: Synthroid Marketing Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*"), the Seventh Circuit indicated that the sophisticated third-party payors (the insurance companies) in that case negotiated a flat 22% rate even after the risk of the litigation had passed and a recovery was assured. 325 F.3d at 976, 978 (explaining the 22% rate was agreed to "after a good deal of the risk had been dissipated" and that the TPPs still "had to offer 22% to sign up lawyers on a contingent fee."). To apply the rationale of that case to the circumstances of this case, the Court must take into consideration the notable differences between the auctions conducted in the securities field where literally dozens of skilled and experienced law firms battle each other to represent the class and typically base their cases on long established legal precedents and the situation present here.

As nationally known pension lawyer Jeffrey Lewis attests, there are only a handful of lawyers in the country who have the expertise and background to practice in this area (compared to the thousands of attorneys who practice securities litigation), and none of them was willing to undertake the risk of pursuing cases challenging cash balance plans in 1999 or for years thereafter. Lewis Dec. at ¶¶ 12-14. The evidentiary record also demonstrates that several of the best and most prominent employment firms in the country specifically refused to take the case on behalf of the IBM employees on any terms. Carr Dec. at ¶¶ 8-13. Similarly, Mr. Susman attests that "if the Court had held an auction at the beginning of this case for qualified counsel to undertake this litigation, no qualified firm would have proposed a fee structure below what Class Counsel is requesting in this case." Susman Dec. at ¶ 8; *see also* Carr Dec. at ¶ 14.

Based on all the evidence and testimony, the Court concludes that if an "auction" had in fact taken place, Class Counsel would have been the only bidder and, in light of the risk then involved, would have extracted a far higher fee that they are now requesting. Thus, the undisputed evidence before this Court indicates that under the standards enunciated in *Synthroid I* and *Synthroid II*, Class Counsel's Fee Request (inclusive of costs) is at or below what application of an "auction" scenario would have determined.

Class Counsel will be required to continue to litigate the two central issues in this case for an indefinite period of time. Not only will that involve additional time and expense, but it also involves additional risk. This is a unique factor in this case and merely emphasizes the reasonable nature of the Fee Request, as any counsel negotiating a fee contract at the outset of the litigation would certainly have taken the potential for appellate litigation into consideration in setting a fee in light of the very novel issues involved in this case.

In analyzing the appropriate fee to be awarded to Class Counsel, the Court has also given careful consideration to the objections that have been filed with the Court regarding the Fee Request. The most notable aspect of those objections is how few were filed. Although more than 272,000 potential Class Members were notified by first class mailing, only 45 objected to the Fee Request in any fashion. This is particularly remarkable in light of the sophistication of the Class Members and the high degree of interest in this litigation by the Class Members as evidenced by the fact that the website IBM established to provide additional information regarding the Settlement to Class Members received more than 38,000 visits. A significant number of the objections to the Fee Request (33 out of the total of 45) are individuals who have filed letters indicating that they agree with a longer statement of objection filed by Mr. Leas. Apparently Mr. Leas's statement was widely

circulated on the internet in an effort to solicit additional objections agreeing with his point of view.

Putting aside the mischaracterizations and inaccuracies regarding both the Class claims and the Settlement in Mr. Leas's objection, his objection ignores any consideration of the controlling Seventh Circuit authority. Instead, it relies almost totally on information Mr. Leas selectively culls from a law review article reporting on a statistical study of class action fee awards. Putting aside the limitations of that study and the potential for distortion when one tries to apply it to arrive at an appropriate fee in this case under the proper Seventh Circuit standards, when one closely examines the article for cases in the category applicable here (the over $190 million decile), the mean fee percentage was 16.4%, the median was 17.6%, and the standard deviation was 9.6%. Applying those percentages here, a fee award of 26% on a $929 million recovery would be presumptively reasonable, and an award of up to 35.6% potentially could be reasonable, depending on the complexity of the case and the risks involved. The study supports the reasonableness of the Fee Request, considering the risk and complexity of this case.

It is plain to see that Class Counsel greatly benefit from a contingent fee scheme. But this case could have ended differently in which event Counsel would have toiled for years having fronted the costs of the litigation for no reward whatsoever. In that event no one would argue that a contingent fee agreement along the lines approved here was unreasonable.

The Fee Request is unreasonable only if the result was likely from the outset, which is not the case. The motion for attorneys' fees, costs, and incentive awards (Doc. 352) is **GRANTED**. The Plan shall pay Class Counsel fees as an administrative cost of the Plan in accordance with the Settlement Agreement and calculated on a decreasing percentage as follows: (1) an amount equal to 29% of the amount of any Settlement Benefits recovered up to $250 million; (2) an amount equal

to 25% of the amount of any Settlement Benefits recovered in excess of $250 million up to the amount of $750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $750 million up to the amount of $1,250 million; and (4) an amount equal to 17% requested of any Settlement Benefits recovered in excess of $1,250 million. Class Counsel shall pay incentive awards of $40,000 to Ms. Cooper and $20,000 to Ms. Harrington out of the attorneys' fees paid by the Plan and shall also reimburse themselves for any expenses they already have incurred or will incur in the future out the attorneys' fees awarded by this Court.

Finally, for the reasons set forth on the record at the August 8, 2005 hearing, the final motion for settlement approval (Doc. 351) is **GRANTED**, and the Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: 08/16/05

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge

# EXHIBIT E

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| *IN RE CITIGROUP*<br>*ERISA LITIGATION* | )<br>)   **Case No. 03-CV-2932**<br>)<br>) |

# NOTICE OF CLASS ACTION SETTLEMENT

## YOUR LEGAL RIGHTS WILL BE AFFECTED IF YOU ARE A MEMBER OF THE FOLLOWING CLASS

All participants in the Citigroup Inc. ("Citigroup" or the "Company") 401(k) plan, and their beneficiaries, whose accounts included investments in Citigroup common stock or the Citigroup Common Stock Fund between December 14, 2001 and November 7, 2003 (the "Class").

**PLEASE READ THIS NOTICE CAREFULLY.**
**A FEDERAL COURT AUTHORIZED THIS NOTICE.**
**THIS IS NOT A SOLICITATION.**
**YOU HAVE NOT BEEN SUED.**

This Notice advises you of a proposed class action settlement (the "Settlement"). The Settlement provides for structural changes to the Citigroup Inc. 401(k) Plan (the "Plan") and the establishment of an investment education program to benefit participants who held Citigroup common stock in their Citigroup 401(k) accounts at any time between December 14, 2001 and November 7, 2003 (the "Class Period") and their beneficiaries. In addition, plaintiffs' counsel may apply to the Court for an award of attorneys' fees and expenses and compensation for the named plaintiffs not to exceed $1 million. The Settlement resolves a lawsuit over whether the defendants breached their fiduciary duties to the Plan and its participants in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"). You should read this Notice carefully because your legal rights are affected whether you act or not. The Settlement Agreement and additional information with respect to the Settlement are available on the Internet on the Citigroup Benefits Web Site at **https://mybenefits.csplans.com** and **www.citigrouperisasettlement.com.**

Judge Laura Taylor Swain of the United States District Court for the Southern District of New York has preliminarily approved the Settlement. Judge Swain also has scheduled a hearing for final approval of the Settlement on August 4 at 11 a.m. in Courtroom 17C, United States Courthouse, 500 Pearl Street, New York, NY 10007.

The procedure for objecting to this Settlement is described on page 7 of this Notice. Any objections to the Settlement or to plaintiffs' motion for attorney's fees and expenses and for compensation for the named plaintiffs must be served in writing on Counsel for the Class and on defendants' attorneys at the addresses listed on page 7 of this Notice.

## Your Legal Rights and Options Under the Settlement

| You can do nothing (No action is necessary to receive a benefit.) | You don't need to do anything to receive the benefit of the structural changes to the Plan and the investment education program. |
|---|---|
| | Upon final approval of the Settlement by the Court, Citigroup will, according to the Settlement's terms, effectuate the Plan's structural changes. Citigroup has also agreed to maintain an investor education program for two years after the Settlement is approved. Citigroup will provide explanatory materials to Plan participants before and during the implementation of the Settlement's terms. |
| | If the Court approves the Settlement, all members of the Class will be deemed to have released the claims asserted in the lawsuit and certain other claims against the defendants. |
| You can object | You can write to the Court if you don't think the Court should approve the Settlement. |
| You can go to a hearing | You can ask to speak in Court about the fairness of the Settlement. |

These rights and options, and the deadlines to exercise them, are explained in this Notice. The Court in charge of this case still has to decide whether to approve the Settlement. The structural changes to the Plan and the other terms of the Settlement will be implemented only if the Court approves the Settlement and that approval is upheld in the event of any appeals. Further information regarding the lawsuit and this Notice may be obtained by contacting Class Counsel at the following address:

Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA 19087
**www.sbclasslaw.com**

Class Counsel has established a toll-free telephone number, Web site, and e-mail address, which are listed at the bottom of each page, to receive your comments and questions. The Plan's Web site (listed below) also will contain information about the Settlement.

# Contents

**Basic Information**........................................................................................................**4**

1.    Why did I get this Notice? .............................................................. 4
2.    How do I get more information?..................................................... 4
3.    What is this lawsuit about? ............................................................ 4
4.    Why is this a class action? ............................................................. 5
5.    Why is there a Settlement? ............................................................ 5
6.    How do I know if I'm part of the Settlement? ............................... 5
7.    I'm still not sure if I'm included. .................................................. 5
8.    Can I exclude myself from the Settlement?................................... 5

**The Settlement Benefits: What You Get**..................................................**6**

9.    What does the Settlement provide?................................................ 6

**How You Get a Benefit** ......................................................................**6**

10.    How can I get my benefit?........................................................... 6
11.    When will I get my benefit?........................................................ 7

**The Lawyers Representing You** ........................................................**6**

12.    Do I have a lawyer in this case?................................................. 6
13.    How will the lawyers be paid?................................................... 7

**Objecting to the Settlement**..............................................................**7**

14.    What does it mean to object?...................................................... 7
15.    How do I tell the Court that I don't like the Settlement?............ 7

**The Court's Fairness Hearing** ..........................................................**7**

16.    How can I be heard at the Fairness Hearing? ........................... 7
17.    Do I have to go to the Fairness Hearing?.................................. 8
18.    May I speak at the Fairness Hearing?........................................ 8
19.    What happens if I do nothing at all? ......................................... 8

**Are There More Details About the Settlement?**....................................**9**

## Basic Information

### 1.    Why did I get this Notice?

You or someone in your family may have had units of the Citigroup Common Stock Fund (consisting primarily of Citigroup common stock) (the "Fund") in a Plan account at any time during the Class Period. The Court has directed the sending of this Notice because you have a right to know about a proposed Settlement of the lawsuit and about all of your options before the Court decides whether to approve the Settlement. If the Court approves the Settlement and after objections and appeals, if any, are resolved, the Plan administrators will make the changes to the Plan and adopt the investment education program for which the Settlement provides. In addition, members of the Settlement Class will be deemed to have released the claims asserted in the lawsuit and certain other claims against the defendants. This Notice explains the lawsuit, the Settlement, your legal rights, what benefits are available, who's eligible for them, and how to get them. The Court in charge of the case is Judge Laura Taylor Swain of the United States District Court for the Southern District of New York, and the case is known as *In re Citigroup ERISA Litigation*, Case No. 03-CV-2932. The people who sued are called Plaintiffs, and the companies, committees, and individuals that the Plaintiffs sued, Citigroup, Citibank, N.A. ("Citibank"), the Plans Administration Committee, the Investment Committee, and several of Citigroup's officers, directors, and employees, are called Defendants.

### 2.  How do I get more information?

You can call 1-866-326-9239 toll free, e-mail **citigrouperisasettlement@sbclasslaw.com**, or visit the Web site **www.citigroupERISAsettlement.com** where you'll find answers to common questions about the Settlement, plus other information to help you determine whether you're a member of the Class. The Citigroup Benefits Web site also will contain information about the Settlement. The Web site's Internet address is **http://mybenefits.csplans.com/**. Please don't contact the Court or Citigroup. They won't be able to answer your questions.

### 3.  What's this lawsuit about?

Lawsuits entitled *Walter v. Citigroup Inc., et al.*, 03-CV-2932 (S.D.N.Y) and *Simon v. Citigroup Inc., et al.*, 03-CV-3465 (S.D.N.Y.) alleging similar violations of ERISA were filed in March and April 2003 against Citigroup, Citibank, the Plan Administration Committee, the Investment Committee, and certain individual defendants. By order entered August 26, 2003, the *Walter* and *Simon* lawsuits were consolidated and captioned *In re Citigroup ERISA Litigation*, Master File 03-CV-2932 (LTS) (the consolidated action and the *Walter* and *Simon* actions may be referred to collectively in this Notice as the "Lawsuit").

The Lawsuit alleges that Defendants breached their fiduciary duties and otherwise violated ERISA by making the Fund available as an investment option under the Plan and causing the Plan to purchase and hold units in the Fund at a time when, according to the Plaintiffs, Citigroup common stock was an unsuitable and imprudent investment for the Plan. Plaintiffs further allege that Defendants violated ERISA by misrepresenting to Plaintiffs and Plan participants the financial status of Citigroup and, consequently, the true value of Citigroup stock. Plaintiffs also allege that Citigroup and the individual defendants failed to monitor the committee defendants and to provide them with accurate information about Citigroup and Citigroup stock. Plaintiffs sought to recover from the Defendants losses incurred by the Plans and, indirectly, losses incurred by the Plan participants and their beneficiaries caused by Defendants' alleged conduct.

### 4. Why is this a class action?

In a class action, one or more persons called class representatives sue on behalf of people who have similar claims. All of these people who have similar claims make up the class and are referred to individually as class members. One court resolves the issues for all class members. Because the Plaintiffs believe that the wrongful conduct they allege affected a large group of people in a similar way, Plaintiffs filed this case as a class action.

### 5. Why is there a Settlement?

The Court hasn't decided in favor of Plaintiffs or Defendants. Instead, both sides agreed to the Settlement, subject to the approval of the Court. By agreeing to the Settlement, the parties avoid the costs and risks of a trial, and the members of the Settlement Class will get substantial benefits. The class representatives and Class Counsel believe that the Settlement is best for all class members of the Class.

An independent fiduciary, Greatbanc Trust Company, was retained on behalf of the Plan to review the terms and conditions of the Settlement. Greatbanc Trust Company has advised the parties that, based on its own review and investigation of the relevant facts and applicable law, it has concluded, among other things, that (i) the terms and conditions of the Settlement are reasonable in light of the relevant circumstances; (ii) the terms and conditions of the Settlement are no less favorable to the Plan than comparable arms-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances; and (iii) the release of settled claims provided in the Stipulation and Agreement of Settlement isn't part of an agreement designed to benefit a "party in interest" as that term is defined in ERISA.

### 6. How do I know if I'm part of the Settlement?

The Court has conditionally certified this case as a class action for purposes of the Settlement, in which everyone who fits the following description is a member of the Class:

***All participants in the Citigroup 401(k) Plan and their beneficiaries, excluding the Defendants, whose accounts contained investments in Citigroup common stock or the Citigroup Common Stock Fund between December 14, 2001 and November 7, 2003.***

### 7. I'm still not sure if I'm included.

If you're still not sure whether you're included, you can ask for free help. Please call 1-866-326-9239, e-mail **citigrouperissasettlement@sbclasslaw.com** or visit **www.citigroupERISAsettlement.com.**

### 8. Can I exclude myself from the Settlement?

In some class actions, class members have the opportunity to exclude themselves from a settlement. This is sometimes referred to as "opting out" of the settlement. **You don't have the right to exclude yourself from the Settlement in this case.** The case was certified under Rules 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure as a "non opt-out" class action because of the way ERISA operates. Plaintiffs' claims were brought on behalf of the Plan, and the Settlement confers a benefit on all Plan participants and beneficiaries. As such, it isn't possible for any participants or beneficiaries to exclude themselves from the Settlement. **Therefore, if the Court approves the Settlement, you'll be bound by the terms of the Settlement and will be deemed to have released all claims that were asserted in this case on your behalf or on behalf of the Plan or are otherwise included in the release provided for by the Settlement.** Although you can't opt out of Settlement, you can object to the Settlement and ask the Court not to approve the Settlement. See question 15 for more information.

---

**QUESTIONS?**

**Call 1-866-326-9239 toll free, e-mail citigrouperisasettlement@sbclasslaw.com, or visit www.citigrouperisasettlement.com or the Citigroup Benefits Web Site at http://mybenefits.csplans.com/. Don't call the Court or Citigroup Inc. They can't answer your questions.**

# The Settlement Benefits: What You Receive

### 9.  What does the Settlement provide?
#### a.  Changes to the Plan; Financial Education Program
As part of the Settlement, Defendants have agreed to implement certain structural changes to the Plan and to maintain an investment education program for Plan participants and other Class members.

The structural changes to the Plan include: past and future Citigroup matching contributions to Plan accounts that were initially invested in the Fund and that previously had to remain invested in the Fund for five years or until a participant turned 55 can, under the terms of the Settlement, be diversified into other Plan investments after one year. With regard to employer matching contributions currently invested in the Fund that originally were made under a predecessor Plan and that could not be moved from this Fund until a participant reached the age of 55, such restriction on diversification will be lifted under the Settlement. These changes must remain in place for at least five years. Further, the Settlement provides that Citigroup will maintain for two years an educational program to provide information to current Citigroup employees concerning investment alternatives under the Plan and to make certain investment education materials available to Settlement Class members through the Plan's Web site. Citigroup has already implemented this program in anticipation of the Settlement being approved.

#### b.  Application for attorneys' fees and expenses
Under the Settlement, Plaintiffs' counsel may apply to the Court for an award of attorneys' fees and expenses not to exceed $1 million, and Defendants have agreed not to oppose such a motion. The two named Plaintiffs also may apply for an award of Case Contribution Compensation in an amount not to exceed $2,500 each. The Plaintiffs' Case Contribution Compensation, if approved by the Court, will be deducted from any award of attorneys' fees and expenses. Any award of attorneys' fees, expenses, and case contribution compensation will be paid by Citigroup and not by the Plan.

# How You Obtain a Benefit

### 10.  How can I get my benefit?
You **don't** need to file a claim for recovery in this Lawsuit.

When the structural changes are implemented, they'll benefit all Plan participants. Certain benefits under the investment education program are available to all Class members whether or not they're currently participants in the Plan.

### 11.  When will I get my benefit?
The Court will hold a hearing on August 4, 2006, at 11 a.m. to decide whether to approve the Settlement. If the Court approves the Settlement, appeals may follow. It's always uncertain whether these appeals can be resolved, and resolving them can take time, perhaps more than a year.

# The Lawyers Representing You

### 12.  Do I have a lawyer in this case?
The Court appointed the law firms of Schiffrin & Barroway, LLP and the Law Offices of Curtis V. Trinko, LLP to represent you and other Class members. These lawyers are called Class Counsel. You won't be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**QUESTIONS?**
**Call 1-866-326-9239 toll free, e-mail citigrouperisasettlement@sbclasslaw.com, or visit**
**www.citigrouperisasettlement.com or the Citigroup Benefits Web Site at http://mybenefits.csplans.com/.**
**Don't call the Court or Citigroup Inc. They can't answer your questions.**

### 13. How will the lawyers be paid?

Class Counsel will ask the Court for attorneys' fees and reimbursement of expenses in an amount not more than $1 million. The Court may award less than Class Counsel requests. Any attorneys' fees and expense reimbursement awarded by the Court will be paid by Citigroup.

## Objecting to the Settlement

You can tell the Court if you don't agree with the Settlement or some part of it, or if you don't believe the Court should grant Class Counsel's request for attorneys' fees and reimbursement of expenses.

### 14. What does it mean to object?

Objecting is simply telling the Court that you don't like something about the Settlement or the request for attorneys' fees and reimbursement of expenses. Filing an objection won't have any bearing on your right to Settlement benefits if the Court approves the Settlement.

### 15. How do I tell the Court that I don't like the Settlement?

You can object to the Settlement if you dislike any part of it. You can give reasons why you think the Court shouldn't approve it. You also may object to Class Counsel's request for attorneys' fees and expenses. The Court will consider your views. To object, you must send a letter saying that you object to the Settlement (or to Class Counsel's request for attorneys' fees and expenses) in *In re Citigroup ERISA Litigation.* Be sure to include your name, address, telephone number, your signature, and the reasons you object to the Settlement or to Class Counsel's request. You must identify in your written objection the names of any witnesses you may call to testify, and any exhibits you intend to introduce into evidence at the Fairness Hearing. **Mail the objection to each of the different addresses below postmarked no later than July 5, 2006. You must mail your objection by this date. If you fail to do so, the Court may not consider your objection. All papers submitted must include the case name — In re Citigroup ERISA Litigation — and the Case Number — 03-CV-2932 — on the top of the first page.**

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Room 820<br>New York, NY 10007-1312 | Joseph H. Meltzer<br>Schiffrin & Barroway, LLP<br>280 King of Prussia Road<br>Radnor, PA 19087 | Lewis R. Clayton<br>Paul Weiss Rifkind Wharton &<br>Garrison, LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064 |

## The Court's Fairness Hearing

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak, but you aren't required to do so.

### 16. How can I be heard at the Fairness Hearing?

The Court will hold a Fairness Hearing at 11 a.m. on August 4, 2006, at the United States District Court for the Southern District of New York, United States District Courthouse, 500 Pearl Street, New York, NY. At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court will listen to people who've asked to speak

**QUESTIONS?**
**Call 1-866-326-9239 toll free, e-mail citigrouperisasettlement@sbclasslaw.com, or visit**
**www.citigrouperisasettlement.com or the Citigroup Benefits Web Site at http://mybenefits.csplans.com/.**
**Don't call the Court or Citigroup Inc. They can't answer your questions.**

at the hearing. The Court also will decide what amount of Class Counsel fees and expenses will be awarded and what amounts, if any, should be paid to the named plaintiffs. After the hearing, the Court will decide whether to approve the Settlement. We don't know how long these decisions will take.

### 17. Do I have to go to the Fairness Hearing?

No. Plaintiffs' Counsel will answer questions the Court may have. However, you're welcome to go at your own expense. If you send an objection, you don't have to go to Court to talk about it. As long as your objection is postmarked by July 5, 2006, the Court will consider it. You also may pay your own lawyer to attend, but it isn't necessary.

### 18. May I speak at the Fairness Hearing?

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that you wish to be heard orally with respect to the approval of the Settlement, the request for attorneys' fees and expenses, or the request for amounts to be paid to the Class Representatives. Your letter must bear the caption "Notice of Intention to Appear in *In re Citigroup ERISA Litigation*, Case No. 03-CV-2932." Be sure to include your name, address, telephone number, and your signature. Your letter must be postmarked no later than July 5, 2006, and sent to the Clerk of the Court, Class Counsel, and Defense Counsel, at the addresses indicated above in question 15.

### 19. What happens if I do nothing at all?

The Settlement doesn't require you to do anything, and there's no penalty for doing nothing at all. If you're a participant in the Plan, you'll receive the benefits of the structural changes and the investment education program. If you're a member of the Class but aren't currently a participant in the Plan, you'll receive the benefits of the educational materials available on the Plan's Web site.

## Are There More Details About the Settlement?

This Notice summarizes the proposed Settlement. More details are in the parties' Stipulation and Agreement of Settlement (the "Settlement Agreement"). You can obtain a copy of the Settlement Agreement by visiting **www.citigroupERISAsettlement.com** or the Citigroup Benefits Web Site at https://mybenefits.csplans.com. **Remember, please don't contact the Court or Citigroup Inc. They can't give you additional information.**

Date: May 11, 2006

# EXHIBIT F

PRN        Shareholder Class Action Filed Against Citigroup, Inc.
           Aug 5 2002  18:21


                  By The Law Firm of Schiffrin & Barroway, LLP


    BALA CYNWYD, Pa., Aug. 5 /PRNewswire/ -- The following statement was
issued today by the law firm of Schiffrin & Barroway, LLP:

    Notice is hereby given that a class action lawsuit was filed in the United
States District Court for the Southern District of New York on behalf of all
purchasers of the common stock of Citigroup Inc. (NYSE: C) ("Citigroup" or the
"Company") securities between July 24, 1999 and July 23, 2002, inclusive (the
"Class Period").
    If you wish to discuss this action or have any questions concerning this
notice or your rights or interests with respect to these matters, please
contact Schiffrin & Barroway, LLP (Marc A. Topaz, Esq. or Stuart L. Berman,
Esq.) toll free at 1-888-299-7706 or 1-610-667-7706, or via e-mail at
info@sbclasslaw.com.
    The complaint charges Citigroup, Inc. and certain of its officers and
directors with issuing false and misleading statements concerning its business
and financial condition.  Specifically, the complaint alleges that during the
class period, Citigroup Inc., Sanford I. Weill, its Chairman and Chief
Executive Officer, and Todd Thomson, its Chief Financial Officer, made
misrepresentations and/or omissions of material fact, including failing to
disclose that Citigroup misrepresented a 1999 transaction with Enron that was
structured as commodity trade but served the same purpose as a loan to help
Enron keep $125 million in debt off of its books, affirmatively
misrepresenting Citigroup's potential Enron-related exposure in its 2001
Annual Report and elsewhere, and failing to disclose the true extent of
Citigroup's potential legal liability arising out of its "structured finance"
dealings with Enron.
    The complaint alleges that when Wall Street learned about the foregoing on
July 23, 2002 after executives of Citigroup and J.P. Morgan Chase testified
before the U.S. Senate regarding the transactions at issue, Citigroup stock
plummeted $5.04 or 15.73% to close at $27.00, less than half its class period
high.
    Plaintiff seeks to recover damages on behalf of class members and is
represented by the law firm of Schiffrin & Barroway, LLP, which prosecutes
class actions on behalf of investors and shareholders.  For more information
on Schiffrin & Barroway, or to sign up to participate in this action online,
please visit http://www.sbclasslaw.com/cgi/signup.cgi.
    If you are a member of the class described above, you may, not later than
September 23, 2002, move the Court to serve as lead plaintiff of the class, if
you so choose.  In order to serve as lead plaintiff, however, you must meet
certain legal requirements.

    CONTACT:  Schiffrin & Barroway, LLP
              Marc A. Topaz, Esq.
              Stuart L. Berman, Esq.
              Three Bala Plaza East, Suite 400, Bala Cynwyd, PA  19004

Copyright (c) 2008

PRN         Shareholder Class Action Filed Against Citigroup, Inc.
            Aug 5 2002   18:21


            1-888-299-7706 (toll free) or 1-610-667-7706
            Or by e-mail at info@sbclasslaw.com

               MAKE YOUR OPINION COUNT -  Click Here
            http://tbutton.prnewswire.com/prn/11690X88754369

SOURCE  Schiffrin & Barroway, LLP
    -0-                          08/05/2002
    /CONTACT:  Marc A. Topaz, Esq. or Stuart L. Berman, Esq., both of
Schiffrin & Barroway, +1-888-299-7706, or +1-610-667-7706, or
info@sbclasslaw.com/
    /Web site:  http://www.sbclasslaw.com/cgi/signup.cgi /
    (C)

CO:  Schiffrin & Barroway, LLP; Citigroup Inc.; Enron; J.P. Morgan Chase
ST:  Pennsylvania, New York
IN:  FIN
SU:  LAW


-0- Aug/05/2002 22:21 GMT

**EXHIBIT G**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| STEPHEN GRAY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CITIGROUP INC., CHARLES PRINCE, THE PLANS ADMINISTRATIVE COMMITTEE OF CITIGROUP INC., THE 401(k) INVESTMENT COMMITTEE, and JOHN DOES 1 - 20,<br><br>Defendants. | Civil Action No: |



## COMPLAINT FOR VIOLATIONS OF THE
## EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following based upon the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, a review of public filings by Citigroup Inc. ("Citigroup" or the "Company") with the United States Department of Labor and the Securities and Exchange Commission, press releases issued by the Company, media reports about the Company, and publicly available trading data relating to the price of Citigroup's securities.

### I.    NATURE OF THE ACTION

1.   Plaintiff brings this suit as a civil enforcement action under the Employee Retirement Income Security Act ("ERISA") §§ 502(a)(2), (3), 29 U.S.C. §§ 1132(a)(2), (3), for

Doc. 158619

relief on behalf of the Citigroup 401(k) Plan, and the Citibuilder 401(k) Plan for Puerto Rico (the "Plans"), 401(k) plans operated and established by Citigroup as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Citigroup is the Plans' "sponsor," within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

2.    Plaintiff brings this action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class of all participants and beneficiaries of the Plans, and on behalf of the Plans themself, during the period January 1, 2007 through the present (the "Class Period"). Defendants are entities and persons acting in a fiduciary capacity or who assumed a fiduciary role in relation to the Plans.

3.    Plaintiff's claims arise from the failure of the Defendants to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence, in administering the Plans and the Plans' assets.

4.    Plaintiff alleges that Defendants allowed the imprudent investment of the Plans' assets in Citigroup common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices including, among other practices: (a) participating in the formation and management of off-balance-sheet structured investment vehicles ("Conduits" or "SIVs") without disclosing Citigroup's contingent liabilities or risks related thereto; (b) causing said Conduits and/or SIVs to issue billions of dollars worth of commercial paper and short term loans based on false and misleading statements; (c) marketing and extending subprime loans made on a "low documentation" basis, without adequate consideration of the borrower's ability to pay and with unreasonably high risk of borrower

default; (d) failing to adequately disclose Citigroup's subprime loan loss exposure to investors, including the Plans' participants; (e) operating without the requisite internal controls to determine appropriate loan loss provisions; (f) understating loan loss provisions that did not properly reflect the risk facing Citigroup; all of which caused Citigroup's financial statements to be misleading and which artificially inflated the value of shares of Citigroup stock. In short, during the Class Period, the Company was seriously mismanaged and faced dire financial crisis due to such mismanagement, which rendered Company stock an imprudent investment.

5.    As Citigroup's dire financial conditions became known to the market, its stock fell from $54.26, on June 19, 2007, to $37.73, at the close of the market on November 2, 2007 – a 30.5% decline in share price and a loss of approximately $81.2 billion in market value in less than 6 months, falling to $35.60 the next trading day, November 5, 2007.

6.    Plaintiff and the other participants and beneficiaries of the Plans owned Citigroup stock through the Plans and have suffered substantial losses. As of December 31, 2006, the Citigroup 401(k) Plan held $4.13 billion of Citigroup Stock, which amounted to 32% of the plan's total assets. Based on publicly available information, it appears that Defendants' breaches of fiduciary duties have caused the Plans to lose well over $1.3 billion dollars in retirement savings during the Class Period.

7.    Plaintiff's claims arise from the failure of the Defendants to exercise the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" in administering the Plans and the Plans' assets during the Class Period.

8.    In particular, Plaintiff alleges that Defendants breached their fiduciary duties to the participants of the Plans because they knew or should have known that the Company's securities were no longer a prudent investment, yet they failed to take steps to eliminate or reduce the amount of Company stock in the Plans, and failed to give Plaintiff and the Class complete and accurate information about Citigroup's loan loss exposure so they could make informed investment choices under the Plans.

9.    As a result of the Defendants' breaches alleged herein, the Plans suffered substantial losses.

10.    Because Plaintiff's claims apply to the participants and beneficiaries as a whole and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plans, Plaintiff brings this action as a class action of behalf of all participants and beneficiaries of the Plans.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to § 28 U.S.C. 1331 and  ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    This Court has personal jurisdiction over Defendants under ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2) because one or more of the Defendants may be found in this district. The Court also has personal jurisdiction over Defendants because the Company's principal executive offices are located in New York, New York.  Defendants systematically and continuously have done and continue to do business in this State, and the case arises out of Defendants' acts within this State.

13.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because

Defendants administer the Plans in this district, some or all of the actionable conduct for which relief is sought occurred in this district, and one or more of the Defendants may be found in this district.

### III.   THE PARTIES

**Plaintiff**

14.    Plaintiff Stephen Gray ("Plaintiff") is a resident of New York, New York.  He is a participant or beneficiary of the Citigroup 401(k) Plan within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and was a participant or beneficiary of the plan throughout the Class Period.  He continues to hold shares of Company stock in his retirement account in the Citigroup 401(k) Plan and did so throughout the Class Period.

**Defendants**

**A.    Citigroup**

15.    Defendant Citigroup is a business entity organized under the laws of the state of Delaware with its executive offices located at 70 Pine Street, New York, New York.

16.    Citigroup is a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers.  Citigroup has more than 200 million customer accounts and does business in more than 100 countries.

17.    Citigroup is the sponsor of the Plans within the meaning of ERISA, and itself exercised important fiduciary duties and responsibilities.  Citigroup exercised ultimate decision-making authority for the administration and management of the Plans and Plans' assets.  Thus, Citigroup is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. §

1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

**B.    Director Defendants**

18.    Upon information and belief, the Citigroup Board of Directors ("Citigroup Board" or the "Board") has ultimate oversight over the Plans, and is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

19.    Defendant Charles Prince ("Prince") was at all times relevant hereto Chairman of the Board and Chief Executive Officer of Citigroup, until being forced to resign on November 4, 2007. Most of Prince's compensation package is tied to his performance at the Company. For example, during the year ended December 31, 2006, Prince received a bonus of $13.2 million and stock awards amounting to $10.6 million, in addition to his base salary of $1 million. Upon information and belief, Defendant Prince has ultimate oversight over the Plans, and is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

20.    Plaintiff does not at this time name all persons who served as members of the Board during the Class Period. Instead, Plaintiff only names the top executive officer of Citigroup because as such, he had intimate knowledge of the Company's business operations and practices and, therefore, knew or should have known the Company's stock was an imprudent investment during the Class Period.

**C.    The Plans Administrative Committee of Citigroup Inc.**

21.    The Plans Administrative Committee of Citigroup Inc. ("Administrative Committee") is the Plan' Administrator and, upon information and belief, was responsible for administering and managing the Plans on a day-to-day basis, and advising Citigroup and the Citigroup Board regarding the Plans and Plans' assets. Therefore, the Administrative Committee members are fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

**D.    The 401(k) Plan Investment Committee**

22.    Upon information and belief, the 401(k) Plan Investment Committee was responsible for choosing the Plans' investments and monitoring the performance of those funds. Therefore, the 401(k) Plan Investment Committee members are fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

23.    Defendants John Does 1-20 are reserved for additional fiduciaries of the Plans. At

the present time, certain fiduciaries are unknown to Plaintiff. Once their identities are discovered, Plaintiff will amend his Complaint to join them under their true names.

## V.    THE PLANS

24.    By information and belief, the Plans are defined contribution plans covering eligible employees of the Company. They are "employee pension benefit plan[s]" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A). Further, they are "eligible individual account plan[s]" within the meaning of ERISA  §407(d)(3), 29 U.S.C. §1107(d)(3), and also are a "qualified cash or deferred arrangement[s]" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k). The Plans are not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plans.

25.    The amounts of employee and Company contributions were limited by pertinent provisions of the Internal Revenue Code. Participants directed employee and Company contributions to various investment options in the Plans. Most of these options were diversified mutual funds. However, the options also included the Citigroup Common Stock Fund.

26.    According to the Citigroup 401(k) Plan's Form 11-K Annual Report of the Citigroup 401(k) Plan, as of December 31, 2006, approximately $4.13 billion of the plan's $12.92 billion of assets were invested in Citigroup common stock through the Citigroup Common Stock Fund.

## VI.    DEFENDANTS' FIDUCIARY STATUS

27.    **Named Fiduciaries.** ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as "administrator" in the plan instrument is automatically a named fiduciary, and

in the absence of such a definition, the sponsor is the administrator. ERISA § 3(16)(A), 29

U.S.C. § 1002(16)(A).

28.    **De Facto Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly

named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries,

i.e., perform fiduciary functions (including a juridical person such as Citigroup). ERISA §

3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he

exercises any discretionary authority or discretionary control respecting management of such plan

or exercises any authority or control respecting management or disposition of its assets . . . or . . .

has any discretionary authority or discretionary responsibility in the administration of such plan."

During the Class Period, all of the Defendants performed fiduciary functions under this standard,

and thereby also acted as fiduciaries under ERISA, by, among other things, appointing Plan

administrators, overseeing the Plan administrators, and making statements to participants with

respect to the Company, its financial results and business prospects.

## VII.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

29.    ERISA is a comprehensive statute covering virtually all aspects of employee

benefit plans, including retirement savings plans, such as the Plan. The goal of ERISA is to

protect the interests of Plan participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect
> interstate commerce and the interests of participants in employee
> benefit plans and their beneficiaries, by requiring the disclosure and
> reporting to participants and beneficiaries of financial and other
> information with respect thereto, by establishing standards of
> conduct, responsibility, and obligation for fiduciaries of employee
> benefit plans, and by providing for appropriate remedies, sanctions,
> and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

30.     Under ERISA, those responsible for employee benefit plan management stand in a

fiduciary relationship to plan participants.  Pursuant to ERISA, a "fiduciary" is defined broadly to

include all persons or entities that are able to exercise discretionary authority over the

management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires

strict fidelity and loyalty in the execution of the plan's management.

31.     ERISA imposes on Defendants, who are responsible for the Plan, the requirement

to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and

their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B),

29 U.S.C. § 1104(a)(1)(B).

32.     ERISA also imposes on Defendants responsible for the Plans a duty of loyalty,

requiring these Defendants to "discharge [their] duties with respect to a plan solely in the interest

of the participants and their beneficiaries and . . . for the exclusive purpose of ... providing

benefits to the participants and their beneficiaries." ERISA § 404 (a)(1),(A),(i), 29 U.S.C. §

1104(a)(1),(A),(i).

33.     Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue

of their exercise of authority or control respecting the management of the Plans or disposition of

Plan assets, include but are not limited to:

        a.     The duty to investigate and evaluate the merits of decisions affecting the

            use and disposition of Plan assets;

10

b.   The duty to evaluate all investment decisions with "an eye single" to the

interests of Plan participants and beneficiaries;

c.   The duty to avoid placing themselves in a position where their acts as

officers, directors, or employees of the Company will prevent their

functioning with the complete loyalty to participants demanded of them as

trustees of a pension plan, and, if they find themselves in such a position,

to seek independent, unconflicted advice;

d.   The duty, under appropriate circumstances, to monitor or influence the

management of the companies in which the Plans own stock including,

where appropriate, the obligation to bring a derivative action if the

fiduciaries were or should have been aware that the officers and directors

of the entities whose stock was held by the Plans had breached fiduciary

duties owed their shareholders;

e.   To the extent that a party is responsible for appointing and removing

fiduciaries, the duty to monitor those persons who have been named;

f.   The duty to disclose and inform of any material adverse information about

the Company which duty entails, among other things: (1) a duty not to

make materially false and misleading statements or misinform Plan

participants; (2) an affirmative duty to inform Plan participants about

material adverse factors which were affecting the Company any time the

fiduciary knew or should have known, pursuant to his duty to investigate,

that failing to make such a disclosure might be harmful; (3) a duty to

convey complete and accurate information material to the circumstances of plan participants and their beneficiaries; and (4) a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it improbable that the investments will bring a fair return commensurate with the prevailing rates; and

g.   When a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information which the fiduciary knows or should know is sufficient to the average plan participant of the comparative risks associated with investing in any particular investment.

34.   ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions. Based on the information available to Plaintiff, the Defendants' fiduciary responsibilities were at least partially allocated among Citigroup, the Administrative Committee, and the Investment Committee.

## VIII.    FACTS BEARING ON FIDUCIARY DUTY

**A.    Citigroup Stock Was an Imprudent Investment for the Plans during the Class Period Because of the Company's Serious Mismanagement, Precipitous Decline in the Price of its Stock, and Dire Financial Condition.**

**1.    Background**

**a.    The Expansion of the Subprime Lending Industry**

35.    The mortgage lending business has changed dramatically since the 1970s with the development of national markets for mortgages, technological changes, and the advent of securitization. In fact, the mortgage market has been the fastest growing securitization debt market, larger than the market for U.S. Treasury bonds and notes. Between 2004 and 2005, the subprime mortgage lending industry grew from $120 billion to $625 billion. Ruth Simon and James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind- Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

36.    One of the products of this new mortgage market is phenomenal growth in subprime lending. The term "subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios." Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd., *Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* U.S. House of Representatives: Subprime Mortgages. Mar. 27, 2007, *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070327/default.htm.

37.    At the end of 2006, subprime borrowers represented approximately 13-14% of the 43 million first-lien mortgage loans outstanding in the United States. Subprime lending has grown rapidly in recent years. In 1994, fewer than 5% of mortgage originations were subprime, but by 2005 about 20% of new mortgage loans were subprime.

38.    Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors. *See* Sandra L. Thompson, Dir., Div. Of Supervision and Consumer Prot., *Testimony Before the Committee on Mortgage Market Turmoil: Causes and Consequences,* Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/spmar22071.html.

39.    In 2004, as interest rates began to climb, the pool of potential prime borrowers looking to refinance began to dry up and lenders began extending loans to subprime borrowers with troubled credit histories in an effort to maintain or grow market share in a declining origination environment. Thus, between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.

40.    In order to take advantage of this new market, lenders began weakening their underwriting standards, including:

(a)    reducing the minimum credit score borrowers need to qualify for certain loans;

(b)    allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

(c)    introducing new products designed to lower borrowers' monthly payments for an initial period; and

(d)    allowing borrowers to take out loans with little, if any, documentation of income and assets.

*See* Ruth Simon, *Mortgage Lenders Loosen Standards-Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules,* Wall St. J., July 26, 2005, at D1.

41.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers which put them at greater risk of defaulting:

(a)    **No-documentation and low-documentation loans:** Known in the industry as "liar loans," the practice of requiring little or no documentation from borrowers constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001. *See* Gretchen Morgenson, *Crisis Looms in Mortgages,* N.Y. Times, Mar. 11, 2007. Moreover, industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and in 60% of the cases, borrowers had inflated their incomes by more than half. *Id.*

(b)    **Piggy-back loans:** These combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80% of the home's value without paying for private mortgage insurance. As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82% of the underlying value of their property, markedly up from 48% in 2000. *See Id.;* James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans- More*

15

*Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Market May Suffer,*
Wall St. J., Feb. 14, 2007, at A3.

(c)    **Interest-only mortgages:** These allow borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.

(d)    **Option adjustable-mortgages:** The most prevalent of which are hybrid adjustable rate mortgages ("ARMs"), the loans are marketed with promotional or "teaser" rates during the loans's introductory period that later balloon to much higher rates once the introductory period has ended. ARMs currently account for between one-half and one-third of subprime mortgages. *See* Testimony of Roger T. Cole, Director, Division of Banking Supervision and Regulation, The Federal Reserve Board, *Mortgage Markets,* Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, Mar. 22, 2007, *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm.

b.    **The Demise of the Subprime Lending Industry.**

42.    In late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices were increasing risks for borrowers and lenders in overheated housing markets. *See* Simon, *Mortgage Lenders, supra.* As lenders were making it easier for borrowers to qualify for loans by such practices as described above, they were also greatly increasing the likelihood that borrowers would be unable to make payments, and that defaults would rise.

16

43.    Of particular concern was the prevalence of adjustable-rate loans, which in combination with the lowered lending standards, were more likely to result in borrowers' early payment defaults.

44.    In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well. *Id.;* Testimony of Sandra L. Thompson, *supra.* The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.

45.    However, most subprime lenders failed to heed these and other warnings. Despite rising interest rates and general housing market cooling in 2005, lenders continued to offer borrowers credit under weakened lending standards. Many lenders kept introductory "teaser" rates low even after short-term interest rates began rising in June 2005. It was not until mid to late 2006 when lenders began to tighten up their terms.

46.    Thus, in mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time in 2002. By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely – as of October 2005, the delinquency rate was twice that recorded on new subprime loans a year earlier. *See* Simon & Hagerty, *More Borrowers, supra.*

47.    According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period. Testimony of Sandra L. Thompson, *supra.*

48.    Subprime loans with ARMS accounted for the largest rise in delinquency rates, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006; whereas foreclosures rose from 1.5% to 2.7% during the same period. *Id.*

49.    In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency. *See* Simon & Hagerty, *More Borrowers, supra.*

50.    At the end of 2006, subprime loans were going into foreclosure at a faster pace than loans made in previous years, and in many cases the loans were "so bad right off the bat" and "so far beyond the borrower's ability to pay that giving the borrower more time to pay or restructuring the loan wouldn't help." *Id.*

51.    By at least January 2007, Citigroup became aware of an extraordinary increase in the default of its subprime loans and the heavy losses which the Company would inevitably recognize. Despite these troubles, Citigroup failed to disclose its subprime loan loss exposure. Instead, the Company slowly revealed its losses and loss exposure during the Class Period to blunt the impact and mask the depth and breath of the crisis.

### b.    Citigroup Fails to Adequately Disclose Contingent Liabilities With Respect to Off Balance Sheet Entities

52.    Conduits and SIVs are entities that banks use to issue commercial paper, which are usually highly rated, short-term notes that offer investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

53.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages.

Banks profit from the SIVs by pocketing the spread between the rate by which they borrow money and the rate by which they lend money.

54.    The vehicles are often established in a tax haven and are run solely for investment purposes as opposed to typical corporate activities.

55.    Because most conduits or SIVs are off the-balance-sheet entities, it is difficult for investors to size up the financial risks they pose.  Off-balance-sheet liabilities played a major role in the 2001 collapse of Enron Corp., and the makers of accounting rules have generally sought to get affiliated entities back on the balance sheets of the companies creating them.

56.    According to reports, Citigroup operates conduits and SIVs with assets totaling at least $160 billion.  *See* David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on*, Wall St. J., Oct. 17, 2007.

57.    In order to raise proceeds for its SIVs, Citigroup touted to money market fund managers and other investors that the conduits were safe investments which use the proceeds from the issuance of commercial paper and short term notes to invest strictly in high quality debt securities.  *See Capital Markets: Team Of The Month - Citigroup SIV Enters Uncharted Space - Citigroup Alternative Investments Last Month Launched A Pioneering Structured Investment Vehicle. It Boosts Leverage To The Subordinated Noteholder Without Really Increasing The R; structured investment vehicles*, The Banker, Oct. 1, 2004; *Citigroup creates bespoke SIV for mystery ABS investor; Structured investment vehicle; asset backed securities; Citigroup Inc.*, Euromoney Institutional Investor, Nov. 10, 2006.

58.    However, as described below, in fact, Citigroup's conduits invested in subprime loans and, as a result, many investors are no longer willing to purchase commercial paper from

its SIVs. Because the conduits still owe money to commercial-paper holders, and they can't raise money by selling new commercial paper, they are being forced to sell its assets at fire-sale prices to pay off its debts. As a result, Citigroup's conduits are on the brink of collapse, subjecting the Company to billions of dollars in liability as a result of investor lawsuits for causing the conduits to issue debt based on materially false and misleading statements. Moreover, Citigroup may have to move its conduits onto its balance sheet, and recognize billions of dollars in potential liability that the Company had not fairly disclosed to investors in Citigroup common stock, including Plan participants. *See* Peter Eavis, *Behind the Citigroup rescue*, Fortune, Oct. 15, 2007.

> **2.      Citigroup Was Aware of the Extraordinary High Default Rates of Its Subprime Assets and Failed to Provide Complete and Accurate Information to Participants Regarding the Company's Loan Loss Exposure**

59.      On January 19, 2007, Citigroup announced its financial results for the year ended December 31, 2006, and for the fourth quarter ended December 31, 2006. The Company reported net income for the 2006 fourth quarter of $5.13 billion, record quarterly revenues of $23.8 billion, record full year 2006 revenues of $89.6 Billion, and record full year 2006 income from continuing operations of $21.2 Billion.

60.      In a press release issued by the Company, announcing its results, Defendant Prince stated "Our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative-investment businesses. In U.S. consumer, we continued to see positive trends from our strategic actions."

61.      During a January 19, 2007 conference call with investors discussing the Company's fourth quarter 2006 results, a UBS analyst questioned why loan loss reserves had not

changed when there had been a pick up in Citigroup's consumer loans. Citigroup's Chief

Financial Officer ("CFO") at the time, Sallie Krawcheck, stated that:

> "...we believe that we have adequate reserves, we believe we have
> the right level of reserve for what we are seeing in terms of the
> growth in the portfolio, what we see in terms of the embedded loss in
> the portfolio. And as the environment changes the complexion, the
> portfolio changes, etc., we review that. We have I guess to go along
> with the guys that have the pocket protectors or the Ph.D. guys who
> look at the reserves and we feel very good, very good about the level
> of them."

62.    On January 23, 2007, the Company announced that Citigroup's CFO, Krawcheck,

was reassigned to head the Company's brokerage and private banking business -- a lower profile

job with narrower responsibilities. The change put Krawcheck back in charge of the brokerage

business she ran two years ago. It also put her in charge of a division of Citigroup that accounted

for only 8 percent of the Company's net income.

63.    On February 9, 2007, Citigroup's shares fell 1.2% to $54.31 after Britain's HSBC

Holdings, Europe's largest bank, warned that bad debts from its U.S. mortgage lending business

would hurt results.

64.    On February 23, 2007, Citigroup filed its Form 10-K for the year ended Decmeber

31, 2006, with the SEC. The Company reported that it earned $21.2 billion from continuing

operations on revenues of $89.6 billion; income was up 7% from 2005, while diluted EPS from

continuing operations increased 11%, with the increment in the growth rate reflecting the benefit

from our share repurchase program; and net income, which includes discontinued operations,

was $21.5 billion, down 12% from the prior year, reflecting the absence of significant gains on

sales of businesses recorded in 2005.

65.    Commenting on its outlook for 2007, the Company stated in part:

We enter 2007 with good business momentum, as we expect to see our investment initiatives generate increasing revenues, and are well-positioned to gain from our balanced approach to growth and competitive advantages.

We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

In 2006, our international businesses contributed 43% of our income from continuing operations. We expect to continue to re-weight our revenue mix towards International Consumer, CIB and Global Wealth Management.

Disciplined capital allocation will remain fundamental to our strategic process and we will have a sharp focus on expense management.

Although there may be volatility in our results in any given year, over the long term our revenues are targeted to grow organically at a mid- to high-single-digit rate, with strong expense and credit management driving earnings and earnings per share growth at a faster level. We will seek to augment this growth rate over time through targeted acquisitions.

Credit is broadly stable as 2007 begins; however, we are budgeting for a moderate deterioration of credit in 2007. In addition, the tax benefits we realized in 2006 will not be repeated in 2007, and we anticipate the effective tax rate to return to a more normalized rate of 30% to 31%, not the 27.3% recorded in 2006.

66.    In commenting on its U.S. Consumer Lending dividions, Citigroup stated in its Form 10-K that "Provisions for loan losses and for benefits and claims increased primarily on higher credit losses in the Real Estate Lending and Auto businesses, partially offset by higher loan loss reserve releases of $63 million in the Real Estate business. Credit losses increased due to volume growth and seasoning in Real Estate, as well as volume growth in Autos."

67.    Citigroup did not disclose any problems with its subprime loan portfolio in its Form 10-K. In fact, the Company led investors to believe that its subprime loss exposure was minimal by stating that from 2004 to 2005 "Non-prime [subprime] mortgage originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers."

68.    On February 25, 2007, Citigroup announced that it replaced Sallie Krawcheck with Gary Crittenden. Gary Crittenden came to Citigroup from American Express Company, where he was the company's chief financial chief for the last six years.

69.    On April 11, 2007, Citigroup announced that it would eliminate about 17,000 jobs as part of a companywide restructuring to reduce costs and improve profit. According to news reports, Citigroup executives, including Defendant Prince, had been under pressure from investors and analysts to get a handle on the bank's burgeoning expenses, which grew 15 percent during 2006, twice the pace of revenue growth, and caused the Company's shares to lag behind those of other big money center banks. Although the Company knew that it would suffer massive losses as a result of its subprime exposure by at least January 2007, Defendant Prince was under intense pressure to delay this disclosure until he obtained control over Citigroup's expenses.

70.    On April 16, 2007, Citigroup reported net income for the 2007 first quarter of $5.01 billion, or $1.01 per share. In a press release announcing the results, Citigroup stated "U.S. consumer revenue growth continued to trend positively, up 6%." Defendant Prince was quoted as stating:

We achieved these results while completing our structural expense review, which will help us become a leaner, more efficient organization and lower our rate of expense growth. As we look ahead, our priorities are clear: we will invest to grow and integrate our businesses, take actions to improve efficiency and lower costs, and continue to build momentum across our franchises.

71.    Citigroup held a conference call with investors on April 16, 2007, to discuss the

Company's financial results for the first quarter of 2007. When questioned by an analyst as to

whether $9 billion worth of loans held by Citigroup were no documentation or low

documentation subprime loans, Citigroup's CFO would not answer the question and implied that

said loans were profitable:

> - GLENN SCHORR, ANALYST, UBS: Thanks, it is UBS. On slide 6, the U.S consumer mortgage trend, in the footnote, you noted that it excludes $5 billion of first mortgages and almost $4 billion of second mortgages where you didn't have FICO and LTV data. Just curious on what type of loans that might be, why you don't have the data and how your gut is that that might change the results that you showed on the slide?

> GARY CRITTENDEN: We actually just finished preparing this data over the course of the last week or so and we don't have a comprehensive view that includes all of the -- the full scope of the portfolio. The underlying delinquency performance of the things that were excluded from the table have very good delinquency performance associated with them. So there was no -- if you look at the underlying performance of those mortgages that were excluded from the table with those that are included, there was just no underlying difference in the delinquency performance between the two.

> GLENN SCHORR: Got you. I would guess it is probably stuff that falls into that all [pay] no [doc]/low doc type of --.

> GARY CRITTENDEN: You know, we don't use that nomenclature here and don't think about the business in that way.

GLENN SCHORR: Okay. But you don't have FICO and LTV scores on the loans? Okay. I'm good. I don't need a follow-up. Thanks.

GARY CRITTENDEN: Great. Thanks.

72.    In the April 16, 2007, conference call, Citigroup's CEO, Defendant Prince, told analysts that he was pleased the bank had achieved "positive operating leverage" in the first quarter, with revenue up 12% more than the 10% rise in expenses, in an attempt to please investors who had been pressing for expense control. "It feels good to me to see that progress," Prince said. "We are delivering on our plan."

73.    Excluding an $871 million after-tax charge relating to the Company's restructuring plan, the Company's profit was $1.18 per share for the first quarter of 2007, which beat analyst estimates of $1.10. Citigroup stock reached a high of $53.59 on the news, a 3.9% increase from is closing price of $51.60 on April 13, 2007.

74.    Citigroup's comments about its operations led investors to believe that Citigroup's subprime loan loss exposure was minimal. Paul Nolte, director of investments at Hinsdale Associates, a money management firm was quoted as stating "One of the question marks coming into earnings season has been the mortgage issue, and Citigroup making positive comments about its business has lent some strength to the overall market." Rob Kelley and Grace Wong, *Stocks soar on earnings, deals*, CNNMoney.com, April 16, 2007.

75.    On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter ended March 31, 2007, in which the Company reported income from continuing operations of $5.01 billion in the first quarter of 2007. The Company also reported in part:

Customer volume growth was strong, with average loans up 14%, average deposits up 19%, average interest-earning assets up 25%, and

client assets under fee-based management up 12% from year-ago levels. U.S. debt, equity and equity-related underwriting increased 21% from year-ago levels. Branch activity included the opening of 99 branches during the quarter (48 internationally and 51 in the U.S.). U.S. Cards accounts were up 14% and purchase sales were up 6%.

\*\*\*

Net interest revenue increased 8% from last year as higher deposit and loan balances were offset by pressure on net interest margins. Net interest margin in the first quarter of 2007 was 2.46%, down 39 basis points from the first quarter of 2006...

Operating expenses increased 17% from the first quarter of 2006. Excluding the restructuring charge in 2007 and the 2006 initial adoption of SFAS 123(R), expenses were up 12% from the prior year. The relationship between revenue growth and expense growth, excluding the aforementioned impact of restructuring and SFAS 123(R), improved during the quarter. As our Structural Expense Review takes shape, we expect the pace of year-over-year expense growth (excluding acquisitions) to continue to moderate through 2007.

\*\*\*

Credit costs increased $1.3 billion from a year ago, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to build loan loss reserves. The $597 million net build compares to a net reserve release of $154 million in the prior-year period. The build was primarily due to increased reserves to reflect: a change in estimate of loan losses inherent in the initial tenor portion of the Consumer Loan Portfolio; portfolio growth, and increased delinquencies in second mortgages, in the U.S. Consumer Lending mortgage portfolio; and portfolio growth in Markets & Banking, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The Global Consumer loss rate was 1.69%, a 23 basis-point increase from the first quarter of 2006.

76.    On June 12, 2007, the media reported that a large hedge fund controlled by The

Bear Stearns Companies, Inc. ("Bear Stearns") has fallen 23% from the start of the year through

late April. "The fund, called the High-Grade Structured Credit Strategies Enhanced Leverage

Fund, [was] widely exposed to subprime mortgages, or home loans to borrowers with weak credit histories." Kate Kelly and Serena Ng, *Bear Stearns Fund Hurt by Subprime Loans*, Wall St. J., June 12, 2007.

77.    Before the market opened, on June 20, 2007, the media reported that two Bear Stearns hedge funds that held more than $20 billion of investments, mostly in complex securities made up of bonds backed by subprime mortgages were close to being shut down as a rescue plan fell apart in a drama that could have wide-ranging consequences for Wall Street and investors. Kate Kelly, Serena Ng and David Reilly, *Two Big Funds At Bear Stearns Face Shutdown --- As Rescue Plan Falters Amid Subprime Woes, Merrill Asserts Claims*, Wall St. J., June 20, 2007. On this news, investors correctly speculated that Citigroup may have similar problems, and the Company's common stock tumbled from its close of $54.26 on June 19, 2007 to close at $51.15 on June 25, 2007 – a 5.7% decline in less than a week.

78.    Before the close of the market on July 20, 2007, Citigroup reported net income for the 2007 second quarter of $6.23 billion, or $1.24 per share, both up 18%. In a press release announcing the results Defendant Price stated:

> We continued to generate revenue and volume growth in our U.S. consumer franchise, while making excellent progress in re-weighting Citi towards our other businesses, especially our international franchises, where revenues and net income increased over 30%. Our capital markets-driven businesses performed extremely well and international consumer revenues and volumes grew at a double-digit pace.

79.    On a July 20, 2007 conference call with investors discussing its second quarter 2007 results, Citigroup was forced to reveal that it had been actively managing down its subprime exposure "some time" and had reduced its exposure "over the last six months." During

27

the second quarter of 2007, Citigroup's profits from consumer banking fell 15 percent, to $2.7 billion, as credit costs increased by $934 million. Citigroup increased its loan loss reserves by $465 million citing higher delinquencies in citing second mortgages in consumer lending. Citigroup also announced that it expects to see continued deterioration in consumer-credit quality through the year's second half, and Citigroup probably will make "meaningful additions" to its loss reserves.

80.    After Citigroup reported that it will probably suffer meaningful losses in the second half of 2007, its stock steeply declined over the next week from a close of $51.19 on July 19, 2007 to a close of $46.97 on July 27, 2007 – an 8.2% decline, wiping out approximately $20.8 billion in market share.

81.    On August 3, 2007, Citigroup filed is Form 10-Q for the second quarter ended June 30, 2007. Citigroup reported in part:

> Income from continuing operations rose 18% to $6.226 billion and was the highest ever recorded by the Company. Diluted EPS from continuing operations was also up 18%.
>
> ***
>
> Customer volume growth was strong, with average loans up 16%, average deposits up 20%, and average interest-earning assets up 32%. International Cards purchase sales were up 31%, while U.S. Cards sales were up 6%. In Global Wealth Management, client assets under fee-based management were up 40% from year-ago levels, and client assets in Alternative Investments grew 55%. Branch activity included the opening or acquisition of 160 new branches during the quarter (136 internationally and 24 in the U.S.).
>
> ***
>
> Operating expenses increased 16% from the second quarter of 2006 driven by increased business volumes and acquisitions (which

contributed 4%). Expense growth was partially offset by savings from our Structural Expense Initiatives and the release of $300 million of litigation reserves reflecting our continued progress in favorably resolving WorldCom/Research Litigation matters. The relationship between revenue growth and expense growth continued to improve during the quarter with positive operating leverage of 4%.

\*\*\*

Credit costs increased $934 million or 59%, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period. The build in U.S. Consumer was primarily due to increased reserves to reflect: higher delinquencies in second mortgages in U.S. ConsumerLending, a change in estimate of loan losses inherent in the U.S. Cards portfolio, and portfolio growth. The increase in International Consumer primarily reflected portfolio growth, an increase in past due accounts and portfolio seasoning in Mexico cards, higher net credit losses in Japan consumer finance, and the impact of recent acquisitions. The Global Consumer loss rate was 1.56%, an 8 basis-point increase from the second quarter of 2006. Corporate cash-basis loans declined 25% from year-ago levels to $599 million.

82.     On October 1, 2007, as previously warned, Citigroup announced that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment are expected to have an adverse impact on third quarter financial results. Citi estimated that it would report a decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third quarter results. The Company's stated losses included a $1.4 billion write-off in Citigroup's $57 billion portfolio of highly leveraged loans, a loss of about $1.3 billion on the value of securities backed by subprime loans, and a loss of $600 million in fixed-income credit trading. Citigroup also announced that consumer credit costs rose $2.6 billion, mostly due to a boost in loan-loss reserves. Citigroup's shares actually rallied after the

October 1, 2007 profit warning, as investors were cheered by Defendant Prince's comments that markets were recovering and Citigroup expected a "return to a normal earnings environment in the fourth quarter."

83.     On October 15, 2007, Citigroup reported its poor financial results for the third quarter of 2007 and announced write-offs that were half a billion dollars more than the Company had forecast only two weeks earlier. Citigroup's third-quarter results included a $1.35 billion pretax write-down in the value of leveraged loans, $1.56 billion of pretax losses tied to loans and subprime mortgages that were to be repackaged and sold to investors, $636 million in pretax fixed-income trading losses and $2.98 billion in increased consumer-credit costs.

84.     On October 13, 2007, the media reported that a number of banks, including Citigroup, had discussions with the United States Treasury Department regarding the creation of to create a super fund to create liquidity for SIVs and conduits that were facing liquidity problems. According to reports, many investors had stopped buying commercial paper sold by these structures because they were concerned that the vehicles were exposed to subprime loans. As a result, the vehicles could not raise proceeds to pay off their debts. Also, the vehicles could not immediately sell their assets without suffering a loss.

85.     The purpose of the proposed super fund wass to purchase troubled SIVs' assets and eventually resell them in an effort to prevent discount fire sales. "Some bankers objected to the plan, calling it an escape hatch for Citigroup, which has more SIVs than any other bank." Carrick Mollenkamp, Deborah Solomon and Robin Sidel, Rescue Readied By Banks Is Bet To Spur Market, Wall St. J., Oct. 15, 2007. According to a Reuters article, dated October 21, 2007, and entitled *Banks launch reform drive in wake of credit crisis*, "[s]ome bankers have criticised

30

the U.S. fund rescue plan as inappropriate because it risked dragging out problems instead of tackling them head-on." The Reuters article stated that Deutsche Bank AG's chief executive officer, Josef Ackermann, rejected the idea and advised financial actors burdened with illiquid assets to write down their value now while the financial sector was strong and not to drag any uncertainty that has made banks become fearful to lend to one another.

86.    On October 16, 2007, Henry M. Paulson, Jr., U.S. Treasury secretary, said that the conduct of some mortgage market participants had been "shameful" and called for consideration of a nationwide licensing and monitoring system for mortgage brokers. *Secretary Paulson Speaks on Current Housing and Mortgage Market Developments*, US Fed News, Oct. 16, 2007. Mr. Paulson also warned caution over banks' exposure to off-balance sheet vehicles, such as Citigroup's conduit vehicles. Mr. Paulson stated that "[o]ur bank regulators must evaluate regulatory capital requirements applicable to bank exposures to off-balance sheet vehicles," and that the U.S. Treasury would "review the accounting rules" for these special purpose entities. *Id.*

87.    In connection with the SIV reports, the media reported that Citigroup "has nearly $160 billion in SIVs and conduits, but its shareholders wouldn't get a clear view of this from reading the bank's balance sheet." David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on*, Wall St. J., Oct. 17, 2007.

88.    It was also reported by the media that "Citigroup is the largest player in the SIV market with seven funds holding about $80 billion in assets" and that SIV "investors are skeptical" about the SIVs and that "[i]nvestors complained that the SIVs were not as reliable as they had been billed." Carrick Mollenkamp, Deborah Solomon, Robin Sidel and Valerie

Bauerlein, *SIVs Fueled Debt Boom, But Now Banks Scramble To Prop Up the Funds*, Wall St. J., Oct. 18, 2007.

89.     After the Company disclosed $500 million in additional losses and media reports surfaced about Citigroup's potential multi-billion dollar exposure to off balance sheet SIVs and conduits, Citigroup's common stock price fell from a close of $47.87 on Friday, October 12, 2007, to a close of $46.24 on October 15, 2007 -- a 3.4% decline. The Company's stock price continued to tumble over the next few days to $42.61 on October 19, 2007 -- a 10.9% decline -- wiping out approximately $25 billion in market value over a 5 day period.

90.     Citigroup's shares fell another 6.8% on November 1, 2007 after Credit Suisse and CIBC World Markets downgraded the Company's stock on concern that Citigroup might have to cut its dividend to boost its capital, amid reports that Citigroup would be required to disclose billions more in losses. Citigroup shares fell $2.85 to $38.51, their lowest level since May 2003 and their biggest one-day drop since September 2002.

91.     On November 2, 2007, after the market closed, the media reported that Citigroup's Board would hold an emergency meeting over the weekend, where Defendant Prince would resign.

92.     On November 3, 2007, the media reported that "[t]he SEC [was] reviewing how Citigroup accounted for certain off-balance-sheet transactions that are at the heart of a banking-industry rescue plan, according to people familiar with the matter." Robin Sidel, Monica Langley and Gregory Zuckerman, *Citigroup CEO Plans to Resign As Losses Grow --- Bank's Board to Meet With Prince on Sunday; SEC Queries Accounting*, Wall St. J., Nov. 3. 2007. The article also reported that "[t]he SEC is also taking a broad look at how brokerage

firms valued assets tied to high-risk mortgages and whether they were timely in their disclosure of losses to investors." *Id.*

93.    On November 4, 2007, Citigroup announced that its CEO, Defendant Prince resigned. The Company also announced "significant declines" in the fair value of approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business. The Company estimated that the reduction in revenues attributable to these declines ranged from approximately $8 billion to $11 billion. That would far surpass the roughly $2.2 billion in mortgage-related writedowns and trading losses that Citigroup reported in its third-quarter earnings last month.

94.    After the market opened on November 5, 2007, Citigroup's stock fell to $35.60.

95.    In all, as Citigroup slowly revealed its dire financial conditions, its stock fell from $54.26, on June 19, 2007, to $37.73, at the close of the market on November 2, 2007.. This amounts to a 30.5% decline in share price and a loss of approximately $81.2 billion in market value in less than six months, and falling to $35.60 the next trading day, November 5, 2007.

## IX.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.    Defendants' Knowledge of Citigroup's Stock Risk and Subsequent Communication with Plan Participants and Beneficiaries

96.    Because of Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and

33

employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

97.     Because of the access to this information, the Defendants knew or should have known that Citigroup's common stock was an imprudent investment during the Class Period.

98.     Upon information and belief, the Defendants regularly communicated with employees, including Plan participants and beneficiaries, about Citigroup's financial performance, future financial and business prospects, and the attractiveness of Citigroup stock.

99.     Despite the Defendants' knowledge of Citigroup's risky business practices during the Class Period, the Company fostered a positive attitude toward Citigroup as a Plan investment. Management touted strong Company performance and stock benefits. Employees continually heard positive news about Citigroup's growth, were led to believe that Citigroup stock was a good investment, and that the Plans were prudently managed.

100.    Moreover, Citigroup publicly repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be false and misleading.

101.    As fiduciaries, the Defendants had a duty to provide participants with complete and accurate information regarding the Plans' investment options, including the Citigroup Common Stock Fund. Despite these duties, however, the Defendants failed to provide Plan participants with complete and accurate information regarding Citigroup stock, such that the participants could appreciate the true risks presented by investments in the stock and could make informed decisions regarding investments in the Citigroup Common Stock Fund.

102.    Employees never received any information from the Company or any other Plan fiduciary that indicated that the Company's stock was not a prudent investment for their funds remaining in the Plans.

103.    Citigroup employees and Plan participants were led to believe that Citigroup stock was a prudent investment and that the Plans were managed properly.   These misleading communications regarding the performance of Citigroup stock and its true value caused Plaintiff and the Class to invest in the Citigroup Common Stock Fund and to maintain that investment to their detriment.

104.    Moreover, the Defendants knew or should have known certain basic facts about the characteristics and behavior of Plan participants, well-recognized in the 401(k) literature and the trade press, concerning investments in company stock, including that:

      a.    Out of loyalty, employees tend to invest in company stock;

      b.    Employees tend not to change their investment option allocations in the plan once made; and

      c.    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

105.    Even though the Defendants knew or should have known these facts, and even though they knew of the high concentration of Plan participant funds invested in the Citigroup Common Stock Fund, they did nothing to address these risks and circumstances.

106.    Defendants' concealment of material non-public information, as well as their improper influence on Plan participants, caused Plaintiff and the Class to invest in Citigroup

35

stock and retain their investment in the stock. The investment decisions of the Plaintiff and the Class were dependent on the misrepresentations and omissions of the Defendants.

**B.    Conflicts of Interest**

107.    Prince had a strong incentive for the participants of the Plan to invest heavily in Citigroup stock because his compensation was closely tied to the performance of Citigroup's stock price.

108.    In addition, the Administrative and Investment Committee members were dominated and/or controlled by Citigroup and Defendant Prince. Their salaries and bonuses were dependent upon obedience to Citigroup and Defendant Prince.

109.    These conflicts of interest forced the Defendants to choose between serving their own interests or serving the interests of the Plan participants and beneficiaries. Although ERISA requires that the Defendants serve the participants and beneficiaries with loyalty and prudence, the Defendants failed to do so.

**C.    Causation**

110.    The Plans suffered well over $1 billion in losses because a substantial amount of the Plans' assets were imprudently allowed to be put at great risk by the Defendants, through investment by the Plans in Citigroup common stock during the Class Period, and in breach of Defendants' fiduciary duties.

111.    Had the Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Citigroup common stock and divesting the Plans of Company stock offered by the Plans when such

investment alternative became imprudent, the Plans would have avoided all of the losses that it suffered through its investment in Company common stock.

**D.    Remedies for Defendants' Breach of Fiduciary Duties**

112.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been so heavily invested in Company stock. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

113.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

114.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been had the plan been properly administered.

115.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above, in an amount to be proven at trial

based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);
(2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as
provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3)
reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the
common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these
amounts, as provided by law; and (6) such other legal or equitable relief as may be just and
proper.

116.    Each Defendant is personally liable and jointly liable for the acts of the other
Defendants as a co-fiduciary.

## IV.    CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2),
and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class consisting of
all participants or beneficiaries of the Plans and their beneficiaries, excluding the Defendants, for
whose accounts the fiduciaries of the Plans made or maintained investments in Citigroup stock
through the Plans during the Class Period, from January 1, 2007 through the present. Excluded
from the Class are Defendants, members of the Defendants' immediate families, any officer,
director or partner of any Defendant or any entity in which a Defendant has a controlling interest
and the heirs, successors or assigns of any of the foregoing.

118.    This action is properly maintainable as a class action because:

A.    The members of the Class are so numerous that joinder of all members is
impracticable. While the exact number of Class members are unknown by Plaintiff at this time
and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a

minimum, thousands of members of the Class. According to the Citigroup 401(k) Plan's Form 5500 Annual Report for the year ended December 31, 2005, the plan had 157,504 participants with account balances at the end of the year.

B.    Plaintiff's claims are typical of those of the Class because Plaintiff and members of the Class suffered similar harm and damages as a result of Defendants' systematic unlawful and wrongful conduct described herein. Absent a class action, members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

C.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in complex class action and ERISA litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent.

D.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner making declaratory and injunctive relief to the Class as a whole appropriate.

Doc. 158619                                        39

119.    The questions of law and fact common to the members of the Class

predominate over any questions affecting individual members of the Class.  The questions of law

and fact which are common to Plaintiff and the Class include, among others:

        a.    Whether ERISA applies to the claims at issue;

        b.    Whether Defendants owe and owed fiduciary duties to the members of the

           Class;

        c.    The nature of the fiduciary duties Defendants owe or owed to members of

           the Class;

        d.    Whether Defendants breached their fiduciary duties; and

        e.    The extent of losses sustained by members of the Class and/or the Plan

           and the appropriate measure of relief.

120.    Plaintiff anticipates no difficulties in the management of this action as a class

action.

### V.    ERISA § 404(C) DEFENSE INAPPLICABLE

121.    ERISA § 404(c) is an affirmative defense that provides a limited exception to

fiduciary liability for losses that result from participants' exercise of control over investment

decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control"

over investment decisions, and the fiduciaries must otherwise satisfy the procedural and

substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations

promulgated under it.

122.    ERISA § 404(c) does not apply here for several reasons.  First, ERISA § 404(c)

does not and cannot provide any defense to the Plans' fiduciaries' imprudent decision to select

and continue offering Citigroup stock in the Plan, as that decision was not made or controlled by the participants. See Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550).

123.    Second, even as to participant directed investment in Citigroup stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Citigroup stock. See 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Citigroup stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

124.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plans, the Plaintiff, and the Class for losses caused by the Plans' investment in Citigroup stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

## COUNT I
### For Breach of Fiduciary Duty or Knowing Participation Therein
### (Against All Defendants)

125.    Plaintiff incorporates the foregoing paragraphs herein by reference.

126.    The Plan is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.*, and Plaintiff and the Class are participants and/or beneficiaries in the Plan. Each of the Defendants is

a fiduciary or co-fiduciary with respect to the Plans pursuant to the provisions of ERISA. As

co-fiduciaries, each of the Defendants is liable for the other's conduct.

127.    Defendants violated their fiduciary duties of loyalty and prudence by: (1) failing to

adequately investigate and monitor the merits of the investments in Company stock; (2) failing to

take steps to eliminate or reduce the amount of Company stock in the Plans; and (3) failing to

give plaintiffs and the Class accurate information about Citigroup regarding its business practices

so they could make informed investment choices under the Plans.

128.    At all times relevant to the allegations raised herein, each of the Defendants was a

co-fiduciary of the others. Each Defendant knowingly participated in the fiduciary breaches

described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure

to comply with the provisions of ERISA, and/or had knowledge of the breaches of its

co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

129.    As a result of Defendants' breach of fiduciary duties, Plaintiff and the Class, as

well as the Plans, suffered damages, the exact amount of which will be determined at trial.

Defendants are personally liable to Plaintiff and the Class for these losses.

### COUNT II
### For Violations of ERISA Disclosure Requirements
### (Against All Defendants)

130.    Plaintiff incorporates the foregoing paragraphs herein by reference.

131.    Defendants failed to advise Plaintiff and the Class that their investment in

Citigroup stock was at substantial risk as a result of the Company's business practices and its

exposure to massive penalties and/or fines. Defendants also failed to provide Plaintiff and the

Class with accurate, truthful, or complete information about the Company's operations and illegal generation of revenue.

132.    Unbeknownst to Plaintiff and the Class, but known to Defendants, Citigroup's undisclosed risk of impaired financial condition was not revealed during the relevant time period. Because of the disparity in knowledge between Defendants, Plaintiff, and the Class, Plaintiff and the Class relied on Defendants to provide them with accurate and complete information about Citigroup, which was material to the suitability of Company stock as a prudent investment option.

133.    By failing to convey complete and accurate information to Plaintiff and the Class, Defendants violated their affirmative duty to disclose sufficient information to apprise Plaintiff and the Class of the risks associated with investment in Company stock when Defendants knew or should have known that the failure to disclose such material information would result in damages to Plaintiff and the Class.

134.    As a result of Defendants' failure to disclose and inform, Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiff and the Class for these losses.

**COUNT III**
**For Failure to Monitor Fiduciaries**
**(Against Citigroup and Defendant Prince)**

135.    Plaintiff incorporates the foregoing paragraphs herein by reference.

136.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

43

137.    Upon information and belief, at all relevant times, the scope of the fiduciary duties of Citigroup and Defendant Prince included the responsibility to appoint, and, thus, monitor the performance of the Administrative Committee.

138.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

139.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

140.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

141.    Citigroup and Defendant Prince breached their fiduciary monitoring duties by, among other things: (a) failing altogether to monitor their appointees, to evaluate their

performance, or to have any system in place for doing so, and standing idly by as the Plans

suffered enormous losses as a result of the appointees imprudent action; (b) failing to ensure that

the monitored fiduciaries appreciated the true extent of Citigroup's highly risky and inappropriate

business and inflated revenue from illegal activities, and the likely impact of such practices on

the value of the Plan's investment in Citigroup stock; (c) to the extent any appointee lacked such

information, failing to provide complete and accurate information to all of their appointees such

that they could make sufficiently informed decisions with respect to the Plans' assets; and (d)

failing to remove appointees named herein whose performance was inadequate in that they

continued to make and maintain huge investments in Citigroup stock during the Class Period for

participants' retirement savings in the Plans, and who breached their fiduciary duties under

ERISA.

142. As a result of Citigroup and Defendant Prince failure to monitor fiduciaries,

Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial.

Defendant Prince is personally liable to Plaintiff and the Class for these losses.

## COUNT IV
### For Breach of Duty to Avoid Conflicts of Interest
### (Against All Defendants)

143. Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

144. At all relevant times, as alleged above, all Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

145. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a

duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the

interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

146.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in the Citigroup Common Stock Fund; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Citigroup Stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company, their co-defendants, and themselves above the interests of the participants with respect to the Plans' investment in Company Stock.

147.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

148.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

### COUNT V
### Co-Fiduciary Liability
### (Against All Defendants)

149.    Plaintiffs incorporate by this reference the allegations above.

46

150.   This Count alleges co-fiduciary liability against the following Defendants: Citigroup and Prince (collectively, the "Co- Fiduciary Defendants").

151.   As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

152.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

153.   Knowledge of a Breach and Failure to Remedy: ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Citigroup and Defendant Prince knew of the breaches by other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

154.   Citigroup, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Citigroup as a matter of law.

155.   Defendant Prince, by virtue of his position at Citigroup, participated in and/or knew about the Company's highly risky and inappropriate business and as well as their consequences, including the artificial inflation of the value of Citigroup stock.

156.   Because Citigroup and Defendant Prince knew of the Company's inappropriate business practices, they also knew: a) that the members of Administrative and Investment Committees were breaching their duties by continuing to invest in Company stock; and b) that the members of the Administrative and Investment Committees were breaching their duties by providing incomplete and inaccurate information to participants. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Citigroup's loan loss exposures, and obfuscating the risks posed to the Company, and, thus, to the Plans.

157.   **Knowing Participation in a Breach**: ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Citigroup, as a de facto fiduciary as alleged above, participated in all aspects of the fiduciary breaches of the other Defendants. Likewise, Defendant Prince knowingly participated in the breaches of the members of the Administrative and Investment Committees because, as alleged above, they had actual knowledge of the Company's misconduct, ignoring their oversight responsibilities (as Directors), and permitted the members of the Administrative and Investment Committees to breach their duties.

158.    **Enabling a Breach:** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

159.    Citigroup and Defendant Prince's failure to monitor the members of the Administrative and Investment Committees enabled those committees to breach their duties.

160.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost well over a billion dollars of retirement savings.

161.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### COUNT VI
#### Knowing Participation in a Breach of Fiduciary Duty
#### (Against All Defendants)

162.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

163.    To the extent that Citigroup is found not to have been fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Citigroup knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

164.    Citigroup benefitted from the breaches by discharging its obligations to make contributions to the Plans in amounts specified by the Plans, contributing Citigroup stock to the Plans while the value of the stock was inflated as the result of Citigroup's highly risky and improper business practices, and providing the market with materially misleading statements and omissions.  Accordingly, Citigroup may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Citigroup stock which would have been contributed to the Plans, but for Citigroup's participation in the foregoing breaches of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class;

b.    Declaring that Defendants have violated the duties, responsibilities, and obligations  imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

c.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Fed. R. Civ. P. 64 and 65;

d.    Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement and/or other remedial relief;

e.    Allowing a trial by jury to the extent permitted by law;

f.    Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and

post judgment interest, as well as their reasonable attorneys' fees, expert witness

fees, and other costs; and

g.    Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York

November 5, 2007

Respectfully submitted,

By: _____

Marian P. Rosner (MR-0410)
Robert Finkel (RF-2373)
Andrew Lencyk (AL-4329)
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel. (212) 759.4600
*Attorneys for Plaintiff*

Doc. 158619

51

**EXHIBIT H**

CHIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAUN ROSE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CITIGROUP INC., CHARLES PRINCE, THE PLANS ADMINISTRATIVE COMMITTEE OF CITIGROUP, INC., THE 401(k) INVESTMENT COMMITTEE and JOHN DOES 1-10.<br><br>Defendants. | # 07 CV 10294<br><br>CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shaun Rose ("Plaintiff"), by his attorneys, on behalf of the Citigroup 401(k) Plan (the "Citigroup Plan"), the Citibuilder 401(k) Plan for Puerto Rico (the "Citibuilder Plan") (collectively, the "Plan" or "Plans") and a class of similarly situated current and former participants ("Participants") in the Plans during the proposed Class Period (defined below), alleges as follows:

### INTRODUCTION

1.      This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plans.

2.      Plaintiff was employed with Citigroup, Inc. ("Citigroup" or the "Company") and was a participant in the Citigroup Plan during the Class Period, during which time the Plan held interests in the Company's common stock. Plaintiff's retirement investment portfolio in the Plan during the Class Period included Citigroup stock.

3.     Plaintiff brings this action for Plan-wide relief on behalf of the Plans and on behalf of a class of all Participants in the Plans for whose individual accounts the Plans held shares of Citigroup common stock and/or a fund invested in Citigroup common stock (collectively, "Citigroup stock," "stock," or "Fund")

4.     401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio. Citigroup stock was one of the investment alternatives of the Plans throughout the Class Period.

5.     Plaintiff alleges that Defendants, as fiduciaries of the Plans as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to him/her and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plans' heavy holdings of Citigroup stock.

6.     Specifically, Plaintiff alleges in Count I that the Defendants, each having certain responsibilities regarding the management and investment of the Plans' assets, breached their fiduciary duties to him, the Plans and proposed Class by failing to prudently and loyally manage the Plans' investment in Company securities by (1) continuing to offer Citigroup stock as a Plan investment option for participant contributions when it was imprudent to do so; and (2) maintaining the Plans' pre-existing heavy investment in Citigroup equity when Company stock was no longer a prudent investment for the Plans. These actions/inactions run directly counter to the express purpose of ERISA pension plans which are designed to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

7.     Plaintiff's Count II alleges that certain Defendants failed to communicate to the Plans' participants complete and accurate information regarding the Plans' investment in Citigroup stock sufficient enough to advise participants of the true risks of investing their retirement savings in Company stock.

2

8.    Plaintiff's Count III alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plans' and its participants' best interests in mind.

9.    Plaintiff's Count IV alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of the Plans' assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Citigroup stock as an investment option and investing the Plans' assets in Citigroup stock when it was no longer prudent to do so.

10.    Plaintiff alleges that Defendants allowed the heavy imprudent investment of Plan assets in Citigroup stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained in detail below and among other things, (a) the Company's failure to disclose material adverse facts about its financial well-being, business relationships and prospects; (b) the foreseeable deleterious consequences to the Company resulting from its substantial entrenchment in the subprime mortgage and related securities markets; (c) the fact that, as a consequence of the above, the Company's stock price was artificially inflated; and (d) the fact that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plans, and consequently, to its participants.

11.    This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132. Because Plaintiff's claims apply to the Plans, inclusive of all participants with Plan accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plan-wide relief from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

### JURISDICTION AND VENUE

3

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were either administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

14.     More specifically, this district is an appropriate venue for this action because, on a recent Plan Form 5500 annual filing with the Internal Revenue Service ("IRS") and Department of Labor ("DOL"), the address listed for the Plan Administrator of the Plans is in this district. *See* IRS and DOL Form 5500 for the Plan, filed 2005 ("2005 Plan 5500"). In addition, the principal executive offices of Defendant Citigroup are located in this district. Accordingly, it is likely that many of the parties and potential witnesses, including corporate executives and many Plan participants, are located in or within close proximity to this district.

**PARTIES**

**Plaintiff**

15.     Plaintiff Shaun Rose is a "participant" in the Citigroup Plan, within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Citigroup shares in his retirement investment portfolio during the Class Period.

**Defendants**

**Citigroup**

16.     Defendant Citigroup is a Delaware corporation with its principal place of business located at 399 Park Avenue, New York, New York 10043. Citigroup is a diversified global financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services, commercial loans to corporate entities, and advisory services regarding the structuring of financial transactions, including engaging in or helping to structure

4

derivatives and hedging financial transactions, acting as underwriter in the sale of corporate securities to the public, and providing investment analysis and opinions on public companies, including its clients, via reports issued by securities analysts. Citigroup has more than 200 million customer accounts and does business in more than 100 countries.

17.    Citigroup, or one of its subsidiaries, is the named sponsor of the Plans.[1] *See* 2005 Plan 5500. Further, the Company exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, and was therefore a fiduciary of the Plans in its own right. Citigroup acted through its Board of Directors, as well as officers and employees, including, upon information and belief, its Chief Executive Officer ("CEO"), and members of any Company oversight and/or Plan administrative/investment committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

18.    Citigroup had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities. Through its Board of Directors or otherwise, Citigroup had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plans. By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plans, its participants and their beneficiaries. Accordingly, the actions of the Board of Directors, the Plans' administrative

---

[1] According to the Company's 2006 11-K, Citibank, N.A., a subsidiary of Citibank, is the actual sponsor of the Citibuilder Plan.

and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

19.    The Company and its Board of Directors (the "Board") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plans' assets. Indicative of the Board's authority, upon information and belief, the Board was ultimately responsible for monitoring and administering the Plans, appointing, monitoring and removing members of committees charged with the operation of the Plans, and for determining the amount, if any, of any additional discretionary or matching contributions by the Company to the Plan. Upon information and belief, the Board also had the authority and obligation to appoint and remove other Plan fiduciaries, including, without limitation, members of the Plans Administration Committee of Citigroup, Inc., ("Administrative Committee") and the 401(k) Investment Committee ("Investment Committee") (collectively, "Committees"), if necessary in order to best serve the interests of Plan participants.

**Administrative Committee Defendants**

20.    Defendant Administrative Committee is designated by Citigroup as the plan administrator. The Administrative Committee is responsible for the operation and administration of the Plans and, upon information and belief, is a "named fiduciary" of the Plans as that term is defined in ERISA Section 403(a)(1). Identities of the Administrative Committee members are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek to join them under their true names.

21.    The Administrative Committee and its individual members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised

6

discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

**Investment Committee Defendants**

22.    Defendant Investment Committee, upon information and belief, is designated by Citigroup as a "named fiduciary" as that term is defined in Section 403(a)(1) of ERISA. The Investment Committee is responsible for monitoring, selecting, managing and administering the investment funds held by the Plans. Identities of Investment Committee members are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek to join them under their true names.

23.    The Investment Committee and its individual members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

**The Director Defendants**

24.    Defendant Charles Prince ("Prince") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period, resigning on November 4, 2007. Defendant Prince was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

25.    Defendant Prince and any Director John Doe Defendants are hereinafter collectively referred to as the "Director Defendants."

**Additional "John Doe" Defendants**

7

26.     Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Administrative Committee, Investment Committee, as well as Company officers, directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

## THE PLANS

27.     Each of the Plans is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are neither defendants nor plaintiffs. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

28.     The Plans are "defined contribution plan[s]" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

**The Citigroup Plan**

29.     The stated purpose of the Citigroup Plan is "to encourage savings on the part of eligible employees." *See* 2006 11-K.[2] The Citigroup Plan purportedly consists of an Employee stock Ownership Plan (ESOP) component and a non-ESOP component. "The ESOP component [effective March 1, 2003] consists of any amount invested in the Citigroup Common stock Fund under the Citigroup Plan, provided that these amounts are attributable to Company contributions and earnings thereon made to participant accounts for any Plan year beginning on or after

---

[2] The information contained in this section is taken from the 2006 11-K, unless otherwise indicated.

January 1, 2003." *Id.*

30.    Certain ERISA plans contain an ESOP component that is intended to be deemed an "eligible individual account plan" ("EIAP") designed to invest primarily in employer securities pursuant to ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6). (ERISA plans otherwise may not hold employer securities.) Although the Citigroup Plan includes a purported ESOP component, upon information and belief, the Citigroup Plan does not satisfy all of the statutory and regulatory mandates with respect to ESOP or EIAP design and/or operation.

31.    Eligible employees for the Citigroup Plan are generally those who are performing services for the Company and participating subsidiaries.

32.    Individual accounts are maintained for each Citigroup Plan participant. Each participant's account is credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.

33.    The trustee of the Citigroup Plan is Citibank N.A. (the " Citigroup Plan Trustee"), which is a subsidiary of the Company.

34.    All contributions to the Citigroup Plan may be allocated among any of the available investments selected by the participant from among the investments designated by, upon information and belief, the Committees. However, a "fifteen-day hold applies to the [Citigroup] Plan's investment funds so that participants cannot transfer money into and out of the same fund within 15 calendar days." 2006 11-K. This restriction does not apply to the Stable Value Fund and the Citi Institutional Liquid Reserves Fund, which have their own restrictions. *Id.*

35.    As of December 31, 2006, there were 32 investment options in the Citigroup Plan, including the Citigroup stock.

9

**Participant Contributions**

36.     Each eligible employee is permitted to contribute in 1% increments, and on a pre-tax basis, an amount up to 50% of his or her eligible pay.[3] *See* 2006 11-K.

37.     Participants are always 100% vested in contributions to the Citigroup Plan made from their eligible compensation and in the earnings thereon. *Id.*

**Company Contributions**

38.     An employee is eligible for Company matching contributions if he or she has been employed for a minimum period (generally one year for full-time employees) and his or her qualifying compensation is $100,000 or less. *Id.*   The maximum Company Matching Contributions are the lesser of $1,500 or 3% of eligible pay.  The following table demonstrates the matching protocol:

| Qualifying Compensation | For each $1 contributed by the participant, the Company will contribute: | To a maximum of: |
|---|---|---|
| $0-$50,000 | $3 | 3% of eligible pay to maximum of $1,500 annually |
| $50,000.01-$75,000 | $2 | Same |
| $75,000.01-$100,000 | $1 | Same |
| Greater than $100,000 | No matching contribution made | |

39.     Prior to January 1, 2007, the Company Matching Contributions made to participant accounts had to remain in Citigroup stock for five Citigroup Plan years, unless the participant attained the age of 55. Effective January 1, 2007, past and future Company Matching Contributions initially invested in Citigroup stock could be transferred into other Plan

---

[3] In 2006, the statutory limit on contributions was $15,000 and in 2005 it was $14,000).

investments.[4]

40.    Participants become vested in Company contributions and earnings thereon under the following circumstances: (1) upon completion of three years of service; (2) if a participant reaches age 55, dies, or becomes disabled while in service; or (2) in the case of a full or partial termination of the Citigroup Plan or complete discontinuance of contributions under the Citigroup Plan. 2006 11-K.

41.    Upon information and belief, each and every Citigroup Plan participant had Company stock in their Plan account during the Class Period. As a result, a substantial portion of the Citigroup Plan's assets are invested in Company stock.

42.    For year end 2006, the assets in the Citigroup Plan were valued at **$12,923,048,740** with Citigroup Common stock comprising **$4,134,940,504** of this amount.

**The Citibuilder Plan**

43.    The stated purpose of the Citibuilder Plan, which became effective on January 1, 2006, is "to encourage savings on the part of eligible employees." *See* 2006 11-K. The Citibuilder Plan covers eligible employees of Citibank, N.A. and its affiliates who primarily reside and work in Puerto Rico. *Id.*

44.    Eligible employees for the Citibuilder Plan are generally those who are performing services for the Company and participating subsidiaries. *Id.*

45.    Individual accounts are maintained for each Citibuilder Plan participant. Each participant's account is credited with employee contributions, Company matching contributions

---

[4] Effective January 1, 2008, the Company Matching Contributions will be increased to a maximum of 6% of the participant's eligible pay for eligible employees at all compensation levels. The Company Matching Contribution will be calculated as the lesser of 6% of the eligible pay or the amount of their contributions to the Plan. The Company also will make a fixed contribution of up to 2% of eligible pay to the Plan accounts of eligible participants whose total compensation is less than $100,000. *See* 2006 11-K.

and investment earnings, and charged with the allocation of investment losses.

46.    The trustee of the Citibuilder Plan is Banco Popular de Puerto Rico (the "Citibuilder Plan Trustee").

47.    All contributions to the Citibuilder Plan may be allocated among any of the available investments selected by the participant from among the investments designated by, upon information and belief, the Committees. However, a "fifteen-day hold applies to the [Citigroup] Plan's investment funds so that participants cannot transfer money into and out of the same fund within 15 calendar days." 2006 11-K. This restriction does not apply to the Stable Value Fund and the Citi Institutional Liquid Reserves Fund, which have their own restrictions. *Id.*

48.    As of December 31, 2006, there were 31 investment options in the Citibuilder Plan, including the Citigroup stock. *Id.*

**Participant Contributions**

49.    Each eligible employee is permitted to contribute in 1% increments, and on a pre-tax basis, an amount up to 10% of his or her eligible pay with maximum contribution of $8,000.00. *See* 2006 11-K.

50.    Participants are always 100% vested in contributions to the Citigroup Plan made from their eligible compensation and in the earnings thereon. *Id.*

**Company Contributions**

51.    Eligible Company employees whose qualifying compensation is $100,000 or less receive Company Matching Contributions. *Id.* The maximum Company Matching Contributions are the lesser of $1,500 or 3% of eligible pay. The following table demonstrates the matching protocol:

12

| Qualifying Compensation | For each $1 contributed by the participant, the Company will contribute: | To a maximum of: |
|---|---|---|
| $0-$50,000 | $3 | 3% of eligible pay to maximum of $1,500 annually |
| $50,000.01-$75,000 | $2 | Same |
| $75,000.01-$100,000 | $1 | Same |
| Greater than $100,000 | No matching contribution made | |

52.    Prior to January 1, 2007, the Company Matching Contributions made to participant accounts had to remain in Citigroup stock for five Citibuilder Plan years, unless the participant attained the age of 55. Effective January 1, 2007, past and future Company Matching Contributions initially invested in Citigroup stock could be transferred into other Plan investments.[5]

53.    Participants become vested in Company contributions and earnings thereon under the following circumstances: (1) upon completion of three years of service; (2) if a participant reaches age 55, dies, or becomes disabled while in service; or (2) in the case of a full or partial termination of the Citigroup Plan or complete discontinuance of contributions under the Citigroup Plan. 2006 11-K.

54.    Upon information and belief, each and every Citibuilder Plan participant had Company stock in their Plan account during the Class Period. As a result, a substantial portion of the Citibuilder Plan's assets are invested in Company stock.

55.    For year end 2006, the assets in the Citibuilder Plan were valued at $23,113,162.00 with Citigroup Common stock comprising $7,397,590.00 of this amount.

## CLASS ACTION ALLEGATIONS

---

[5] Effective January 1, 2008, the Company Matching Contributions will be increased to provide a two-for-one match on the first 3% of the participant's eligible pay (up to the annual maximum set by the Puerto Rico Internal Revenue Code of 1994 ("PRIRC")) for eligible employees at all compensation levels. The Company Matching Contribution will be calculated as the lesser of 3% of the eligible pay or the amount of their contributions to the Citibuilder Plan. The Company Matching Contribution may be less than these amounts if necessary to meet the maximums set by the PRIRC. The Company also will make a fixed contribution of up to 2% of eligible pay to the Plan accounts of eligible participants whose total compensation is less than $100,000. *See* 2006 11-K.

56.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Citigroup 401(k) Plan (the "Citigroup Plan") and the Citibuilder 401(k) Plan for Puerto Rico (the "Citibuilder Plan") (collectively, "Plan" or "Plans") at any time between January 19, 2007 and the present (the "Class Period") and whose Plan accounts included investments in Citigroup stock. Excluded from the Class are the defendants, any entity in which the defendants have a controlling interest, or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the defendants.

57.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period and whose Plan accounts included investment in Citigroup stock.[6]

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to the

Plans, Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the

Plans, Plaintiff and members of the Class by failing to act

prudently and solely in the interests of the Plans and the

Plans' participants and beneficiaries;

---

[6] *E.g.* the Citigroup Plan's Form 5500 for Plan year 2005 indicates that, at the beginning of that Plan year, the Citigroup Plan had approximately 189,470 participants. The Citibuilder Plan had 53,116 Plan participants at the beginning of the 2000 Plan year.

(c)  whether Defendants violated ERISA; and

(d)  whether the Plans and members of the Class have sustained damages and, if so, the proper measure of damages.

59.  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plans and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

60.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plans or the Class.

61.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

62.  Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

63.  During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

64.  During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

65.  ERISA requires every plan to provide for one or more named fiduciaries who will

15

have "authority to control and manage the operation and administration of the plan." §
402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Company, the Board and
the Committees were named fiduciaries of the Plan.

66.    Instead of delegating fiduciary responsibility for the Plans to external service
providers, Citigroup chose to internalize at least certain aspects of this fiduciary function.

67.    Upon information and belief, the Company administered the Plans through the
Board, the Administrative Committee and the Investment Committee, which had discretionary
authority to manage and control the operation and administration of the Plans and investment of
its assets, as noted above. The Company, through the Board and the Administrative Committee,
was, upon information and belief, responsible for appointing, evaluating and monitoring the
Investment Committee, including its members and delegees.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

68.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under
§ 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary
functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a
fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control
respecting management of such plan or exercises any authority or control respecting
management of disposition of its assets . . . ." During the Class Period, Defendants performed
fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

69.    Further, ERISA mandates that plan fiduciaries have a duty of loyalty to the Plans
and its participants which includes the duty to speak truthfully to the Plans and its participants
when communicating with them. A fiduciary's duty of loyalty to the Plan participants under
ERISA includes an obligation not to materially mislead, or knowingly allow others to materially
mislead, Plan participants and beneficiaries. "[L]ying is inconsistent with the duty of loyalty

16

owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that Plan participants will not be injured. *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Jones v. Am. Gen. Life & Accident Ins. Co.*, 370 F.3d 1065, 1072 (11th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993).

70.     During the Class Period, upon information and belief, Defendants made direct and indirect communications with Plan participants including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and Prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, Citigroup's SEC filings were incorporated into and made part of the SPDs, the Prospectus and/or the Form S-8 registration statements. Defendants also acted as fiduciaries to the extent of this activity.

71.     Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press,[7] concerning investment in company stock, including

---

[7] Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at

that:

    (a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

    (b)     Out of loyalty, employees tend to invest in company stock;

    (c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

    (d)     Employees tend not to change their investment option allocations in the plan once made;

    (e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

    (f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

    (g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

    72.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

## DEFENDANTS' CONDUCT

    73.     Citigroup is one of the world's largest bank holding companies boasting diverse

---

http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

segments and products. Its segments include Global Consumer Groups, Corporate and Investment Banking, Global Wealth Management and Alternative Investments. *See* Citigroup Form10-K for the year 2006 filed with the SEC on February 23, 2007 ("2006 10-K"). As of December 31, 2006, the Company had approximately 144,000 full-time and 10,000 part-time employees in the United States and approximately 183,000 full-time employees outside the United States. *Id.* The Company is thus a global leader in banking and related services.

74.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to Plan participants. Although they knew or should have known that the Company's stock was artificially inflated, due to the Company's gargantuan involvement in the securitized subprime mortgage market, Defendants continuously reassured Plan participants and did nothing to protect the heavy investment of their retirement savings in Citigroup stock.

**The Subprime Mortgage Industry**

75.    Subprime mortgage lending is defined as the practice of issuing high-interest or variable interest loans to customers with impaired or non-existing credit histories, who otherwise would not qualify for loans from mainstream lenders.

76.    Typically, subprime borrowers have relatively low credit scores along with little or no money to apply to a down-payment on a home. These individuals would usually be excluded from the mortgage market and, accordingly, would not have mortgages included in the secondary market.

77.    According to an article in *USA Today* on December 7, 2004, subprime mortgage lenders "offer products from fixed-rate mortgages to interest-only loans, where borrowers pay just the interest for a set number of years, or 80-20 loans, in which borrowers finance a home with an 80% mortgage at one rate and the remaining 20% through a second loan." *USA Today*, "Subprime Loan Market Grows Despite Troubles," December 7, 2004.

78.    Subprime mortgage loans represent a greater risk to lenders than prime mortgage loans. For example, one product marketed by some subprime lenders is a Pay Option ARM,

19

which is an adjustable rate mortgage with an interest rate that changes monthly and payments that change annually. The borrower can choose from a variety of payment options, including one that is below what would be paid in an interest-only mortgage. Selection of this option would result in negative amortization, meaning that the loan's principal would actually *increase* during this period. Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed since the loan was made. In both cases, the loan will become fully amortizing (meaning interest and principal payments will be made like a traditional mortgage. The reversion to full amortization is referred to as a "reset" or "recast" and can result in a substantial increase in a borrower's monthly mortgage payment. If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

79.    An additional product marketed by many subprime lenders is the 2/28 ARM, which is an adjustable rate mortgage that fixes rates for two years, and then resets to an ARM rate index value (*e.g.* the Treasury Bill rate or the London Inter-Bank Offering Rate (LIBOR)) plus a "margin" ("fixed percentage points above the "index " rate) after the two-year mark. For example if the rate is 5% for two years but after two years, the index is 4% and the margin is 4.5%, a 5% loan becomes an 8.5% loan. As with the Pay Option ARM discussed above, if borrowers are unable to refinance the loan and obtain a more favorable arrangement, they may be in a position where they cannot meet their new mortgage payment once their fixed mortgage loan resets.

80.    Upon information and belief, many mortgage lenders intentionally steered borrowers into high-cost, unsuitable subprime loans. For instance, in 2006, $600 billion, or 20% of the total mortgage originations were subprime loans as compared with $40 billion in Federal Housing Administration ("FHA")-insured loans, which are typically less costly for borrowers, but less profitable for lenders. Further, FHA loans generally require borrowers to supply extensive documentation and therefore take much longer to secure approval. Evidence strongly

20

suggests that lenders sought to profit on higher margin subprime mortgages by making subprime adjustable rate mortgages, even when borrowers could qualify for a loan through the FHA program. For example, *TheStreet.com* reported, as of April 2007, that "under current FHA requirements, approximately 18% of the 'pre-reset' subprime adjustable-rate mortgages, including those originated last year, could qualify for an FHA loan." *TheStreet.com*, "Subprime Swoon sparks an FHA Revival," April 30, 2007.

81.    Rather than hold mortgage loans, generally, lenders sell subprime mortgages "bundled into bonds and offered to individual and institutional investors. Mortgages are sold by lenders to the secondary market, pooled, securitized and sold to investors as mortgage-backed securities. The money that the lender receives for the sale of the mortgages on the secondary market is then used to fund new mortgages—increasing the lender's profits and, typically, boosting its stock price.

82.    As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans. Too often, this had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans. In other words, many lenders became less concerned with borrowers' ability to repay over the long term and more concerned with their mere volume of loans over the short term. This is because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay.

83.    Thus, as home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for these mortgages rose as well. For example, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5% in 2006, as reflected in the chart below:

21



Source: *The New York Times*, "Tremors at the Door," January 26, 2007.

84.    The substantial increase in mortgage loan defaults has had a tremendous impact upon the mortgage market. During the first half of 2007, dozens of lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

**Citigroup's Heavy Participation in the Subprime Market**

85.    Generally speaking, collateralized debt obligations ("CDOs") are pools of bonds, loans and other asset-backed securities. After mortgages are written, investment banks pool them together and use the cash flows they produce to pay off mortgage-backed bonds, which are underwritten by investment banks. The mortgage bonds, in turn, are often packaged again into CDOs and sold to investors in slices. In 2006, CDOs soaked up an estimated $150 billion of mortgage-backed bonds, the vast majority of which were underpinned by subprime mortgages. A CDO usually takes several months to assemble a portfolio of bonds before it raises money from investors by issuing securities of its own. During the "ramp-up" period, CDO managers -- typically big money managers -- work with a Wall Street bank to buy and collect the securities that will be bundled together. The bank often bears the risk of short-term fluctuations in prices

22

of the bonds prior to the sale of the CDO. Serena Ng and Michael Hudson, *Mortgage Shakeour May Roil CDO Market*, *The Wall Street Journal*, March 13, 2007.

86.     Citigroup was deeply entrenched in investments in the subprime mortgage market, including CDOs and other mortgage-backed securities. Further, Citigroup has been one of the largest underwriters of CDOs, as a result of an aggressive marketing effort and a commitment to investing in the subprime mortgage market. Citigroup currently "has some $55 billion of direct exposure to American subprime mortgages through loans and CDOs." *See The Economist*, "America's Economy," Nov. 5, 2007. CDO's alone comprise $43 billion of this amount. Robin Sidel, *Citi Shares Fall in Wake of Shake-Up, Write Downs*, *The Wall Street Journal*, Nov. 5, 2007.

87.     The problems in the subprime mortgage industry had investors demanding much higher returns on CDOs they buy, which had the impact of making them more difficult to sell and drove down prices. Despite the fact that most investment banks recognized warning signs and reduced their exposure to CDOs, Citigroup failed to take adequate measures to address limit its exposure to losses resulting from its substantial entrenchment in the subprime mortgage market. While some of its peers placed savvy bets that the value of home loans and related securities would fall, Citigroup stood paralyzed. "The situation has called into question Citgroup's ability to manage its risk appropriately." *See* Robin Sidel, *A Vote of Confidence For CEO Charles Prince In 'Year of No Excuses,'* *The Wall Street Journal*, October 2, 2007.

88.     Thus, when the subprime mortgage market collapsed, Citigroup found itself trapped with billions of dollars of debt that it simply could not resell—investors were not interested.

89.     Certain of Defendants had a clear conflict of interest, as their compensation was tied to the Company's performance. Thus, despite the fact that they knew or should have known that Citigroup's heavy involvement in the CDO market would lead to a substantial devaluation of the Company's stock once the truth became known, certain of Defendants had a strong financial incentive to conceal the truth and keep the Company's stock price artificially high and write-

downs for subprime losses artificially low.

**Citigroup's Involvement in Structured Investment Vehicles (SIV)**

90.     Closely related to Citigroup's involvement in the CDO market is its involvement in SIVs, which are off-balance-sheet entities that have invested heavily invested in mortgage-backed securities. A plan pushed by Citigroup and other banks, as part of the banking-industry rescue plan related to the collapse of the subprime market, would set up a new "superconduit" to buy assets from SIVs. *See* Robin Sidel, *Citigroup CEO Plans to Resign As Losses Grow, The Wall Street Journal*, Nov. 3, 2007

91.     SIVs are entities that banks use to issue commercial paper, which are usually highly rated, short-term notes that provide investors an investment with a yield above government debt and other similar investments. More specifically, SIVs have issued short-term debt to investors such as money-market funds while buying mortgage-backed securities and other assets that carry a higher yield.

92.     Because most SIVs are off the-balance-sheet entities, it is difficult for investors to determine the financial risks they pose. Citibank touts on its website that it has a long history of successfully managing SIVs on behalf of investor clients. It states that, the seven SIVs advised by Citi Alternative Investments hold a total of approximately $80 billion assets.

93.     In fact, Citigroup is the largest player in the $350 billion SIV market. *See* Robin Sidel, *Citigroup CEO Plans to Resign As Losses Grow, The Wall Street Journal,* Nov. 3, 2007.

94.     Citigroup's conduits invested in subprime loans and, as a result, many investors are no longer willing to purchase commercial paper from its SIVs. Since the conduits still owe money to commercial-paper holders, and they cannot raise money by selling new commercial paper, they are being forced to sell its assets at cut-rate prices to pay off its debts. As a result, Citigroup's conduits are on the verge of collapsing, thus subjecting the Company to billions of dollars in liability as a result of investor lawsuits for causing the conduits to issue debt based on materially false and misleading statements.

95.     Currently, the SEC is carefully scrutinizing how Citigroup accounted for certain

24

SIVs. *See* Robin Sidel, *Citigroup CEO Plans to Resign As Losses Grow, The Wall Street Journal,* Nov. 3, 2007

**Citigroup Disseminated Materially Inaccurate, Incomplete and Misleading Information to Plan participants**

96.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to Plan participants, particularly regarding the following: (1) that the Company was grossly over-exposed to the potential for substantial losses as conditions in the subprime industry deteriorated; (2) that the Company concealed the ominous dangers it faced as a result of its huge exposure to CDOs; (3) that the Company failed to take accurate and timely write-downs for losses resulting from the collapse of the subprime market; (4) that the Company's enormous stake in the SIV market and its improper management of its SIVS could have deleterious to the Company's well-being; and (5) that the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

97.    Citigroup's dissemination of inaccurate, incomplete and materially misleading statements prevented the market from realistically assessing Citigroup and its financial well-being, thus resulting in the overvaluation and artificial inflation of its stock. Defendants further knew or should have known that the Company's stock price would plummet—and that Plan participants would suffer tremendously and unnecessarily—once the foreboding truth became known.

98.    Nonetheless, throughout the Class Period, the Company fostered a positive image to assure the market and Plan participants that Citigroup would not fall prey to adverse trends in the credit industry—particularly, the subprime mortgage industry.

99.    For example, on January 19, 2007, the first day of the Class Period, Citigroup issued a press release boasting, among other things, that "our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and

alternative investment businesses." The Company reported net income for the 2006 fourth quarter of $5.13 billion, record quarterly revenues of $23.8 billion, record full year 2006 revenues of $89.6 billion, and record full year 2006 income from continuing operations of $21.2 billion.

100.     In other words, as many other lenders were going out of business or taking losses that they were not expecting, Citigroup announced confidence in its performance and made no attempt to abandon or at least reduce its presence in the murky mire of the subprime mortgage industry.

101.     On February 23, 2007, Citigroup filed its Form 10-K for the year ended December 31, 2006, with the SEC. The Company reported that it earned $21.2 billion from continuing operations on revenues of $89.6 billion. The Company further stated quite optimistically that:

> We enter 2007 with good business momentum, as we expect to see our investment initiatives generate increasing revenues, and are well-positioned to gain from our balanced approach to growth and competitive advantages.
>
> We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

102.     There was not one mention in the Form 10-K filing of any problems with Citigroup's subprime loan portfolio or otherwise.

103.     On April 16, 2007, Citigroup reported net income for the 2007 first quarter of $5.01 billion, or $1.01 per share. In a press release announcing the results, Citigroup stated "U.S. consumer revenue growth continued to trend positively, up 6%." Defendant Prince stated:

> We achieved these results while completing our structural expense review, which will help us become a leaner, more efficient organization and lower our rate of expense growth. As we look ahead, our priorities are clear: we will invest to grow and integrate our businesses, take actions to improve efficiency and lower costs, and continue to build momentum across our franchises.

104.     Citigroup's statements about it state of affairs had the effect of misleading

26

investors into believing that the Company's exposure to subprime losses was minimal. For example, Paul Nolte, director of investments at Hinsdale Associates, a money management firm, was quoted as saying, "One of the question marks coming into the earnings season has been the mortgage issue, and Citigroup making positive comments about its business has lent some strength to the overall market." Rob Kelley and Grace Wong, *Stocks Soar on Earnings, Deals,* CNNMoney.com, April 16, 2007.

105.    In early June 2007, media reports indicated that certain hedge funds controlled by The Bear Stearns Companies, Inc. ("Bear Stearns") had suffered massive losses due to exposure to subprime mortgages. Upon speculation by some investors that Citigroup may suffer from similar problems, Citigroup's stock price experienced a 5.7% decline in less than one week— between June 19, 2007 and June 25, 2007.

106.    Throughout autumn 2007, the stock prices of many large lenders/investment banks dropped significantly. This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges. Nevertheless - and despite the Plans' heavy investment in Company stock - Citigroup stubbornly stood its ground and continued to hide the truth about its financial condition. In fact, On September 12, 2007, Steven Freiberg, a chief executive at Citigroup was quoted as saying Citigroup's subprime mortgage business "actually looks pretty good." *Citigroup Says Subprime Business Looks 'Pretty Good,' CNBC.Com,* September 12, 2007.

**The Truth Begins to Emerge**

107.    On October 1, 2007, Citigroup announced that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment were expected to have an adverse impact on third quarter financial results. Citigroup estimated that it would report a decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third quarter results. The Company's stated losses included a $1.4 billion write-off in Citigroup's $57 billion portfolio of highly leveraged loans, a loss of about $1.3 billion on the

27

value of securities backed by subprime loans, and a loss of $600 million in fixed-income credit trading. Citigroup also announced that consumer credit costs rose $2.6 billion, mostly due to a boost in loan-loss reserves.

108.    On October 15, 2007, Citigroup issued a press release announcing a revision of its financial results for the third quarter of 2007. The revision was related to a correction of the valuation on the Company's $43 billion in CDOs. The impact of the correction was a $270 million reduction in Principal Transactions Revenue, a $166 million reduction in Net Income and a $.03 reduction in Diluted Earnings Per Share.

109.    Then, on October 16, 2007, Henry M. Paulson, Jr., United States Treasury Secretary, stated that the conduct of some mortgage market participants had been "shameful" calling for a nationwide monitoring system. *Secretary Paulson Speaks on Current Housing and Mortgage Market Developments*, US Fed News, Oct. 16, 2007. Mr. Paulson also warned about banks having exposure to off-balance-sheet vehicles such as SIVs.

110.    After the Company disclosed $500 million in additional losses and media reports surfaced about Citigroup's potential multi-billion dollar exposure to off-balance-sheet SIVs, Citigroup's stock price fell from a close of $47.87 on Friday, October 12, 2007, to a close of $46.24 on October 15, 2007. The Company's stock price continued to drop over the next few days to $42.61 on October 19, 2007. This steady drop accounted for about $25 billion in market value in a five day period.

111.    Citigroup's shares further fell another 6.8% on November 1, 2007 after Credit Suisse and CIBC World Markets downgraded the Company's stock on concern that Citigroup might have to cut its dividend to boost its capital, amid reports that Citigroup would be required to disclose billions more in losses. Citigroup shares fell $2.85 to $38.51, their lowest level since May 2003.

112.    Finally, on November 4, 2007, Defendant Prince resigned in the wake of Citigroup's announcement that it would write off between $8 billion and $11 billion to reflect the declining value of subprime-mortgage-related securities since September 30, 2007.

113.    On January 19, 2007 (the beginning of the Class Period), Citigroup stock closed at $54.50 per share and reached a Class Period high close of $55.55 per share on May 18, 2007 as a result of Defendants' concealment of the truth regarding the Company's artificially inflated revenues and its failure to accurately report its true financial condition.

114.    However, once the truth emerged, Plan participants suffered drastically as Citigroup's stock price plunged. On November 9, 2007, with a close of $33.10 per share, the Company's stock had suffered **a 39% drop from the beginning of the Class Period**. This drop, especially given the Plans' enormous investment of the Plans' participants' retirement savings in Citigroup stock, caused at least hundreds of millions in losses to the Plans and the Class.

115.    Further declines and bad news are likely forthcoming. Further, recent media reports have indicated that Citigroup specifically withheld material information regarding some of the allegations *infra. See Citi's Giant Write-Downs: What did it know, and when did it know it?*, http://www.cnnmoney.com (from Fortune).

**Defendants Knew or Should Have Known That Citigroup Stock Was an Imprudent Investment for the Plan, Yet Mislead Plan Participants.**

116.    During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.

117.    As a result of the enormous erosion of the value of Company stock, Plan participants, the retirement savings of whom was heavily invested in Citigroup tock, suffered unnecessary and unacceptable losses.

118.    At all relevant times, Defendants knew or should have known that Citigroup stock was an imprudent investment in the Plans, as a result of the risks to its financial well-being due to the risk associated with subprime lending as evidenced by failure of numerous mortgage

lending competitors that went out of business as a result of increased delinquencies and foreclosures in the sub-prime sector; despite representations otherwise, its knowledge that it would confront a liquidity crisis which would impair future business operations; and the inevitable drop in the value of Company stock as the truth emerged regarding Citigroup's need for significant sums of cash as its liquidity evaporated.

119.    Through their high ranking positions within the Company- especially the Director Defendants, Defendants knew or should have known of the existence of the above-mentioned problems.

120.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Citigroup stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

121.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Defendants also failed to conduct an appropriate investigation into whether Citigroup stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Citigroup's deep-rooted problems so that participants could make informed decisions regarding whether to include Citigroup stock in the Plans.

122.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Citigroup stock, under these circumstances, was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

123.    Because Defendants knew or should have known that Citigroup stock was not a

30

prudent investment option for the Plans, they had an obligation to protect the Plans and its participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Citigroup stock.

124.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of Citigroup stock; discontinuing further contributions to and/or investment in Citigroup stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Citigroup they could not loyally serve the Plans and its participants in connection with the Plans' acquisition and holding of Citigroup stock.

125.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plans' investment in Citigroup stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company stock even as Citigroup's problems came to light.

**Defendants Regularly Communicated with the Plans' Participants Regarding Investments in Citigroup Stock Yet Failed to Disclose the Imprudence of Plan Investment in Citigroup Stock**

126.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company whose common stock was, far and away, the single largest asset of the Plans. During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

31

127.    SEC filings and related Company statements, pronouncements and releases issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plans' participants to purchase, and to hold and maintain, Plan investments in Citigroup stock.

128.    These statements, their related press releases, and substantially similar SEC filings and press releases issued during the Class Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the Plans' participants of the Company's ever-increasing problems with its key product lines, including loan defaults, liquidity concerns and shrinking demand. These statements were made with the implicit knowledge that the Plans' participants would rely upon such information in determining whether to maintain investment in Citigroup stock.

**Defendants Suffered From Conflicts of Interest**

129.    Citigroup's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officers' compensation was in the form of stock option awards.

130.    Because the compensation of at least several of the Defendants was significantly tied to the price of Citigroup stock, Defendants had incentive to keep the Plans' assets heavily invested in Citigroup stock on a regular, ongoing basis. Elimination of Company stock as a Plan investment option would have reduced the overall market demand for Citigroup stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Citigroup stock, resulting in reduced compensation for the Defendants.

131.    Some Defendants may have had no choice in tying their compensation to Citigroup stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Citigroup stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

132.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan

32

participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Hill v. BellSouth Corp.,* 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

## CLAIMS FOR RELIEF UNDER ERISA

133. At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

134. ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

135. ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

136. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

137. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things:

    a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

33

b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

138.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

139.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

34

140.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

141.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

142.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans. Defendants are liable for losses incurred as a result of such investments being imprudent.

143.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

144.    Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period these Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plans as described herein. Investment in the Company stock during the Class Period clearly did not serve the Plans' purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps

35

to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

145.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock. Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

146.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

147.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT II

**Failure to Provide Complete and Accurate Information
to Plan Participants and Beneficiaries by all Defendants
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and
405 of ERISA)**

148.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

149.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

150.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan-related communications and material disclosures.

151.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. This duty to

inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plans' investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans. This duty applies to all of the Plans' investment options, including investment in Company stock.

152.    Defendants knew that investment in Company stock carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

153.    Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Company's difficulties with its various product lines, their concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook. These failures were particularly devastating to the Plans and its participants—losses in this investment had an enormous impact on the value of participants' retirement assets.

154.    These actions and failures to act were uniform and caused the Plan, and/or the participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in Company stock in the Plans at a time when these Defendants knew or should have known that the Plan's participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments. Plaintiff and the Class relied to their detriment on Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company stock.

155.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the Company stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty

37

to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

156.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of the Plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested assets of the Plan in the Company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

157.    As a consequence of the Defendants' breaches of fiduciary duty, the Plans suffered at least tens of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

158.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

159.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

160.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

161.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and Beneficiaries.

162.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company's own securities; and by otherwise placing their own and the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

163.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered at least tens of millions of dollars in losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

164.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count

### COUNT IV

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Citigroup & Director Defendants)**

165.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

39

166.    At all relevant times, as alleged above, Citigroup and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

167.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Citigroup and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries (including the members of any Plan Committee(s)).

168.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, Citigroup and the Director Defendants, had the duty to:

> (1)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;
>
> (2)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;
>
> (3)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;
>
> (4)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;
>
> (5)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and
>
> (6)    Ensure that the monitored fiduciaries report regularly to the Company, Committee and/or the Director Defendants. The Company, Committee and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

169.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan

assets, and must take prompt and effective action to protect the Plans and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the Plans and the Plans' assets.

170.    Citigroup and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation. Citigroup and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plans to continue offering the Citigroup stock fund as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plans in Citigroup stock when it no longer was prudent to do so. Despite this knowledge, Citigroup and the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

171.    In addition, Citigroup and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Citigroup that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

172.    Citigroup and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored

41

fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

173.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

174.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

175.    The Plans, and their participants, suffered at least tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plans' participants.

176.    Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. By failing to apprise participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of Company stock as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

177.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

42

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

178.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

179.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

180.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

181.    Plaintiff, the Plans, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

182.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

43

## SECTION 404(c) DEFENSE INAPPLICABLE

183.     The Plans suffered a loss, and the Plaintiff and the other Class members suffered losses, because substantial assets in the Plans were invested in Citigroup stock during the Class Period in violation of the Defendants' fiduciary duties.

184.     As to contributions invested in Company stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period, unless the Plans satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

185.     Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.     In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.     In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary."     29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

186.     As alleged above, Defendants failed to provide participants with complete and accurate information regarding Citigroup stock in the Plans.     Accordingly, participants failed to exercise the requisite independent control over their investment in Citigroup stock in the Plans.

187.     In addition, § 404(c) does not apply to any portion of the Plan (1) derived from Company matching or profit-sharing contributions as those investments/investment vehicles were made/invested by/through the sole discretion of the Company or (2) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).

188.    The Defendants' liability to the Plans, Plaintiff and the Class for relief stemming from the Plans' imprudent investments in Citigroup stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.    An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Citigroup maintained by the Plans in proportion to the accounts' losses attributable to the decline in the stock price of Citigroup;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H    An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

45

I.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: November 13, 2007

Respectfully submitted,

**DEALY & SILBERSTEIN, LLP**

By: _____

Milo Silberstein (MS 4637)
*Attorneys for the Plaintiff*
*SHAUN ROSE, Individually and On Behalf*
*of All Others Similarly Situated*
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

**SCHIFFRIN BARROWAY TOPAZ &**
**KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Mark K. Gyandoh
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**Attorneys for Plaintiff**

46

**EXHIBIT I**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



.JUDGE SULLIVAN

**07 CIV 10258**

LENNARD HAMMERSCHLAG,
Individually, and On Behalf of All Others
Similarly Situated,

No.

**CLASS ACTION COMPLAINT**

Plaintiff

**JURY TRIAL DEMANDED**

v.

CITIGROUP INC., CHARLES PRINCE,
SALLIE KRAWCHECK, and GARY
CRITTENDEN,

Defendants.

RECEIVE

NOV 09 2007

U.D.U. S.D. N.Y.
CASHIERS

Plaintiff Lennard Hammerschlag ("Plaintiff"), individually and on behalf of all

other persons and entities who purchased or otherwise acquired securities issued by

Citigroup Inc. ("Citigroup" or the "Company") from January 1, 2004 through November

5, 2007, inclusive (the "Class Period"), by his undersigned attorneys, for his Complaint,

alleges the following upon personal knowledge as to himself and his own acts, and upon

information and belief as to all other matters. Plaintiff's information and belief is based

on his investigation (made by and through his attorneys), which investigation included,

among other things, a review and analysis of: (1) public documents pertaining to

Citigroup and the Defendants; (2) Citigroup filings with the Securities and Exchange

Commission ("SEC"); (3) press releases published by Citigroup; (4) analyst reports

concerning the Company; (5) newspaper and magazine articles (and other media

coverage) regarding Citigroup, its business or any Defendant. Many of the facts

supporting the allegations contained herein are known only to the Defendants or are

exclusively within their custody and/or control. Plaintiff believes that further substantial

evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all purchasers of Citigroup publicly traded securities during the Class Period, which securities were artificially inflated as a result of Defendants' dissemination of false and misleading statements and deceptive acts concerning: (1) Citigroup's actual exposure to the risk of loss due to its enormous warehoused portfolio of mortgage-backed securities; (2) the overvaluing of mortgage-backed securities held as assets on Citigroup's balance sheet based on intentionally misleading and overly optimistic valuation models; and (3) Citigroup's improper accounting for and lack of disclosure of its implicit guarantees of the debt of certain highly-leveraged special investment vehicles ("SIVs") that were heavily invested in mortgage-backed securities.    In each of Citigroup's financial statements since January 1, 2004, Citigroup has failed to consolidate the financial results and liabilities of certain SIVs as required by Generally Accepted Accounting Principles ("GAAP"), and Citigroup has failed to disclose the risks attendant to its SIVs.

2.      Citigroup has orchestrated a massive scheme designed to conceal an enormously risky and unsound subprime mortgage portfolio, much of which was used as the underlying collateral for debt instruments sold or held for sale by Citigroup. Despite the impending defaults in these subprime mortgages resulting from shoddy and reckless underwriting, Citigroup continued to highly rate and thereby inflate the value of the debt securities it created which were collateralized by these mortgages. These debt securities were packaged into commercial instruments that were either held on Citigroup's balance sheet awaiting sale or were sold to investors.

3.     As the truth about the actual risks and true value of Citigroup's various mortgage backed securities were revealed to the market, Citigroup has been forced to incur massive write downs of the value of its mortgage backed assets held on its balance sheet.

4.     Moreover, as the market has absorbed the truth about the value of Citigroup's debt securities, Citigroup has been forced to provide guarantees to off-balance sheet SIVs which had acquired Citigroup's debt securities. Unknown to Citigroup's investors, Citigroup has implicit guarantees to back up these SIVs in the case of default. As the mortgage-backed securities owned by these SIVs (and which were sold to them by Citigroup) have tumbled in value, these SIVs have looked to Citigroup to rescue them to the tune of billions of dollars in additional liability. The crisis has, therefore, revealed the clear fact that Citigroup should have kept these entities and their potential debt on its balance sheet and its failure to do so was in violation of GAAP.

5.     Beginning on October 15, 2007, Citigroup finally began to reveal the extent of its overvaluing of its mortgage backed debt instruments and has been forced to write down over $11 billion dollars of mortgage backed debt instruments held on its balance sheet. In addition, Citigroup has been forced to enter into agreements with other Wall Street institutions to shore up its SIVs by creating a $100 billion dollar credit facility.     As the market has absorbed the truth about Citigroup's true financial condition, Citigroup's share price has fallen by over 26% and the Company has lost over $60 billion in market value.

## JURISDICTION AND VENUE

6.     This action arises under Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

7.     This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391. Many of the acts and practices complained of herein, including the misrepresentations and schemes alleged herein, occurred in substantial part in this District, and Citigroup's principle executive offices are located in this District.

9.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States' mail, interstate telephone communications and the facilities of a national securities exchange and market.

## THE PARTIES

10.     Plaintiff Lennard Hammerschlag purchased Citigroup common stock on the open market during the Class Period at a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants. Plaintiff's purchases of Citigroup common stock are set forth in the attached certification. When the truth about Citigroup's true financial condition was disclosed, Plaintiff suffered damages when Citigroup's stock price lost more than a quarter of its value.

11.     Defendant Citigroup, together with its subsidiaries, is a diversified global financial services holding company providing a broad range of financial services to consumer and corporate customers. The Company has more than 200 million customer accounts and conducts business in more than 100 countries. Citigroup was incorporated in 1988 under the laws of the State of Delaware. The principal executive offices of Citigroup are located at 399 Park Avenue, New York, New York. Citigroup's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "C."

12.     Defendant Charles Prince ("Prince") was, at all times relevant hereto, Chairman of the Board and Chief Executive Officer of Citigroup, until being forced to resign on November 4, 2007. Prince became CEO of Citigroup in October 2003 and assumed the role of Chairman in April 2006. Most of Prince's compensation package is tied to his performance at the Company. For example, during the year ended December 31, 2006, Prince received a bonus of $13.2 million and stock awards amounting to $10.6 million, in addition to his base salary of $1 million. During the Class Period, Prince signed false and misleading SEC filings and knowingly issued false statements about Citigroup's financial health.

13.     Defendant Sallie Krawcheck ("Krawcheck") was, from November 2004 until March 2007, Chief Financial Officer and Head of Strategy for Citigroup. In that position, she oversaw Citigroup's financial reporting, treasury, tax, investor relations, mergers and acquisitions and strategic planning for the firm. She is now the Chairman and Chief Executive Officer for Citigroup Global Wealth Management and is responsible for the Citigroup Private Bank, Citigroup Smith Barney, and Citigroup

Investment Research. During the Class Period, Krawcheck signed false and misleading SEC filings and knowingly issued false statements about Citigroup's financial health.

14.     Defendant Gary Crittenden, formerly American Express's CFO, became CFO of Citigroup on March 12, 2007, replacing Defendant Krawcheck. During the Class Period, Crittenden signed false and misleading SEC filings and knowingly issued false statements about Citigroup's financial health.

15.     Prince, Krawcheck and Crittenden are collectively referred to herein as the "Individual Defendants." The Individual Defendants and Citigroup are collectively referred to herein as the "Defendants."

## CONTROL PERSON ALLEGATIONS/GROUP PLEADING

16.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Citigroup, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through Citigroup's internal corporate documents, conversations and connections with other corporate officers, analysts, marketing executives, and conversations and connections with the Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Citigroup's officers and directors.

17.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their

6

high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

18.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

19.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.    The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the

content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

21.     Each of the Defendants is liable as a participant in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities. Throughout the Class Period, Defendants disseminated materially false and misleading statements and suppressed material adverse facts about Citigroup.

## CITIGROUP'S FRAUDULENT CONDUCT

22.     Over the past five years, Citigroup has been the industry leader in extending subprime mortgages and refinancings. Subprime loans are loans made to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-valuations.

23.     The current crisis in subprime mortgages is rooted in the massive volume of mortgage loans given to high credit risk consumers in recent years without sufficient assessments of the risks that these consumers would be able to afford these loans. These risky loans have then been bundled into various security and debt obligations and then sold into the commercial paper markets. Generally, after a homeowner gets a mortgage, the lending institution sells the loan to a Wall Street firm, known as an underwriter, where it is repackaged with other loans, securitized and offered to investors as a

8

mortgage backed security. These mortgage backed securities are sold in the form of various commercial instruments, but principally as bonds and collateralized debt obligations ("CDOs").

24.     CDOs are a type of asset-backed security and structured credit product. CDOs gain exposure to the credit of a portfolio of fixed income assets and divide the credit risk among different tranches: senior tranches (rated AAA), mezzanine tranches (AA to BB), and equity tranches (unrated). Losses are applied in reverse order of seniority and so junior tranches offer higher coupons (interest rates) to compensate for the added risk.

25.     Rating agencies, like Moody's or Fitch, rate these securities to let investors know the chances of default.

26.     The aggressive, and oftentimes predatory, loan policies by U.S. lenders has resulted in large numbers of U.S. borrowers being particularly sensitive to interest rate changes in their ability to pay their mortgages as they come due – particularly where mortgages were qualified based on low introductory rates in adjustable rate mortgages.

27.     With the cooling of the housing market, and increase in interest rates, borrowers who over-extended themselves by relying on the low mortgage payments that came with adjustable rate mortgages have been forced to default on their payments as these interest rates and corresponding monthly payments have been jolted upwards.

28.     The defaults in mortgages have led to a number of cascading effects in the market for mortgage backed commercial instruments. As defaults have increased, credit rating agencies, which substantially overrated these instruments in concert with

9

the banks that issued them, downgraded their ratings of the bonds and CDOs. These downgrades diminished the marketability of these instruments and accordingly, those financial institutions holding these bonds and CDOs face massive write-down of these assets.

29.    In September 2007, Congress convened a hearing to examine whether the credit agencies had "compromised their impartiality" when they simultaneously rated various mortgage-backed securities and provided advice to Wall Street investment firms about how to package them so as to gain higher credit ratings. Their impartiality was particularly questioned because they receive fees from the investment firms whose securities they rate. This investigation is ongoing.

30.    Citigroup has played a central role in orchestrating the subprime crisis. Over the last several years, Citigroup's consumer finance division, CitiFinancial, has been the industry leader in extending sub-prime mortgages. According to an article in *Southern Exposure* in Summer 2003, Citigroup established itself as one of the most powerful sub-prime loan originators by acquiring competitors and marketing its brand-name. Through its flagship sub-prime unit, CitiFinancial, Citigroup claimed 4.3 million customers and 1,600-plus branches in 48 states. (CitiFinancial currently has more than 2,000 branches across the United States.) Many of these sub-prime mortgages were provided to households that either could not afford the high interest rates, or to households that actually qualified for lower-interest mortgages.

31.    As has become clear over the last few months, Citigroup's subprime loans were extended based on shoddy underwriting and, often abusive and predatory

10

terms, thereby ensuring that a significant number of the borrowers would ultimately default.

32.     Citigroup securitized its portfolios of subprime mortgages, selling the bulk of these securities to the market and also warehousing a portion of the more risky, less marketable securities for later sale.

33.     Simultaneously, Citigroup has also been creating the secondary market for its subprime mortgage-backed securities by being one of the largest purchasers of mortgage backed securities through its "Special Investment Vehicles" ("SIVs").

34.     SIVs are off-balance sheet entities that are managed by Citigroup in exchange for lucrative fees. SIVs acquire their assets by issuing short-term, relatively low interest rate notes and then collect higher interest rates from high risk mortgage-backed securities in which they invest.

35.     Citigroup has been able to keep these SIVs of its balance sheet by failing to disclose that it is, effectively, the ultimate guarantor of the notes issued by its SIVs.

36.     Citigroup has significantly misled investors regarding the health of its subprime business and its exposure to risk from the SIVs it has established. It has, for many years, wholly failed to disclose the risks created by its subprime lending activities and its use of SIVs to purchase and hold securities that result from its lending.

37.     Until very recently, even in the face of the widespread problems with subprime loans, Citigroup has continued its practice of denying any problems. For example, on Sept. 12, 2007, Steven Freiberg, chief executive of Citigroup's North American consumer operations, claimed that Citigroup's subprime mortgage business

11

"actually looks pretty good." According to Freiberg, "Where you think there would be a fire – in our subprime portfolio – it actually looks pretty good."

38.    Citigroup's house of cards has now come crashing down. Citigroup's assurances that it was unaffected by the subprime mortgage crisis have proven to be blatantly incorrect. Citigroup's SIVs have suffered significant losses and now face the prospect of even greater losses as a result of having to sell their assets at fire sale prices in order to pay back the money they borrowed.

39.    On October 15, 2007, Citigroup and two other major banks, Bank of America and JPMorgan Chase, announced their intention to establish a fund of up to $100 billion that would be used to purchase the assets from the SIVs and thereby alleviate the risk that the SIVs would be forced to dump their assets at fire sale prices.

40.    Importantly, in connection with this new fund, Citigroup will be required to take any losses on the assets acquired from the SIVs. In short, by setting up a fund to bail out the SIVs, a fund in which Citigroup will now be explicitly exposed to losses, Citigroup has essentially admitted that it was exposed to the liabilities of the SIVs all along.

41.    Most recently, before the market opened on November 5, 2007, Citigroup announced the replacement of its top management team and admitted that it would have to take a write-off in excess of $10 billion in connection with its subprime business. As a result of Citigroup's admission of its subprime problems and its exposure to the liabilities of the SIVs, Citigroup's stock, since October 11, 2007, has fallen from $48.32 to $35.90 (on November 5, 2007), for a total decline of nearly 26%.

42.    Thus, in a little more than three weeks, Citigroup has lost nearly $62 billion in market capitalization, making it one of the most significant and rapid market declines in U.S. history.

## THE TRUTH BEGINS TO COME OUT

43.    On September 5, 2007, despite Citigroup's denials, investors began to learn of Citigroup's substantial exposure to its affiliated SIVs. On that day, *The Wall Street Journal* published an article titled "Conduit Risks Are Hovering Over Citigroup" and sub-titled "If the Vehicles Go Sour, Rescues Could Be Costly; 'Bank Has No Concerns.'" The article stated that although few investors realize it, banks such as Citigroup could find themselves burdened by affiliated investment vehicles that issue tens of billions of dollars in short-term commercial paper. The article further stated:

> Citigroup, for example, owns about 25% of the market for SIVs, representing nearly $100 billion of assets under management. The largest Citigroup SIV is Centauri Corp., which had $21 billion in outstanding debt as of February 2007, according to a Citigroup research report. There is no mention of Centauri in its 2006 annual filing with the Securities and Exchange Commission.

> Yet some investors worry that if vehicles such as Centauri stumble, either failing to sell commercial paper or suffering severe losses in the assets it holds, Citibank could wind up having to help by lending funds to keep the vehicle operating or even taking on some losses.

> Citigroup has told investors in its SIVs (which stands for Structured Investment Vehicles) that they are sound and pose no problems.

> "Quite simply, portfolio quality is extremely high and we have no credit concerns about any of the constituent assets," said a recent letter from Paul Stephens and Richard Burrows, directors in Citigroup's London-based group that oversees the bank's SIVs. "Citigroup's SIVs remain robust and their asset portfolios are performing well."

> A Citigroup spokesman declined to comment on the bank's SIV disclosures or potential exposure that it might face from them.

13

44.     Reaction to this news was immediate. Citigroup's stock price dropped $1.21 per share from $47.21 per share on September 4, 2007 to $46.00 per share on September 5, 2007 – a decline of 2.56 percent on heavy trading volume of over 35 million shares traded. Citigroup's stock price continued to decline the following day, down another 34 cents to $45.66 on September 6, 2007, for a two-day drop of $1.55 per share or 3.28% (a loss of market capitalization of approximately $7.7 billion). Based upon its assurances that it could weather any problems, Citigroup's stock price recovered by mid-October to the levels at which it was trading prior to the September article.

45.     Citigroup's fraudulent denials and omissions were further revealed in mid-October 2007. Over the weekend of October 13 and 14, 2007, press reports circulated that several major banks, including Citigroup, Bank of America and JPMorgan Chase, had been meeting for at least three weeks to create a rescue fund of up to $100 billion to bail out the SIVs. According to *The Wall Street Journal*, in an article entitled "Big Banks Push $100 Billion Plan to Avert Crunch", October 13, 2007:

> The new fund is designed to stave off what Citigroup and others see as a threat to the financial markets world-wide: the danger that dozens of huge bank-affiliated funds will be forced to unload billions of dollars in mortgage-backed securities and other assets, driving down their prices in a fire sale. That could force big write-offs by banks, brokerages and hedge funds that own similar investments and would have to mark them down to the new, lower market prices.

> The ultimate fear: If banks need to write down more assets or are forced to take assets onto their books, that could set off a broader credit crunch and hurt the economy. It could make it tough for homeowners and businesses to get loans. Efforts so far by central banks to alleviate the credit crunch that has been roiling markets since the summer haven't fully calmed investors, leading to the extraordinary move to bring together the banks.

> In recent weeks, investors have grown concerned about the size of bank-affiliated funds that have invested huge sums in securities tied to shaky U.S. subprime mortgages and other assets. Citigroup, the world's biggest

14

bank by market value, has drawn special scrutiny because it is the largest player in this market.

46.    In essence, the fund would be used to purchase the assets held by SIVs, including Citigroup's seven SIVs, and allow those SIVs to be unwound.  According to *The Wall Street Journal* report:

> The plan is encountering resistance from some big banks.  They argue that Citigroup is asking others to help bail out its affiliates and an industry-wide bailout isn't needed. ...
>
> The new fund represents a way for Citigroup and other banks to 'outlast the current market conditions that are so dry right now,' says Jaime Peters, an analyst at Morningstar Inc.

47.    On Monday, October 15, 2007, the details of the plan were announced before the market opened.  Under the details of the proposed plan, the rescue fund would buy highly rated assets from the SIVs and sell short term debt such as commercial paper to help finance the purchases.  However, the sponsoring banks would be the first to take losses if the new fund suffered losses on its assets.  *See* "Banks set up fund to bail out investment vehicles," *Reuters*, October 15, 2007.

48.    In short, by sponsoring an up to $100 billion rescue plan to buy the assets from the SIVs and then wind down the SIVs, Citigroup effectively admitted that it was liable for the losses of the SIVs all along.  By agreeing to take first line losses on the assets purchased by the rescue fund, Citigroup made explicit its commitment to back-stop the SIVs.  Unlike JPMorgan Chase and Bank of America, who had little or no exposure to SIVs and sponsored the fund in order to earn fees, Citigroup sponsored the fund purely to protect its exposure to its seven affiliated SIVs.  As reported by *The Wall Street Journal* on October 18, 2007, "How London Created a Snarl in Global Markets": "[u]nder the superconduit rescue plan, the fund's sponsors will have to pay a fee to take

part, *accept a discounted price for their assets* and *help insure investors against losses*"
(emphasis added).

49.     At the Company's 2007 Q3 earnings conference call later on October 15,
2007, Citigroup confirmed its financial commitment to its affiliated SIVs. During the
conference call, Citigroup revealed that it had been buying commercial paper from some
of its SIVs and that this was one of the reasons that Citigroup's balance sheet had
deteriorated, including a decline in Citigroup's Tier 1 capital ratio from 7.9 percent to 7.4
percent during the course of the third quarter, falling below Citigroup's target of 7.5
percent. As Citigroup CFO Crittenden, stated:

> Both the Tier 1 capital ratio and the [Total Common Equity] to risk
> weighted managed assets ratio reflect the impact of acquisitions and
> additional assets such as certain leveraged loans and commercial paper
> which came onto our balance sheet during the quarter. (Bloomberg
> Transcript, 10/15/07.)

50.     The Q3 earnings call also revealed the shocking news that despite
Citigroup's assurances just a month earlier that its subprime mortgage portfolio looked
"pretty good" its reported net income for July through September quarter declined 57
percent from a year earlier because of, in part, a write-down of subprime mortgage losses
totaling $1.56 billion (pre-tax and net of hedges) that Citigroup had "warehoused for
future collateralized debt obligation ... securitizations." *See* David Wighton, *Citigroup
still failing to stop the SIV skeptics*, FT.com, October 22, 2007.

51.     On the Company's subsequent earnings call, Citigroup disclosed that
"[o]ur subprime exposure [from securities warehoused for securitization as well as
Citigroup's direct holdings of CDO positions] was $24 billion at the beginning of the
year, $13 billion at the end of the second quarter, and declined slightly during the third
quarter." In reaction to all of these news events, Citigroup's stock price plummeted

16

$3.09 per share or 6.45% over the immediately following two trading days, from $47.87 on Friday October 12, 2007 to $44.79 on Tuesday October 16, 2007, for a loss of market capitalization of over $15 billion.

52. Then, on October 19, 2007, *The New York Times* published an article titled "No Way to Make a Loan," which revealed why Citigroup's non-performing "corporate loan" total had doubled to $1.2 billion in just three months, the bulk of which was a loan to shore-up a SIV. Citigroup had provided a back-up line of credit to a SIV that would be called if the SIV could not borrow and a German bank could not meet its promise to make the loan. Yet, the very facts that triggered Citigroup's obligation to extend the loan had occurred at the time the agreement was made and the so-called "corporate loan" was simply Citigroup disguising its commitments to shore-up the SIV's it managed in the event of a potential default.

53. On October 19, 2007, Citigroup's stock price declined a further $1.47 to close at $42.36, for an additional loss of market capitalization of approximately $7.3 billion.

54. Thereafter, on October 31, 2007 and November 1, 2007, Citigroup announced it was convening an emergency weekend board meeting to discuss its problems, amid speculation of significant management turn-overs, including replacement of Citigroup's CEO. As a result, Citigroup's share price declined 10.4 percent from the close of $42.11 on October 30, 2007 to $37.73 on November 2, 2007, representing a loss in market capitalization of nearly $22 billion in two trading days.

55. On November 4, 2007, Citigroup issued a press release announcing that its Chairman and CEO, Charles Prince was resigning and that the Company would have to

take a further write down of $8 billion to $11 billion. Citigroup claimed that the declines in value of the bank's subprime exposure "followed a series of rating agency downgrades of subprime U.S. mortgage related assets and other market developments which occurred after the end of the third quarter." According to *The Wall Street Journal*, Citigroup's revelation that its exposure to subprime mortgages were multiples more than originally projected may still be substantially underestimated.

56.    On the news of Prince's resignation and the increased writedowns, Citigroup's stock fell 4.85% to $35.90 at the close on November 5th. After close of market on November 5, Citigroup said it provided $10 billion of financing to its SIVs in recent weeks to shore up those funds and the SIVs had drawn $7.6 billion of credit as of October 31. In short, since October 11, 2007, as investors began learning of Citigroup's true exposure to esoteric SIVs and the falsity of its earlier reassurances, and its true exposure to the subprime mortgage crisis, Citigroup's stock has fallen from $48.32 to $35.90, for a total decline of nearly 26% -- representing a loss of nearly $62 billion in market capitalization.

## FALSE AND MISLEADING STATEMENTS
## AND/OR OMISSIONS DURING THE CLASS PERIOD

### Misrepresentations and Omissions Regarding Exposure To Subprime Losses

57.    Citigroup failed to disclose to investors known risks in the default of its subprime portfolios and products and concealed the fact that, as the subprime crisis unfolded, it stood to lose billions of dollars. Citigroup's financial statements assured investors that it had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through various means.

58.    For example, the 2006 10-K stated that:

> The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.

59.    Citigroup also states in the 2006 10-K that it mitigates risk in its mortgage portfolio by selling most of the loans its originates:

> As with all other lending activity, this exposes Citigroup to several risks, including credit, liquidity and interest rate risks. To manage credit and liquidity risk, Citigroup sells most of the mortgage loans it originates, but retains the servicing.

60.    What Citigroup failed to disclose, however, was that it actually retained a significant volume of these securitized assets on its balance sheet. Moreover, Citigroup also failed to disclose, as more fully set forth below, that despite Citigroup's mortgage loan securitizations being non-recourse, it nevertheless retained a significant risk exposure on these securitizations by implicitly guaranteeing loans issued to SIVs, which were collateralized by Citigroup issued mortgage backed securities.

61.    Citigroup also failed to disclose that the credit ratings and value assigned to its mortgage backed securities were based on unreliable financial models. According to the Citigroup's 2006 10-K, in describing the strategy for valuing the assets on its balance sheet:

> Substantially all of these assets and liabilities are reflected at fair value on the Company's balance sheet. Fair values are considered verified if they meet one of the following criteria:
>
> •    Externally substantiated via comparison to quoted market prices or third party broker quotations;
>
> •    By using models that are validated by qualified personnel independent of the area that created the model and inputs that are verified

19

by comparison to third-party broker quotations or other third-party sources where available; or

• By using alternative procedures such as comparison to comparable securities and/or subsequent liquidation prices

62.    What Citigroup did not disclose was that its financial models used to determine the value of its CDOs and mortgage backed securities were highly inaccurate and entirely subjective. Moreover, rather than these models being "verified" by "third party broker quotations or other third party sources," Citigroup worked with rating agencies to manipulate the debt ratings of its assets and these ratings were then used by Citigroup (and the investing community) to value these assets.

63.    As the subprime mortgage crisis intensified in the first quarter of 2007, Citigroup continued to falsely portray to investors that its financial results were sound and that the subprime crisis would not affect its performance. On January 19, 2007, Citigroup published its financial results for the year ended December 31, 2006, and for the fourth quarter ended December 31, 2006. The Company reported net income for the 2006 fourth quarter of $513 billion, record quarterly revenues of $23.8 billion, record full year 2006 revenues of $89.6 Billion, and record full year 2006 income from continuing operations of $21.2 billion.

64.    In a press release issued by the Company, announcing its results, Defendant Prince stated "Our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative-investment businesses. In U.S. consumer, we continued to see positive trends from our strategic actions."

65.    During a January 19, 2007 conference call with investors discussing the Company's fourth quarter 2006 results, a UBS analyst questioned why loan loss reserves

had not changed when there had been a pick up in Citigroup's consumer loans. Defendant Krawcheck, stated that: " . . . we believe that we have adequate reserves, we believe we have the right level of reserve for what we are seeing in terms of the growth in the portfolio, what we see in terms of the embedded loss in the portfolio. And as the environment changes the complexion, the portfolio changes, etc., we review that. We have I guess to go along with the guys that have the pocket protectors or the Ph.D. guys who look at the reserves and we feel very good, very good about the level of them."

66.      On February 23, 2007, Citigroup filed its Form 10-K for the year ended December 31, 2006, with the SEC. The Company reported that it earned $21.2 billion from continuing operations on revenues of $89.6 billion; income was up 7% from 2005, while diluted EPS from continuing operations increased 11 %, with the increment in the growth rate reflecting the benefit from our share repurchase program; and net income, which includes discontinued- operations, was $21.5 billion, down 12% from the prior year, reflecting the absence of significant gains on sales of businesses recorded in 2005.

67.      Commenting on its outlook for 2007, the Company stated in part:

We enter 2007 with good business momentum, as we expect to see our investment initiatives generate increasing revenues, and are well-positioned to gain from our balanced approach to growth and competitive advantages.

We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

In 2006, our international businesses contributed 43% of our income from continuing operations. We expect to continue to re-weight our revenue mix towards International Consumer, CIB and Global Wealth Management.

> Disciplined capital allocation will remain fundamental to our strategic
> process and we will have a sharp focus on expense management.
>
> Although there may be volatility in our results in any given year, over the
> long term our revenues are targeted to grow organically at a mid to high-
> single-digit rate, with strong expense and credit management driving
> earnings and earnings per share growth at a faster level. We will seek to
> augment this growth rate over time through targeted acquisitions.
>
> Credit is broadly stable as 2007 begins; however, we are budgeting for a
> moderate deterioration of credit in 2007. In addition, the tax benefits we
> realized in 2006 will not be repeated in 2007, and we anticipate the
> effective tax rate to return to a more normalized rate of 30% to 31 %, not
> the 27.3% recorded in 2006.

68.     In commenting on its U.S. Consumer Lending divisions, Citigroup stated

in its Form 10-K that "Provisions for loan losses and for benefits and claims increased

primarily on higher credit losses in the Real Estate Lending and Auto businesses,

partially offset by higher loan loss reserve releases of $63 million in the Real Estate

business. Credit losses increased due to volume growth and seasoning in Real Estate, as

well as volume growth in Autos."

69.     Citigroup concealed the mounting risks of default and devaluing of its

subprime loan portfolio in its Form 10-K. Rather, Defendants led investors to believe

that the Company's subprime loss exposure was minimal by stating that from 2004 to

2005 "Non-prime [subprime] mortgage originations declined 20%, reflecting the

Company's decision to avoid offering teaser rate and interest-only mortgages to lower

FICO score customers."

70.     On February 25, 2007, Citigroup announced that Crittenden was replacing

Krawcheck as CFO of the Company.

71.     On April 16, 2007, Citigroup reported net income for the 2007 first quarter

of $5.01 billion, or $1.01 per share. In a press release announcing the results, Citigroup

stated "U.S. consumer revenue growth continued to trend positively, up 6%." Prince was

quoted as stating:

> We achieved these results while completing our structural expense review,
> which will help us become a leaner, more efficient organization and lower
> our rate of expense growth. As we look ahead, our priorities are clear: we
> will invest to grow and integrate our businesses, take actions to improve
> efficiency and lower costs, and continue to build momentum across our
> franchises.

72.    Citigroup held a conference call with investors on April 16, 2007, to

discuss the Company's financial results for the first quarter of 2007. When questioned by

an analyst as to whether $9 billion worth of loans held by Citigroup were no

documentation or low documentation subprime loans, Citigroup's CFO would not answer

the question and implied that said loans were profitable:

> GLENN SCHORR, ANALYST, UBS: Thanks, it is UBS. On slide 6, the
> U.S consumer mortgage trend, in the footnote, you noted that it excludes
> $5 billion of first mortgages and almost $4 billion of second mortgages
> where you didn't have FICO and LTV data. Just curious on what type of
> loans that might be, why you don't have the data and how your gut is that
> that might change the results that you showed on the slide?
>
> GARY CRITTENDEN: We actually just finished preparing this data over
> the course of the last week or so and we don't have a comprehensive view
> that includes all of the -- the full scope of the portfolio. The underlying
> delinquency performance of the things that were excluded from the table
> have very good delinquency performance associated with them. So there
> was no -- if you look at the underlying performance of those mortgages
> that were excluded from the table with those that are included, there was
> just no underlying difference in the delinquency performance between the
> two.
>
> GLENN SCHORR: Got you. I would guess it is probably stuff that falls
> into that all [pay] no [doe]/low doe type of --.
>
> GARY CRITTENDEN: You know, we don't use that nomenclature here
> and don't think about the business in that way.
>
> GLENN SCHORR: Okay. But you don't have FICO and LTV scores on
> the loans? Okay. I'm good. I don't need a follow-up. Thanks.

23

GARY CRITTENDEN: Great. Thanks.

73.    In the April 16, 2007, conference call, Prince told analysts that he was pleased the bank had achieved "positive operating leverage" in the first quarter, with revenue up 12% more than the 10% rise in expenses, in an attempt to please investors who had been pressing for expense control. "It feels good to me to see that progress," Prince said. "We are delivering on our plan."

74.    Excluding an $871 million after-tax charge relating to the Company's restructuring plan, the Company's profit was $1.18 per share for the first quarter of 2007, which beat analyst estimates of $1.10. Citigroup stock reached a high of $53.59 on the news, a 3.9% increase from is closing price of $51.60 on April 13, 2007.

75.    Citigroup's comments about its operations led investors to believe that Citigroup's subprime loan loss exposure was minimal. Paul Nolte, director of investments at Hinsdale Associates, a money management firm was quoted as stating "One of the question marks coming into earnings season has been the mortgage issue, and Citigroup making positive comments about its business has lent some strength to the overall market." Rob Kelley and Grace Wong, "Stocks soar on earnings, deals," *CNNMoney.com*, April 16, 2007.

76.    On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter ended March 31, 2007, in which the Company reported income from continuing operations of $5.01 billion in the first quarter of 2007. The Company also reported in part:

> Customer volume growth was strong, with average loans up 14%, average deposits up 19%, average interest-earning assets up 25%, and client assets under fee-based management up 12% from year-ago levels. U.S. debt, equity and equity-related underwriting increased 21 % from year-ago levels. Branch activity included the opening of 99 branches during the quarter (48 internationally and 51 in the U.S.). U.S. Cards accounts were up 14% and purchase sales were up 6%. . . .

24

Credit costs increased $1.3 billion from a year ago, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to build loan loss reserves. The $597 million net build compares to a net reserve release of $154 million in the prior-year period. The build was primarily due to increased reserves to reflect: a change in estimate of loan losses inherent in the initial tenor portion of the Consumer Loan Portfolio; portfolio growth, and increased delinquencies in second mortgages, in the U.S. Consumer Lending mortgage portfolio; and portfolio growth in Markets & Banking, which includes higher commitments to leveraged transactions and an .increase in average loan tenor. The Global Consumer loss rate was 1.69%, a 23 basis-point increase from the first quarter of 2006.

77.    On June 12, 2007, the media reported that a large hedge fund controlled by The Bear Stearns Companies, Inc. ("Bear Stearns") had fallen 23% from the start of the year through late April. "The fund, called the High-Grade Structured Credit Strategies Enhanced Leverage Fund, [was] widely exposed to subprime mortgages, or home loans to borrowers with weak credit histories."

78.    Citigroup continued to lie about its exposure to subprime credit risks even after the rating agencies began to downgrade the mortgage backed securities that Citigroup held in its portfolios. Indeed, when specifically asked whether Citigroup had significant exposure to defaults in subprime loans, Citigroup painted a rosy picture for investors. On Sept. 12, 2007, Steven Freiberg, chief executive of Citigroup's North American consumer operations, claimed that Citigroup's subprime mortgage business "actually looks pretty good." According to Freiberg, "Where you think there would be a fire -- in our subprime portfolio -- it actually looks pretty good."

**Misrepresentations and Omissions Regarding SIVs**

79.    Under applicable accounting rules, because of Citigroup's financial and other commitments to its affiliated SIVs, Citigroup was required to disclose the nature, purpose, size, and activities of the SIVs and disclose the carrying amount and

classification of the consolidated assets that were collateral for the SIVs' obligations. Citigroup fraudulently failed to comply with any of these accounting rules.

80.    In each of Citigroup's financial statements since January 1, 2004, Citigroup has failed to consolidate the financial results and liabilities of its seven affiliated SIVs as required by GAAP. Moreover, Citigroup has failed to disclose in the management discussion and analysis section of its financial statements the risks attendant to Citigroup in the liabilities of its affiliated SIVs.

81.    Citigroup's most recent Form 10-K illustrates Citigroup's omissions. In Citigroup's 2006 Annual report filed on Form 10-K (filed February 23, 2007), Citigroup set forth a table in the notes to the financial statements that purported to summarize all of the Company's involvement in special purpose entities. That table disclosed that Citigroup was involved with SIVs that collectively held approximately $81 billion in assets. However, apart from the reference in that one table, the notes to the financial statements did not discuss these SIVs in any further detail. Although the notes referred to the Company's exposure to *conduits*, the notes never discussed Citigroup's exposure to the SIVs:

> In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. These include multi-seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds. ...
>
> The Company administers several third-party-owned, special purpose, multi-seller finance companies that purchase pools of trade receivables, credit cards, and other financial assets from third-party clients of the Company. As administrator, the Company provides accounting, funding, and operations services to these conduits. Generally, the Company has no ownership interest in the conduits. The sellers continue to service the transferred assets. The conduits' asset purchases are funded by issuing commercial paper and medium-term notes. The sellers absorb the first

26

losses of the conduits by providing collateral in the form of excess assets. The Company, along with other financial institutions, provides liquidity facilities, such as commercial paper backstop lines of credit to the conduits. The Company also provides loss enhancement in the form of letters of credit and other guarantees. All fees are charged on a market basis.

During 2003, to comply with FIN 46-R, many of the conduits issued "first loss" subordinated notes such that one third-party investor in each conduit would be deemed the primary beneficiary and would consolidate the conduit. At December 31, 2006 and 2005, total assets in unconsolidated conduits were $66.3 billion and $55.3 billion, respectively.

82.     There was no mention of the seven affiliated SIVs, the assets and liabilities held by them, or Citigroup's exposure to them given the rapidly deteriorating credit environment.

83.     All of Citigroup's other previous financial filings are similarly devoid of any disclosure of the risks that Citigroup faced with respect to the liabilities of its affiliated SIVs. *See, e.g.,* Citigroup's 2007 first quarter 10Q (filed May 4, 2007), Note 13 to the financial statements, "Securitizations and Variable Interest Entities", which failed to discuss the SIVs; Citigroup's 2007 second quarter 10Q (filed August 3, 2007), Note 13 to the financial statements, "Securitizations and Variable Interest Entities" (same).

## INAPPLICABILITY OF SAFE HARBOR

84.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Citigroup were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that members of the investing public were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were

27

involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law. _

85.     Defendants participated in and knew of the fraudulent scheme alleged herein, by virtue of their receipt of information reflecting the true facts regarding Citigroup; their control over, and/or receipt of Citigroup's allegedly materially misleading misstatements; and/or their association with Citigroup, all of which made them privy to confidential proprietary information concerning Citigroup.

86.     With respect to non-forward-looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

87.     Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor. The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made. No statutory safe harbor applies to any of Defendants materially false or misleading statements.

88.     Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pleaded herein, Defendants are liable for the false forward-looking statement pleaded because, at the time each forward-looking statement was made, the defendant making the statement knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Citigroup who knew that the forward-looking statement was false or misleading. None of the historic or present tense statements made by Defendants was an assumption

underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made. Nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## ADDITIONAL SCIENTER ALLEGATIONS

89.    The Individual Defendants were active, culpable, and primary participants in the fraud by virtue of: (1) their knowledge of (a) the increasing risks to which Citigroup was exposed due to defaults in its subprime mortgage portfolio; (b) the inflation in the ratings and value accorded debt instruments linked to Citigroup's subprime mortgages; and (c) Citigroup's exposure to liabilities of SIVs which required that these SIVs be consolidated onto Citigroup's balance sheet; (2) their supervision over Citigroup's employees and actual direction of policies that encouraged the fraud detailed herein; and (3) their association with the Company which made them privy to confidential information concerning the Company.

90.    The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public. The Individual Defendants also knew or recklessly disregarded that the failure to disclose the Company's exposure to subprime mortgages, the overvaluing of mortgage backed debt securities, and the failure to recognize on Citigroup's balance sheet implicit guarantees to back up affiliated SIVs, would cause Citigroup's financial statements to be materially false and misleading, would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to be artificially inflated. The Individual Defendants acted

29

knowingly or in such a reckless manner as to constitute fraud and deceit upon Plaintiff and the Class.

91.     The Individual Defendants directed, knew about or recklessly disregarded the fraudulent practices implemented under their watch. As officers of the Company, the Officer Defendants each knew, through direct knowledge or knowledge learned through the supervisory nature of their positions or recklessly disregarded and failed to disclose, material adverse information; were involved in the decisions concerning the use of finite reinsurance contracts made at the Company and its subsidiaries and the deficient controls; and, made false and misleading statements of material fact.

92.     Citigroup knew for many years that, despite maintaining its affiliated SIVs as off-balance sheet entities, Citigroup was required to back-stop them because of Citigroup's significant financial interest in the SIVs and for reputational reasons.

93.     At all material times, Citigroup knew that, due to the mismatch in the duration of assets and liabilities held by the SIVs, the SIVs were exposed to heightened liquidity risk in that a severe contraction in the credit market could result in the SIVs struggling to re-borrow when their short-term commercial paper borrowings matured.

94.     By early 2007, Citigroup could see that, due to credit quality issues with sub-prime mortgages and the consequent tightening of the credit markets, this liquidity risk was being realized and that Citigroup would be exposed to the losses of the SIVs.

95.     Because SIVs fund their operations by raising short-term debt and then use these funds to purchase long-term assets, there is classic mismatching of the duration of assets and liabilities, with the result that SIVs are subject to an enormous "liquidity" risk. In other words, because SIVs constantly re-borrow in the short-term commercial

paper market, the SIVs always face the risk that they will not be able to re-borrow if demand for commercial paper disappears. In that event, the SIVs would no longer be able to hold their long-term assets and would be required to sell them. If there was no demand for those assets either, the SIVs could potentially be forced to sell those assets at depressed prices.

96.    At all relevant times, Citigroup and the SIVs knew about this liquidity risk. The ratings agencies, which rated the commercial paper issued by SIVs, explicitly analyzed liquidity risk in determining their ratings. On March 13, 2002, Standard & Poor's published "Structured Investment Criteria", which outlined all the criteria considered by Standard & Poor's in rating a SIV. Among the criteria, Standard & Poor's cited the SIVs liquidity risk, which was described as follows:

> Liquidity risk in a SIV arises in two scenarios. While most SIVs issue a mixture of CP [commercial paper] and MTNs [medium term notes], their weighted-average liability maturity is usually about four to six months, whereas the assets in the vehicle will have considerably longer average maturities. Secondly, some of the SIV's assets will require due diligence by potential purchasers, thereby increasing the sale period for such assets.

97.    Both of the above aspects of liquidity risk-- inability to re-borrow in the short-term market and an inability to sell assets-- came to pass. In August 2007, based on fears of sub-prime mortgages and securities backed by such mortgages, credit markets experienced an extreme tightening.

98.    As a result of this tightening, SIVs globally were confronted with a one-two punch scenario whereby the short-term commercial paper market dried up, restricting the ability of the SIVs to re-borrow to finance their operations, and the SIVs were unable to divest their assets, because of fears as to the quality of these assets given the problems with sub-prime mortgages.

99. According to an October 15, 2007 *Reuters* article, entitled "Banks set up fund to bail out investment vehicles", since hitting an all-time high of $1.183 trillion in early August, the U.S. asset-backed commercial paper market shrank by nearly 25 percent during an unprecedented nine consecutive weeks of contraction. As of October 10, 2007, the Federal Reserve reported $899.3 billion in asset-backed commercial paper outstanding. Combined with steep drops in its asset portfolio, Citigroup's seven affiliated SIVs were faced with the prospect of having to liquidate their asset portfolios at steep losses.

100. Citigroup also purposely disregarded GAAP accounting for its SIVs while disclosing in its financial statements that its accounting fully complied with GAAP. Under applicable GAAP accounting rules, because of Citigroup's commitments to the SIVs, whether explicit or implicit, Citigroup was required to consolidate the SIVs or, even if not required to consolidate, at least to provide complete disclosures concerning its involvement with the SIVs. Citigroup failed to comply with these requirements. In its 10-K and 10-Q filings in 2007, apart from one table that listed SIVs, Citigroup omitted any mention of the SIVs, and only discussed its exposure to "conduits."

101. Beginning on September 5, 2007, Citigroup's exposure to the SIVs began to leak out. Finally, on October 15, 2007, Citigroup was forced to admit that it was indeed liable for the losses sustained by the SIVs when it announced that it would be participating in a rescue fund that would be used specifically to buy the assets held by SIVs, including the seven SIVs affiliated with Citigroup. By failing to disclose its exposure to the SIVs, Citigroup violated Section 10(b) and Rule 10b-5.

102. Citigroup has maintained a business model relying on issuing subprime loans and securitizing these mortgages for the commercial paper market. Citigroup failed to disclose the risks of default in these mortgages to its investors and, moreover, failed to disclose the risks of default in the portfolios of mortgage backed securities it sold to the market. Rather, it worked with rating agencies to assign the highest credit ratings to investment vehicles based on risky mortgages it had failed to properly underwrite.

## LOSS CAUSATION

103. Throughout the Class Period, the price of Citigroup's securities was massively inflated as a result of Defendants' false and misleading statements and omissions concerning Citigroup's financial health. But for Defendants' misrepresentations and omissions, which had the effect of overstating shareholders' equity, assets and investment income, while understating liabilities, Plaintiff would not have purchased Citigroup's securities at the artificially inflated prices at which they were offered.

104. As a direct result of Defendants' scheme, misrepresentations and omissions of material facts the price of Citigroup's common stock was artificially inflated throughout the Class Period. When the truth of Citigroup's financial condition was revealed beginning in October 2007, Citigroup's stock price collapsed dramatically. On the first two trading days after Citigroup announced the rescue plan for its SIVs, Citigroup's stock declined by $3.09 per share or 6.45% from $47.87 at the close on Friday, October 12, 2007 to $44.79 at the close on Tuesday October 16, 2007. Over the next two days, Citigroup's stock dropped nearly another dollar to close at $43.83 on Thursday, October 18, 2007. Most recently, before the market opened on November 5, 2007, Citigroup announced the replacement of its top management team and admitted

that it would have to take a write-off in excess of $10 billion in connection with its subprime business. As a result of Citigroup's admission of its subprime problems and its exposure to the liabilities of the SIVs, Citi's stock, since October 11, 2007, has fallen from $48.32 to $35.90 (on November 5, 2007), for a total decline of nearly 26%. Thus, in a little more than three (3) weeks, Citigroup has lost nearly $62 billion in market capitalization.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased Citigroup securities during the Class Period and who suffered damages as a result of their purchases (the "Class"). Excluded from the Class are (1) the Company and the Individual Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company or any of Defendants; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company or any of Defendants; (5) any entity in which any of Defendants has a controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

106.    The members of the Class are so numerous that joinder of all members is impracticable. As of the date of this Complaint, there were approximately 5.06 billion shares of Citigroup common stock outstanding. While Plaintiff does not know the exact number of Class members, Plaintiff believes that there are, at minimum, thousands of members of the Class who purchased Citigroup securities during the Class Period.

107.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

108.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether the SEC filings, and other public statements published and disseminated to the investing public and purchasers of the common stock during the Class Period omitted and/or misrepresented material facts about the risks of Citigroup's mortgage backed securities;

(c)    Whether Defendants omitted to state and/or misrepresented material facts about the financial condition, profitability and present and future prospects of the Company;

(d)    With respect to Plaintiff's claims under the Exchange Act, whether Defendants acted willfully or recklessly in omitting to state and/or misrepresenting material facts about the financial condition, profitability and present and future prospects of the Company;

(e)    Whether the market price of Citigroup common stock during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(f)    Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

109.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

110.    A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress Defendants' wrongful conduct. Furthermore, Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE

111.    The market for Citigroup's securities was open and efficient at all relevant times for the following reasons (among others):

(a)    The Company's securities met the requirements for listing, and were listed and actively traded on the NYSE;

(b)    As a regulated issuer, Citigroup filed periodic public reports with the SEC;

(c)    Citigroup regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

36

(d)     The market reacted to public information disseminated by Citigroup;

(e)     Citigroup was followed by numerous material securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public market place;

(f)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Citigroup securities; and

(g)     Without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or otherwise acquired Citigroup securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of Citigroup securities was inflated by Defendants' misrepresentations and omissions.

112.    As a result of the forgoing, the market for Citigroup securities promptly digested current information regarding Citigroup from all publicly available sources and reflected such information in Citigroup's securities prices. Under these circumstances, all purchasers and acquirers of Citigroup's securities during the Class Period suffered similar injury through their purchase or acquisition of Citigroup's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)

113.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.    This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

115.    During the Class Period, Defendants, who owed a fiduciary duty to Plaintiff and the Class, carried out a plan, scheme and course of conduct which was intended to and, throughout the class period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (2) artificially inflate and maintain the market price of Citigroup's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

116.    The Defendants (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use means or instrumentalities of interstate commerce; and (3) engaged in acts, practices, and course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Citigroup securities in violation of Section 10(b) and Rule 10b-5.

117.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a

38

duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. §29.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information. Defendant's material misrepresentations and omissions as set forth herein violated that duty.

118.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

119.    As a result of Defendants' fraudulent activity, the market price of Citigroup's securities was artificially inflated during the Class Period.

120.    In ignorance of the truth concerning Citigroup's true financial condition and exposure to subprime mortgage related liabilities, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Citigroup containing the misleading information, purchased or otherwise acquired Citigroup securities at artificially inflated prices during the Class Period.

121.    Citigroup knew that its potential exposure to subprime mortgage losses was greater than that disclosed in its public statements and that it carried significantly more risk of loss due to its exposure to subprime mortgages. Accordingly, the decline in the Company's market capitalization that occurred between October 11, 2007 and

November 7, 2007 was directly attributable to Defendant's fraudulent conduct as alleged herein.

122.    Plaintiff's (and the Class's) losses were proximately caused by Defendants' active and primary participation in Citigroup's fraud the investing public. Plaintiff (and members of the Class) purchased Citigroup securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of Citigroup securities through their misconduct as described herein.    Furthermore, Defendants' misconduct proximately caused Plaintiff's (and the Class') losses. Plaintiff's (and the Class's) losses were a direct and foreseeable consequence of Defendants' failure to disclose and the concealment of, *inter alia*, the true state of the business operations and financial condition of Citigroup.

123.    Throughout the Class Period, Defendants were aware of material non-public information concerning Citigroup's fraudulent conduct (including false and misleading statements identified herein).    Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information regarding Citigroup's exposure to liabilities due to subprime mortgages, and Plaintiff's (and the Class's) losses were the foreseeable consequence of Defendants' concealment of this information.

124.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Citigroup securities during the class period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (AGAINST THE INDIVIDUAL DEFENDANTS)

125.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

126.    As alleged herein, the Individual Defendants acted as controlling persons of Citigroup within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly of indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends is false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

127.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

128.    As set forth above, the Individual Defendants and Citigroup committed a primary violation of Section 10(b) and Rule 10b-5 by the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Citigroup, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other member of the Class suffered damages in connection with their purchases or acquisition of Citigroup securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring this action to be a proper Class action pursuant to Fed. R. Civ. P. 23;

(B)    Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of Plaintiff and the Class for all losses and damages suffered as a result of the Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

(C)    Awarding Plaintiff his reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

(D)    Awarding the Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: November 9, 2007

GARDY & NOTIS, LLP

By: _____

James S. Notis (JN 4189)
Dustin P. Mansoor (DM 4039)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiff*

43

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Lenard Hammond, certify that:

1.    I have reviewed the complaint and authorized its filing.

2.    I did not purchase the security that is the subject of this action (Citigroup, Inc. (NYSE: C)) at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

Purchases:

| Date | Shares Bought | Price Per Share |
|------|---------------|-----------------|
| 8/29/07 | 200 | 46.44 |
| 10/18/07 | 800 | 44.06 |

Sales (if any):

| Date | Shares Sold | Price Per Share |
|------|-------------|-----------------|
|  |  |  |

5.    I have not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Signed: _____

**EXHIBIT J**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MARK GEROULO, individually, on behalf of
the CITIGROUP 401(k) Plan, the
CITIBUILDER 401 (K) PLAN FOR
PUERTO RICO, and all others similarly
situated,

                      Plaintiff,

      v.

CITIGROUP, INC., CITIBANK, N.A., THE
PLAN ADMINISTRATIVE COMMITTEE
OF CITIGROUP, INC., MICHAEL E.
SCHLEIN, JOHN DOES 1-10, THE
CITIGROUP 401(k) PLAN INVESTMENT
COMMITTEE and JOHN DOES 10-20, C.
MICHAEL ARMSTRONG, ALAIN J.P.
BELDA, GEORGE DAVID, KENNETH T.
DERR, JOHN M. DEUTCH, ROBERTO
HERNÁNDEZ, ANN DIBBLE JORDAN,
ANDREW N. LIVERIS, DUDLEY C.
MECUM, ANNE M. MULCAHY, RICHARD
D. PARSONS, ANDRALL E. PEARSON,
CHARLES PRINCE, JUDITH RODIN,
ROBERT E. RUBIN, FRANKLIN A.
THOMAS, SANFORD I. WEILL

                     Defendants.

Civil Action No. _____

07 CV 10472

**CLASS ACTION**

COMPLAINT FOR VIOLATION OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT OF 1974 (ERISA)



RECEIVED
NOV 20 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Mark Geroulo ("Plaintiff"), individually, as a representative of The Citigroup

401(k) Plan (the "Citigroup Plan") and the Citibuilder 401 (k) Plan for Puerto Rico (the "Puerto

Rico Plan")(collectively, the "Plans"), and on behalf of a class of similarly situated participants

in the Plans (the "Participants"), by his attorneys, alleges the following for his Complaint

("Complaint"):

## I. NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      Plaintiff, a Participant in the Citigroup Plan, brings this action against Citigroup,

Inc. ("Citigroup" or the "Company") and others individually, as a representative of the Plans and

on behalf of a class of all Participants in the Plans for whose individual accounts the Plans

invested in the Citigroup Common Stock Fund (the "Fund") from January 1, 2004 to the present

(the "Class Period"). Plaintiff brings this action on behalf of both the Plans and the Plans'

Participants and beneficiaries pursuant to § 502(a)(2) and (3) of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2.      As more fully set forth below, Defendants breached their fiduciary duties owed to

the Plans and the Participants, including those fiduciary duties set forth in ERISA § 404, 29

U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these

breaches, Defendants are liable to the Plans for all losses resulting from each such breach of

fiduciary duty. Plaintiff also seeks equitable relief.

3.      Plaintiff's claims arise out Defendants' misrepresentations and failures to disclose

material adverse information concerning Citigroup's massive risks and liabilities arising out of

its structured and mortgage lending businesses.

4.      These misrepresentations and failures to disclose artificially inflated the value of

Fund and Company common stock shares. Yet, throughout the Class Period, the Plans continued

to invest in the Fund and the Fund continued to invest in Company stock.

5.      Plaintiff alleges that it was imprudent to permit the Plans to invest in the Fund and

the Fund to invest in Company stock because the prices of shares of Fund and Company stock

were artificially inflated. Plaintiff also alleges that Defendants breached their fiduciary duties by

negligently failing to disclose material information necessary for Participants to make informed

decisions concerning the Plans' assets and benefits and investing in the Fund. Plaintiff further

alleges that those Defendants who had a duty to appoint and monitor the fiduciaries with

authority or control over Plan assets breached their duty to appoint and monitor. Finally,

Defendants are liable as co-fiduciaries.

## II.  JURISDICTION AND VENUE

6.    Plaintiff's claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

7.    This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29

U.S.C. § 1132(e)(1).

8.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2), because this is the district where the Plan is administered, where the breaches took

place and where one or more defendants reside or may be found.

## III.  THE PARTIES

### Plaintiff

9.    Plaintiff Mark Geroulo is a resident of the State of Pennsylvania. Plaintiff is a

Participant in the Citigroup Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

### Defendants

10.    Defendant, Citigroup, Inc. is a corporation organized and existing under the laws

of the state of Delaware with its principal place of business in New York, New York.

11.    Defendant, Citibank, N.A. is a corporation organized and existing under the laws

of the state of New York with its principal place of business in New York, New York.

12.    Defendant, The Administration Committee of Citigroup, Inc. (" Administration

Committee") is, on information and belief, an association of Citigroup employees responsible for

the administration of the Plan.

13.     Defendant, Michael E. Schlein, is the Citicorp Head of Global Affairs, Human Resources and Business Practices. Schlein signed the Plans' 2006 Forms 11-k on behalf of the Administration Committee and is, on information and belief, a member of that Committee.

14.     Defendants, John Does 1 and 10 are the other members of the Administration Committee (collectively with Schlein, the "Administration Committee Members") whose names are not currently known. The Administration Committee Members are liable to the same extent as the Administration Committee and vice versa and hereinafter are referred to collectively as the Administration Committee.

15.     Defendant, The Citigroup 401 (k) Plan Investment Committee ("Investment Committee") is, on information and belief, an association of Citigroup employees responsible for the selection and monitoring of Plan investment options.

16.     Defendants, John Does 10 and 20 are members of the Committee (the "Investment Committee Members") whose names are not currently known. The Investment Committee Members are liable to the same extent as the Investment Committee and vice versa and hereinafter are referred to collectively as the Investment Committee.

17.     Upon information and belief, the Committee Members in addition to Schlein were all Citigroup senior officers and employees. As a result of their senior positions within the Company, they knew or should have known all of the facts alleged herein.

18.     Upon information and belief, Defendants, the Citigroup Board of Directors ("Board") has the duty to appoint and monitor the Committee Members. The Board as an entity and each of the following who were members of the Board of Directors during some or all of the Class Period are named as Defendants: C. Michael Armstrong, Alain J.P. Belda, George David, Kenneth T. Derr, John M. Deutch, Roberto Hernández, Ann Dibble Jordan, Andrew N. Liveris,

Dudley C. Mecum, Anne M. Mulcahy, Richard D. Parsons, Andrall E. Pearson, Charles Prince,

Judith Rodin, Robert E. Rubin, Franklin A. Thomas, Sanford I. Weill (collectively the "Director

Defendants").

## V. **DESCRIPTION OF THE PLANS**

19.     The Plans are an employee benefit plans within the meaning of ERISA § 3(3) and

3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A). According to a memo dated September 10, 2004

from the Company to Participants, the Citigroup Plan "is an important element of

[Participant]retirement savings." According to the Citigroup Plan Summary Plan Description

("SPD"), Citigroup "encourages" Participants to save for their retirements and financial futures

through the Plans.

20.     The Plans are "defined contribution" or "individual account" plans within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual

accounts for each Participant and for benefits based solely upon the amount contributed to those

accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other

Participants which may be allocated to such Participant's account.  Consequently, retirement

benefits provided by the Plans are based solely on the amounts allocated to each individual's

account.

21.     The Plans are voluntary contribution plans whereby Participants contribute a

portion of their employment compensation to the Plans. ("Employee Contributions") Depending

on the time period, Participants in the Citigroup Plan were permitted to contribute on a pre-tax

basis from one to twenty or one to fifty percent of their eligible compensation. See, SPD and

2006 Form 11-k. Participants in the Puerto Rico Plan were permitted to contribute on a pre-tax

basis from one to ten percent of their eligible compensation. See, 2006 Form 11-k.

22.     According to the SPD, the Company made matching contributions to individual Plan accounts in the amount of 3% of eligible pay up to $50,000 plus, depending on the time period, additional amounts up to eligible pay of $250,000, subject to IRS limits. ("Matching Contributions")

23.     The assets of the Citigroup Plan were held in trust pursuant to a Trust Agreement executed between Citigroup and Citibank ("Trust").

24.     According to the SPD, Participants could cause the Plans to invest the Employee Contributions held in each of their accounts in the Trust among a number of "Investment Options" offered by the Plans.

25.     One of the Investment Options which Participants could select for the investment of Employee Contributions was the Company Stock Fund.

26.     Up until January 1, 2007, the Plans required that Matching Contributions be invested in the Fund for at least five years or until a Participant reached the age of 55, and after either of which occurred, Matching Contributions could be invested in the same way as Employee Contributions. After January 1, 2007, all Matching Contributions could be invested in the same way as Employee Contributions.

## VI. DEFENDANTS WERE FIDUCIARIES

27.     The SPD states that the people who operate the Plans are fiduciaries. As set forth below, Defendants operated the Plan.

28.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

       (a)     they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

    (c)     they exercised discretionary authority or discretionary control respecting management the Plans; and/or

    (d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

29.     In that regard, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities. The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

30.     A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

31.     The Administration Committee is a fiduciary because it was the "Named Fiduciary" and Plan Administrator of the Plans.

32.     According to the June 2007 Citigroup 401 (k) Plan newsletter, the Investment Committee is responsible for providing a menu of investment options that will best serve the needs of participants and beneficiaries. The Investment Committee is, therefore, a fiduciary.

33.     Citigroup is a fiduciary in that it managed, administered and operated the Plans, exercised authority or control over the management and disposition of Plan assets and disseminated Plan communications to Participants. Upon information and belief, the Committees met infrequently and spent very little time on matters relating to administration of the Plans and Plan investments. Rather, upon information and belief, these jobs were performed by Citigroup employees acting in the scope of their day to day duties and, in particular, by Citigroup human resources, legal, corporate communications, finance and treasury personnel.

34.     Moreover, upon information and belief, the Committee members were appointed and served on the Committees as part of and in the ordinary course of their job responsibilities without any additional compensation. Accordingly, the Company is responsible and liable for their actions.

35.     The Director Defendants were fiduciaries of the Plan because they had the fiduciary duty to appoint and monitor the members of the Committees. They had the power and responsibility to appoint as members of the Committees persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties as committee members, including the duty to evaluate the merits of investment options under the Plans. The Director Defendants also had an ongoing duty to ensure that the persons appointed to the Committees were fully informed and performing their duties properly with respect to the selection of investment options under the Plans and the investment of the assets of the Plans.

36.     Citibank is a fiduciary with respect to the Citigroup Plan because it is the trustee for the Citigroup Plan and all of that Plan's assets. According to the Citigroup Plan 2006 Form 11-k, Citibank is a wholly owned subsidiary of the Company. For this reason, and because it is a bank and, on information and belief, participated in the lending activities alleged herein, it knew

or should have known of the facts alleged herein and, therefore, that the Fund was an imprudent investment.

37.    The Committees are fiduciaries because, upon information and belief, they had the power and duty to direct Citibank in regard to the Trust's investment in Company Stock.

## VII. FIDUCIARY DUTIES UNDER ERISA

38.    The SPD states that the Plan fiduciaries have a duty to operate the Plans prudently and in the best interests of all Participants and beneficiaries.

39.    **The Statutory Requirements.** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

40.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty-- that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ,"

41.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.    A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

42.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary

the duty of prudence--that is, the duty "to discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like

aims. . . ."

43.    **The Duty to Inform.** The duties of loyalty and prudence include the duty to

disclose and inform. These duties entail: 1) a negative duty not to misinform; 2) an affirmative

duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a

duty to convey complete and accurate information material to the circumstances of participants

and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and

in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and

the Participants, on the other.

44.    Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA

to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021,

requires that fiduciaries furnish the SPD to Participants. ERISA § 102, 29 U.S.C. § 1022,

provides that the SPD must apprise Participants of their rights under the Plan. The SPD and all

information contained or incorporated therein constitutes a representation in a fiduciary capacity

upon which Participants were entitled to rely in determining the identity and responsibilities of

fiduciaries under the Plan and in making decisions concerning their benefits and investment and

management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of
> misleading, misinforming or failing to inform participants and beneficiaries. Any
> description of exceptions, limitations, reductions, and other restrictions of plan

benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b). Here, Defendants purported to make that required disclosure

concerning the Fund by incorporating by reference into the SPD all of Citigroup's filings under

Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act. Additionally, the SPD

expressly directed Participants to Citigroup's website or to the Administration Committee for

such information.

45.    **The Duty to Investigate and Monitor Investment Alternatives.** With respect

to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct

an independent investigation into, and continually to monitor, the merits of the investment

alternatives in the Plan including employer securities, to ensure that each investment is a suitable

option for the Plan.

46.    **The Duty to Monitor Appointed Fiduciaries.** Fiduciaries who have the

responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus

appointed. The duty to monitor entails both giving information to and reviewing the actions of

the appointed fiduciaries. In a 401(k) plan such as the Plan the monitoring fiduciaries must

therefore ensure that the appointed fiduciaries:

(a)    possess the needed credentials and experience, or use qualified advisors

and service providers to fulfill their duties;

(b)    are knowledgeable about the operations of the Plan the goals of the Plan and the behavior of Plan's participants;

(c)    are provided with adequate financial resources to do their jobs;

(d)    have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

(e)    have access to outside, impartial advisors when needed;

(f)    maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

(g)    report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

47.    **The Duty Sometimes to Disregard Plan Documents**.  A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

48.    **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

49.     **Non-Fiduciary Liability.**  Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## VIII.  PARTICIPANTS ARE NOT RESPONSIBLE FOR IMPRUDENT PLAN INVESTMENTS

50.     The fact that Participants selected investments from options pre-selected by Defendants is no defense in this case.  Fiduciaries can shift liability for imprudent investments to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet five specific requirements:

(a)     they disclose in advance the intent to shift liability to Participants;

(b)     they designate the Plan as a "404(c) plan" and adequately communicate this to Participants;

(c)     they ensure that Participants are not subject to undue influence;

(d)     they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

(e)     they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law.  In this regard, fiduciaries have a choice: they can disclose all material

information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii). Here, Defendants purported to make that required disclosure concerning the Fund by incorporating by reference into the SPD all of Citigroup's filings under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act. Additionally, the SPD expressly directed Participants to Citigroup's website or to the Administration Committee for such information.

51.    Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations.

## IX. SUBSTANTIVE ALLEGATIONS

52.    Citigroup is an industry leader in making loans to borrowers with poor credit or secured by properties that do not provide adequate collateral for the amount of credit extended. These mortgages are known as "subprime" loans or mortgages.

53.    Citigroup claims millions of residential mortgage customers which it serves through branches in 48 states and the internet to whom it sold subprime mortgages.

54.    Citigroup's subprime loans were underwritten based on exceptionally weak borrower credit and inordinately high loan to value ratios.

55.    Citigroup securitized its subprime loans, which it sold in the secondary securities market in the form of various commercial instruments, but principally as bonds and as collateralized debt obligations ("CDOs").

56.    CDOs are structured credit products which divide the interest earned, the right to

and priority of repayment and the credit risk among different tranches. Senior tranches receive a

lower interest rate because they have a prior right of repayment and, therefore, are lower risk.

57.    Rating agencies rate the different tranches to apprise investors of the relative risk

of the different tranches.

58.    Citigroup and others helped create a secondary market for CDO's and other

subprime mortgage backed securities through "Special Investment Vehicles" ("SIVs").

59.    SIVs issue short term commercial paper and use the proceeds thereof to buy long

term subprime mortgage backed securities.

60.    SIVs are off balance sheet entities managed by Citigroup in exchange for lucrative

fees.

61.    Citigroup does not report SIV liabilities on its balance sheet because it does not

disclose that it is the ultimate guarantor of the commercial paper issued by its SIVs.

62.    The quality of Citicorp's subprime mortgage business was far worse that

Citigroup led the market to believe in that the value of the subprime mortgages Citigroup held

either directly or through its interest in SIV's was far lower than represented due to a high risk of

default due to low collateral valuations or weak borrower credit.

63.    Citigroup did not disclose the risks of its subprime lending business

or its use of SIVs to invest in securities arising out of that lending.

64.    On November 5, 2007, Citigroup replaced senior management stated that it would

write-off in excess of $10 billion in connection with its subprime business.

65.    However, even as late as September 12, 2007, Steven Freiberg, chief executive of

Citigroup's North American consumer operations, claimed that Citigroup's subprime mortgage

business "actually looks pretty good." According to Freiberg, "Where you think there would be

a fire - in our subprime portfolio -it actually looks pretty good."

66.    Citigroup's promises concerning its subprime mortgage business were false.

Citigroup has suffered massive losses and may experience substantially greater losses if it is

forced to liquidate its subprime portfolio at distressed prices.

## X.  MISREPRESENTATIONS

67.    Citigroup negligently misrepresented and failed to disclose material adverse

information concerning its subprime lending business in SEC filings that were incorporated by

reference into Plan documents as further alleged above.

68.    For example, Citigroup's 2004 10-K stated with respect to its mortgage lending

business:

> The Company provides a wide range of mortgage and other loan products to a
> diverse customer base. In addition to providing a source of liquidity and less
> expensive funding, securitizing these assets also reduces the Company's credit
> exposure to the borrowers. ...The Company's mortgage loan securitizations are
> primarily non-recourse, thereby effectively transferring the risk of future credit
> losses to the purchasers of the securities issued by the trust.

> The Company packages and securitizes assets purchased in the financial markets
> in order to create new security offerings, including arbitrage collateralized debt
> obligations (CDOs) and synthetic CDOs for institutional clients and retail
> customers, that match the clients' investment needs and preferences. Typically
> these instruments diversify investors' risk to a pool of assets as compared with
> investments in an individual asset. The VIEs, which are issuers of CDO securities,
> are generally organized as limited liability corporations. The Company typically
> receives fees for structuring and/or distributing the securities sold to investors.
> ...The Company is not the primary beneficiary of these VIEs under FIN 46-R due
> to its limited continuing involvement and, as a result, we do not consolidate their
> assets and liabilities in our financial statements.

69.     In its 2005 Form 10-K, Citigroup made similar representations concerning its

mortgage loan business:

> In addition to securitizations of mortgage loans originated by the Company, the Company
> also securitizes purchased mortgage loans, creating collateralized mortgage obligations
> (CMOs) and other mortgage-backed securities (MBSs) and distributes them to investors.
> In 2005 and 2004, respectively, the Company organized 36 and 29 mortgage
> securitizations with assets of $25 billion and $24 billion. For 2005 and 2004, the
> Company's revenues for these activities were $483 million and $464 million, and
> estimated expenses before taxes were $116 million and $78 million.
> The Company packages and securitizes assets purchased in the financial markets
> in order to create new security offerings, including arbitrage collateralized debt
> obligations (CDOs) and synthetic CDOs for institutional clients and retail
> customers, which match the clients' investment needs and preferences. Typically
> these instruments diversify investors' risk to a pool of assets as compared with
> investments in an individual asset. The VIEs, which are issuers of CDO securities,
> are generally organized as limited liability corporations. The Company typically
> receives fees for structuring and/or distributing the securities sold to investors.
> The Company is not the primary beneficiary of these VIEs under FIN 46-R due to
> its limited continuing involvement and, as a result, we do not consolidate their
> assets and liabilities in our financial statements.

70.     Citigroup's 2006 10-k similarly stated that:

> The Company provides a wide range of mortgage and other loan products to its
> customers. In addition to providing a source of liquidity and less expensive
> funding, securitizing these assets also reduces the Company's credit exposure to
> the borrowers. The Company's mortgage loan securitizations are primarily non-
> recourse, thereby effectively transferring the risk of future credit losses to the
> purchasers of the securities issued by the trust.

> As with all other lending activity, this exposes Citigroup to several risks,
> including credit, liquidity and interest rate risks. To manage credit and liquidity
> risk, Citigroup sells most of the mortgage loans it originates, but retains the
> servicing.

71.     The representations were false or misleading in that Citigroup retained a

substantail amount of credit risk concerning these subprive mortgages.

72.     Concerning its SIV business, which Citigroup classified as Special Purpose

Entities ("SPE"), in its 2004 10-k, the Company stated as follows:

Citigroup and its subsidiaries are involved with several types of off-balance sheet arrangements, including special purpose entities (SPEs), lines and letters of credit, and loan commitments. The principal uses of SPEs are to obtain sources of liquidity by securitizing certain of Citigroup's financial assets, to assist our clients in securitizing their financial assets, and to create other investment products for our clients.

....

The Company packages and securitizes assets purchased in the financial markets in order to create new security offerings, including hedge funds, mutual funds, unit investment trusts, and other investment funds, for institutional and private bank clients as well as retail customers, that match the clients' investment needs and preferences. The SPEs may be credit-enhanced by excess assets in the investment pool or by third-party insurers assuming the risks of the underlying assets, thus reducing the credit risk assumed by the investors and diversifying investors' risk to a pool of assets as compared with investments in individual assets. The Company typically manages the SPEs for market-rate fees. In addition, the Company may be one of several liquidity providers to the SPEs and may place the securities with investors.

73.    Under applicable accounting rules, because of Citigroup's financial and other commitments to its affiliated SIVs, Citigroup was required to disclose the nature, purpose, size, and activities of the SIVs and disclose the carrying amount and classification of the consolidated assets that were collateral for the SIVs' obligations.

74.    Citigroup failed to consolidate the financial results or liabilities of its affiliated SIVs as required by GAAP. Moreover, Citigroup has failed to disclose in the management discussion and analysis section of its financial statements the risks attendant to Citigroup in the liabilities of its affiliated SIVs.

75.    Concerning the valuation of its subprime mortgage assets, the 2005 10-k stated:

The Company values its securitized retained interests at fair value using either financial models, quoted market prices, or sales of similar assets. Where quoted market prices are not available, the Company estimates the fair value of these retained interests by determining the present value of expected future cash flows using modeling techniques that incorporate management's best estimates of key assumptions, including prepayment speeds, credit losses, and discount rates.

76.    Similarly, in its 2006 10-k Citigroup stated:

Substantially all of these assets and liabilities are reflected at fair value on the
Company's balance sheet. Fair values are considered verified if they meet one of
the following criteria:

Externally substantiated via comparison to quoted market prices or third party
broker quotations;

By using models that me validated by qualified personnel independent of the area
that created the model and inputs that are verified by comparison to third-party
broker quotations or other third-party sources where available; or

By using alternative procedures such as comparison to comparable securities
and/or subsequent liquidation prices.

77.    Citigroup's financial models used to determine the "fair value" of its mortgage

backed securities were inaccurate and subjective. Moreover, rather than verify the values with

"third party broker quotations or other third party sources," Citigroup worked with rating

agencies to manipulate the debt ratings of its assets which were then used by Citigroup to value

these assets.

78.    Citigroup misrepresented the risks of default and decline in the value of its

subprime loan portfolio and instead led Participants to believe that the Company's subprime loss

exposure was minimal by stating that from 2004 to 2005 "Non-prime [subprime] mortgage

originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and

interest-only mortgages to lower FICO score customers."

79.    On February 23, 2007, Citigroup filed its From 10-K for the year ended December

31, 2006, with the SEC in which the Company stated in part:

We enter 2007 with good business momentum, as we expect to see our investment
initiatives generate increasing revenues, and are well positioned to gain from our
balanced approach to growth and competitive advantages.

We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

In 2006, our international businesses contributed 43% of our income from continuing operations. We expect to continue to re-weight our revenue mix towards International Consumer, CIB and Global Wealth Management.

. . .

Concerning its outlook for 2007, the Company stated in part:
We enter 2007 with good business momentum, as we expect to see our investment initiatives generate increasing revenues, and are well positioned to gain from our balanced approach to growth and competitive advantages.

We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

In 2006, our international businesses contributed 43% of our income from continuing operations. We expect to continue to re-weight our revenue mix towards International Consumer, CIB and Global Wealth Management.

Disciplined capital allocation will remain fundamental to our strategic process and we will have a sharp focus on expense management.

Although there may be volatility in our results in any given year, over the long term our revenues are targeted to grow organically at a mid to high single-digit rate, with strong expense and credit management driving earnings and earnings per share growth at a faster level. We will seek to augment this growth rate over rune through targeted acquisitions.

Credit is broadly stable as 2007 begins; however, we are budgeting for a moderate deterioration of credit in 2007. In addition, the tax benefits we realized in 2006 will not be repeated in 2007, and we anticipate the effective tax rate to return to a more normalized rate of 30% to 31%, not the 27.3% recorded in 2006.

80.     In its 2006 10-K, Citigroup failed to disclose the true risks and problems it was

likely to experience as a result of its subprime mortgage business.

## XI.  CAUSES OF ACTION

**A.     Count I: Failure to Prudently and Loyally Manage the Plan and**

**Assets of the Plan**

81.     Plaintiff incorporates by reference the paragraphs above.

82.     This Count alleges fiduciary breach against all Defendants other than the Director Defendants (the "Prudence Defendants").

83.     As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

84.     As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plans for the sole and exclusive benefit of Plan Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plans and directing the trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

85.     Yet, contrary to their duties and obligations under the Plan documents and ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans.  Specifically, during the Class Period, these Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plans, but was, instead, an imprudent investment in light of the Company's material undisclosed fundamental weaknesses.

86.    Nonetheless, during the Class Period, these Defendants continued to permit the Plans to offer the Fund as an investment option for Employee and Matching Contributions and continued to permit the Plans to invest those contributions in the Fund and permit the Fund to invest in Company stock. They did so despite the fact that they knew or should have known that the prices of Fund and Company stock shares was artificially inflated.

87.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

88.    The Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but had no such procedure. Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Fund. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Fund under these circumstances.

89.    The Prudence Defendants' breached their fiduciary duty respecting the Plans' investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

90.    The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C.

§ 1104(a)(1)(B).

91.    According to United States Department of Labor ("DOL") regulations and case

law interpreting this statutory provision, a fiduciary's investment or investment course of action

is prudent if: (a) he has given appropriate consideration to those facts and circumstances that,

given the scope of such fiduciary's investment duties, the fiduciary knows or should know are

relevant to the particular investment or investment course of action involved, including the role

the investment or investment course of action plays in that portion of the plan's investment

portfolio with respect to which the fiduciary has investment duties; and (b) he has acted

accordingly.

92.    According to DOL regulations, "appropriate consideration" in this context

includes, but is not necessarily limited to:

(a)    A determination by the fiduciary that the particular investment or

investment course of action is reasonably designed, as part of the portfolio (or, where applicable,

that portion of the plan portfolio with respect to which the fiduciary has investment duties), to

further the purposes of the plan, taking into consideration the risk of loss and the opportunity for

gain (or other return) associated with the investment or investment course of action; and

(b)    Consideration of the following factors as they relate to such portion of the

portfolio:

(i)    The composition of the portfolio with regard to diversification;

(ii)    The liquidity and current return of the portfolio relative to the

anticipated cash flow requirements of the plan; and

(iii)    The projected return of the portfolio relative to the funding objectives of the plan.

93.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Company stock because, among other reasons:

94.    The Prudence Defendants knew of and/or failed to investigate the failures of the Company as alleged above.

95.    The risk associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with investment in company stock.

96.    This abnormal investment risk could not have been known by the Plans' Participants, and the Prudence Defendants knew that it was unknown to them, as it was to the market generally, because the fiduciaries never disclosed it.

97.    Knowing of this extraordinary risk, and knowing the Participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plans or any Participant from investing the Plans' assets in the Fund or Company stock.

98.    Further, knowing that the Plans were not adequately diversified, but were heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plans of Company stock if it became or remained imprudent.

99.    The Prudence Defendants breached their fiduciary duties by, inter alia, failing to engage independent advisors who could make independent judgments concerning the Plans' investment in the Company; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the Plans;

failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's inappropriate practices; and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the Plans' investment in Company stock.

100.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

101.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II:  Failure to Provide Complete and Accurate Information to Participants and Beneficiaries**

102.    Plaintiff incorporates by reference the allegations above.

103.    This Count alleges fiduciary breach against all Defendants other than Citibank and the Director Defendants (the "Communications Defendants").

104.    As alleged above, during the Class Period the Communications Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

105. As alleged above, the scope of the Communications Defendants' duties included disseminating Plan documents and/or Plan-related information to Participants regarding the Plans and/or assets of the Plans.

106. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plans. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that Participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all the Plans' investment options, including investment in Company stock.

107. This fiduciary duty to honestly communicate with Participants is designed not merely to inform Participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Communications Defendants facilitated the illegal conduct in the first instance.

108. The Communication Defendants were obligated to provide Participants with complete and accurate information concerning all of the Plans' assets. However, their duties of honest disclosure were especially significant with respect to Company stock because: a) during the Class Period, a large percentage of the Plans' assets were invested in it; b) company stock is a

particularly risky and volatile investment, even in the absence of company misconduct; and c) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock investment.

109.    The Communications Defendants breached their ERISA duty to inform Participants by failing to provide complete and accurate information regarding the Company and Company stock as alleged above, and, generally, by conveying through statements and omissions inaccurate information regarding the soundness of Company stock, and the prudence of investing retirement contributions in the stock.

110.    In particular, the Committee Defendants were responsible for communications made in the official Plan documents and materials which were disseminated directly to all participants to be used by participants in the management of the investment of their Plan accounts in the Fund, including the Plan's SPDs which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports.

111.    These failures were particularly devastating to the Plans and the Participants, as a significant percentage of the Plans' assets were invested in Company stock during the Class Period, with acquisitions of Company stock occurring at significantly inflated prices. Thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets. Had such disclosures been made to Participants, or Plan fiduciaries, if any, who were not aware of facts alleged herein, Participants and fiduciaries could have taken action to protect the Plans, and the disclosure to Participants, which necessarily would have been accompanied by disclosure to the market, would have assured that any further acquisitions of Company stock by the Plans would have occurred at an appropriate price.

112.    As a consequence of the failure of the Communications Defendants to satisfy their duty to provide complete and accurate information under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Company stock, or to appreciate that under the circumstances known or that should have been known to the Communications Defendants, but not known by Participants, Company stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.

113.    The Communications Defendants' failure to provide complete and accurate information regarding Company stock was uniform and Plan-wide, and impacted all Plan Participants the same way in that none of the Participants received crucial, material information regarding the risks of Company stock as a Plan investment option and all Plan acquisitions of employer stock during the Class Period occurred at inflated prices.

114.    As a consequence of the Communications Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. If the Communications Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

115.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Communications Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Failure to Monitor Fiduciaries**

116.    Plaintiff incorporates by reference the allegations above.

117.   This Count alleges fiduciary breach against the Director Defendants (the "Monitoring Defendants").

118.   As alleged above, upon information and belief, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

119.   As alleged above, the scope of the fiduciary responsibilities of the Director Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of the Committee Defendants.

120.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

121.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

122.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plans and the plan assets, or that may have an extreme impact on the plans and the fiduciaries' investment decisions regarding the plan.

123.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock;

(b)    failing to ensure that the monitored fiduciaries appreciated the true extent of Company's inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Company stock;

(c)    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in the Fund; and

(d)    failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Fund despite the practices that rendered Company stock an imprudent investment during the Class Period.

124.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary

monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

125.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**D.     Count IV: Co-Fiduciary Liability**

126.   Plaintiff incorporates by reference the allegations above.

127.   This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

128.   As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

129.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

130.   Knowledge of a Breach and Failure to Remedy. ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another

fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

131.    In particular, because the Director Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the Plans.

132.    Knowing Participation in a Breach. ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. The Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties. Moreover, as alleged above, each of the Defendants participated in the management of the Plan's improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

133.    Enabling a Breach. ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

134.    The Monitoring Defendants' failure to monitor the Prudence Defendants enabled those Defendants to breach their duties.

135.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants and beneficiaries, lost millions of dollars of retirement savings.

136.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XII.  CAUSATION

137.    The Plans suffered millions of dollars in losses of vested benefits because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties.

138.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plan of Company stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it suffered.

## XIII.  REMEDY FOR BREACHES OF FIDUCIARY DUTY

139.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plans' assets should not have been invested in the Fund during the Class Period.

140.    As a consequence of the Defendants' breaches, the Plans suffered a significant loss of vested benefits.

141.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan....".  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate....".

142.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of:

(a)    a monetary payment to the Plans to make good to the Plans the loss of vested benefits to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)    injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c)    reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d)    taxable costs and interest on these amounts, as provided by law; and

(e)    such other legal or equitable relief as may be just and proper.

## XIV.  CLASS ACTION ALLEGATIONS

143.    Class Definition.  Plaintiff brings this action as a class action pursuant to Rules

23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and

the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the
> Plan at any time between January 1, 2004 and the present, and whose accounts
> included investments in Citigroup stock.

144.    Class Period.  The fiduciaries of the Plans knew or should have known at least by,

that the Company's material weaknesses were so pervasive that Company stock could no longer

be offered as a prudent investment for retirement Plans.

145.    Numerosity.  The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class members is unknown to Plaintiff at

this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are,

based on the Plans Form 5500 Annual Return filed with the Internal Revenue Service ("IRS")

and dated October 16, 2006, more than 189,000 members of the Class who participated in, or

were beneficiaries of, the Plans during the Class Period.

146.    Commonality.  Common questions of law and fact exist as to all members of the

Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and members

of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans suffered losses and, if so, what is the proper measure of damages.

147.    Typicality. Plaintiff's claims are typical of the claims of the members of the Class because: (a) to the extent Plaintiff seeks relief on behalf of the Plans pursuant to ERISA § 502(a)(2), their claims on behalf of the Plans are not only typical of, but identical to claims under this section brought by any Class member; and (b) to the extent Plaintiff seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class members equally.

148.    Adequacy. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

149.    Rule 23(b)(1)(B) Requirements. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

150.    Other Rule 23(b) Requirements. Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XV.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plans resulting from imprudent investment of the Plans' assets; to restore to the Plans all profits the Defendants made through use of the Plans' assets; and to restore to the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company stock;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.    An Order for equitable restitution and other appropriate equitable and injunctive

relief against the Defendants.

DATED: November 20, 2007

PLAINTIFF,

SARRAF GENTILE LLP

Ronen Sarraf (RS 7694)
Joseph Gentile
485 Seventh Avenue, Suite 1005
New York, New York 10018
T: 212-868-3610
F: 212-918-7967

SCHATZ NOBEL IZARD P.C.
Robert A. Izard
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
rizard@snilaw.com

Attorneys for Plaintiff and the Class

**EXHIBIT K**

*√P 2776*
*8/22/05*

lancaster82205

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 04-1398

GORDON LANCASTER, et al.,          :
                                   :
          Plaintiffs,              :
                                   :
          -vs-                     :
                                   :
ROYAL DUTCH PETROLEUM, et          :
Al,                                :     TRANSCRIPT OF PROCEEDINGS
                                   :
          Defendants.              :
                                   :
- - - - - - - - - - - - - - - - -  :

                              Newark, New Jersey
                              August 22, 2005

          B E F O R E:

              THE HONORABLE JOHN W. BISSELL
          UNITED STATES DISTRICT COURT JUDGE

          A P P E A R A N C E S:

          LITE DEPALMA GREENBERG & RIVAS
          BY:  JOSEPH J. DE PALMA, ESQ.,
          For the Plaintiffs.

          Pursuant to Section 753 Title 28 United States
          Code, the following transcript is certified to be
          an accurate record as taken stenographically in the
          above-entitled proceedings.

                    Joanne M. Caruso, CSR, CRR
                      Official Court Reporter
                         (908)334-2472

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

2

lancaster82205

APPEARANCES CONTINUED:

MILBERG WEISS
BY:   BRAD N. FRIEDMAN, ESQ.,
         And
WECHSLER HARWOOD
BY:   ROBERT I. HARWOOD, ESQ.,
         And
SCOTT & SCOTT
BY:   DAVID R. SCOTT, ESQ.,
For the Plaintiffs.

LEBOEUF, LAMB, GREENE & MACRAE
BY:   RALPH C. FERRARA, ESQ.,
         ANN M. ASHTON, ESQ.,
For the Corporate Defendants.

9

MAYER, BROWN, ROWE & MAW
BY:   BRUCE M. BETTIGOLE, ESQ.,
For Defendant Watts.

11

FOLEY & LARDNER
BY:   NANCY J. SENNETT, ESQ.,
For Defendant Boynton.

13

SMYSER KAPLAN & VESELKA
BY:   LARRY R. VESELKA, ESQ.,
For Defendant Thomas, Jr.

15

DEWEY BALLANTINE
BY:   MIKE STENGLEIN, ESQ.,
For U.S. Trust.

17

STEPHEN TSAI, ESQ.,
For Jay Lambert.

19

20

21

22

23

24

25

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

3

August 22, 2005

Page 2

lancaster82205

2        THE COURT:    Good morning.

3            The Court is prepared to proceed with the fairness

4    hearing in the matter of In Re Royal Dutch/Shell Transport

5    ERISA litigation.

6            I apologize in the first instance.  I think I'm

7    getting over a case of laryngitis rather than contracting one,

8    but nevertheless, this may be a blessing in disguise.  You may

9    not listen to me as much as might otherwise be the case.

10           In any event, I'll take appearances first on behalf

11   of the plaintiffs.

12           MR. DePALMA:   Joseph DePalma of Lite, DePalma for the

13   plaintiffs.

14           Your Honor, I'd like to introduce co-lead counsel,

15   Robert Harwood.

16           MR. HARWOOD:   Good morning.

17           MR. FRIEDMAN:  Brad Friedman from Milberg Weiss.

18           MR. SCOTT:   Good morning.

19           Daivd Scott, from Scott & Scott.

20           MR. DePALMA:   With the Court's permission, we would

21   like to split the argument.  Mr. Harwood is prepared to

22   address the fairness of the settlement and Mr. Friedman the

23   fee issues, if that is okay.

24           THE COURT:   Counsel, the gentlemen to your immediate

25   right, I didn't catch the name.

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

4

1           MR. SCOTT:   David Scott, Scott & Scott.

2           THE COURT:   Thank you.

3           Counsel?

lancaster82205

4          MR. FERRARA:  Ralph Ferrara, appearing for the

5   corporate defendants.

6          MS. ASHTON:  Ann Ashton, also from LeBoeuf, Lamb.

7          THE COURT:   We have some applications for admissions

8   pro hac and persons who have sought to present positions on

9   behalf of objectors.

10         We'll continue with that.

11         MR. BETTIGOLE:  Bruce Bettigole for Sir Philip Watts.

12         MS. SENNETT:  Nancy Sennett for Judith Boynton.

13         MR. MORIN:  Phil Morin for defendant Pervis Thomas,

14  Jr.

15         MR. VESELKA:  Larry Veselka.  I'm the subject of one

16  of the pro hac motions.

17         THE COURT:   Thank you.

18         MR. VESELKA:  On behalf of Pervis Thomas, Jr.

19         THE COURT:  You're Mr. Thomas?

20         MR. THOMAS:  Yes.

21         THE COURT:  Welcome.

22         Mr. Veselka, I'll deal first with your motion to be

23  admitted pro hac on behalf of Mr. Thomas.  I've read the

24  papers involved.

25         Is there any objection on behalf of the other parties

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

5

1   to the case?

2          MR. DePALMA:  There is no objection.

3          MR. FERRARA:  No, your Honor.

4          THE COURT:   Thank you.

5          Your papers are in order.  I'll sign the order.

Page 4

lancaster82205
6    Welcome to this court.

7              MR. VESELKA:  Thank you, your Honor.

8              THE COURT:   Mr. Stenglein?

9              MR. STENGLEIN:  Yes.

10             THE COURT:   Will you join the Court in the well,

11   please?  Find a seat wherever you can.

12             MR. STENGLEIN:  Thank you, your Honor.

13             THE COURT:   Mr. Stenglein, I have your application

14   for admission pro hac on behalf of U.S. Trust Company.  Is

15   that correct?

16             MR. STENGLEIN:  Correct.

17             THE COURT:   I note that you're being moved by Mr.

18   Krovatin who is one of the best advocates in this entire

19   district.  If he were here, I was going to ask him if he

20   needed your help, but since he isn't, I won't.

21             Your papers are in order.

22             Any objection to the admission of Mr. Stenglein pro

23   hac in this case?

24             MR. DePALMA:  No objection.

25             MR. FERRARA:  No.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

                                                        6


1              THE COURT:   Thank you.

2              I'll sign the order.

3              MR. STENGLEIN:  Thank you.

4              THE COURT:   Now, we had an objection filed on behalf

5    of one Jay Lambert by a Stephen Tsai.

6              MR. TSAI:  That's me.

7              THE COURT:   You're present, sir?

lancaster82205

8        MR. TSAI:  Yes, sir.

9        THE COURT:  I'll enter your appearance.

10       MR. TSAI:  Stephen Tsai, appearing for class member

11 and objector, Jay Lambert.

12       THE COURT:  Thank you.

13       I received an objection by letter from a William S.

14 Gill of Kingwood, Texas, who apparently was not represented by

15 counsel and presented a position to the Court pro se

16 contesting only the amount of the allowance of plaintiffs'

17 attorneys' fees in this case.

18       Is Mr. Gill in court or anyone on his behalf?

19       All right.  That's an issue that's common to many of

20 the objections advanced today.  We'll address that in turn.

21       Are there any other persons present here in court who

22 are lodging objections to the terms of the settlement in this

23 matter?

24       Court notes no presentation.

25       Mr. Tsai, I'll hear you first on behalf of Mr.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

7

1 Lambert.

2       I've read your papers, of course, as well as those

3 submitted in response and I'll hear anything you would like to

4 add at this time.

5       MR. TSAI:  At this point, I'll just highlight a few

6 main points, I'm not going to belabor the Court's time.

7       We feel, your Honor, that there are certain

8 deficiencies in the notice and also in the release.  The

9 notice, your Honor, does not provide enough information about

Page 6

lancaster82205

10  how many class members there are, how many employees there

11  are, what is the aggregate value of the settlement, what are

12  the damages that are computed such that a class member could

13  determine what is the value of the settlement to him or her in

14  terms of percentage of losses.

15        THE COURT:    Let us assume for the moment that I

16  would accept your argument, at least in part.  We've had

17  papers submitted here in response to those objections which I

18  believe set forth a valid estimation of the potential number

19  of class members, that have talked in terms of what would

20  appear to be a reasonable maximum recovery of $115 million in

21  this case by the plaintiffs' own calculation.

22        Frankly, I haven't -- I don't believe you specified

23  much about what the deficiencies in the plan of allocation,

24  which I reread not ten minutes ago and which seem fairly

25  explicit on its face.  Have any of the papers that have been

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

8

1  filed here in answer to some of the objections that you have

2  raised, in fact, answered them adequately?

3        MR. TSAI:  Your Honor, they seem to be fairly -- I

4  would just say that they're estimates only, one person's best

5  estimate.  Your Honor, we feel that more specific information

6  be more appropriate.

7        THE COURT:  Are you aware of the complexities

8  involved in this matter in connection with the terms of the

9  release, potential losses are?

10        MR. TSAI:  Sorry to interrupt.

11        I'm aware that it is very complex, yes.

Page 7

lancaster82205

12       THE COURT:    Anything further?

13       MR. TSAI:    Your Honor, we also felt that the

14   release's overbroad.    It seemed to release not only the

15   defendants, but also related parties and entities which have

16   privity with the defendant and the parties related to it,

17   perhaps possibly for claims or causes of action that are not

18   related to the subject matter of this litigation.

19       THE COURT:    Well, are you referring to specifically

20   to the Texas action or a greater overbreadth of the release?

21       MR. TSAI:    I'm sorry.

22       THE COURT:    Are you referring specifically to the

23   Texas action or to the general overbreadth of the release?

24       MR. TSAI:    The general overbreadth.

25       THE COURT:    Thank you.


JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

9


1        Anything further?

2        MR. TSAI:    Nothing.

3        THE COURT:    Thank you.

4        Counsel, in support -- as far as the deficiencies

5   raised by Mr. Lambert regarding anything other than the scope

6   of releases, this Court determines that they have not been

7   substantiated here.

8        The Court, in the course of its ultimate findings of

9   fact and conclusions of law, will address the adequacy of the

10   notice and its terminology.  Excuse me, I may have taken a

11   step in advance.  It doesn't appear that other objectors here

12   are joined, at least in writing, in the objections by Mr.

13   Lambert.

lancaster82205

14          Do any of the other objectors, in quotes, here

15     endorse or want to be heard further on the Lambert objection?

16     I note none.

17          I'll continue with my analysis.

18          So the Court's findings of fact and conclusions of

19     law will encompass the determinations with regard to the lack

20     of merit in the Lambert allegation.

21          What about the question of scope of releases,

22     however?  While I'm not inclined to feel that that is

23     overbroad under the entire circumstances of this case, I think

24     I would like a response on that point.

25          I'll be happy to hear one on behalf of the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

10

1   plaintiffs, perhaps with a synopsis with the scope of releases

2   because they are rather lengthy documents.

3          MR. HARWOOD:  It is, your Honor.  If it pleases the

4   Court, Robert Harwood, co-lead counsel.

5          The releases release agents and others in privity

6   with the defendants is the objection that Mr. Lambert has

7   lodged without excluding certain actions that are not part of

8   the lawsuit, he says.  But, in fact, I think the release's

9   narrowly tailored to include only the claims that were

10   asserted or could have been asserted in this lawsuit.  He also

11   argues that --

12          THE COURT:  And in the Texas action as I understand

13   it.

14          MR. HARWOOD:  I was about to mention the Texas

15   action.  He also mentions that we are releasing valuable

Page 9

lancaster82205

16    claims that could be asserted in the Texas action.  My firm

17    filed the Texas action.  The Texas action is a duplicate, a

18    carbon of the action pending in this court, and it's most

19    likely if we had pushed, if there was a need to push the Texas

20    action, which there isn't, the defendants would have resisted

21    fighting a war on two fronts and the Texas action would have

22    been either dismissed, stayed or most likely transferred to

23    your Honor, which is the way it should be.

24          So this release, in addition, was scrutinized by the

25    independent fiduciary U.S. Trust and they seem satisfied with


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

11


1    the scope of the release.

2          The release was a document, I can tell your Honor,

3    that was contentiously negotiated over.  My co-counsel and I

4    scrutinized that language to make sure that we were releasing

5    only the claims that could have been asserted in this action.

6    Indeed, we vetted that release not only with the Court, with

7    the approval phase, but we vetted that release with the

8    counsel, lead counsel in the parallel securities class action

9    because we wanted to make sure that they wouldn't come in and

10    say you're releasing claims that we're asserting.  That

11    frequently happens.

12          Mr. Bernstein, the Bernstein Liebhard firm was

13    satisfied with the scope of the language of the release, that

14    it wasn't overbroad and wasn't throwing in claims that there

15    was no right.

16          THE COURT:  Transgressing over into the claims that

17    were in the securities action?

Page 10

lancaster82205

18          MR. HARWOOD:   That's right.

19          THE COURT:   Anything further?

20          MR. HARWOOD:   Thank you.

21          THE COURT:   This Court agrees.  The Court also

22  determines that the release is appropriate, sufficiently

23  comprehensive to resolve and, where appropriate, bar claims

24  that are the subject of the settlement, but also determines

25  that it is sufficiently clear with regard to its terms and not

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

12

1  overbroad as argued on behalf of Mr. Lambert.

2          There was, once again, as I said, the proposed

3  findings of fact and conclusions of law, which I'll ask the

4  parties to prepare jointly for the Court at the conclusion of

5  this hearing, should indicate that ruling and its basis.

6          I was advised in papers submitted on behalf of the

7  plaintiffs that a Mr. McGuinniss, who hasn't filed any papers

8  in the court as such, did raise a question with regard to

9  perhaps some deficiency or failing in the settlement because

10  of the fact that the taxability of funds coming to him through

11  this settlement and, of course, through whatever fund he

12  participated in was taxable, whereas those which might be

13  payable to him directly in the course of the lawsuit would

14  not.

15          No one appears on Mr. McGuinniss' behalf and the

16  Court believes that the plaintiffs and defendants both have

17  adequately answered that question; namely that the

18  beneficiaries and recipients of the funds from this settlement

19  are, in fact, the Shell Funds, themselves, so we were not

Page 11

lancaster82205

20  dealing with the prospect of an individual distribution in any
21  case.

22      The taxability, of course, of the ultimate
23  distribution of a portion of the settlement funds here to Mr.
24  McGuinniss or anyone else, among other things, is going to be
25  governed, I presume, by the terms of the fund itself and maybe

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

13

1  their investments and also whatever applicable state and
2  federal tax laws would apply.

3      The Court also denies any objections based upon Mr.
4  McGuinniss' position.

5      I'd like to hear now from counsel on behalf of Mr.
6  Thomas.  I have read your papers, sir.  I'd be happy to hear
7  anything you would like to emphasize.

8      MR. VESELKA:  May it please the Court, Larry Veselka,
9  your Honor.  I appreciate this opportunity.

10     Mr. Thomas appreciates this opportunity.  He
11  understands the somewhat novel nature of his position, but
12  it's a matter of some seriousness to him.

13     Every defendant is entitled to make their own
14  decisions with regard to the process when they're accused of
15  violating fiduciary duties that are crucial to their daily
16  activities and their profession.  It's a serious charge
17  against him.

18     As the Court notes from our papers, Mr. Pervis does
19  not object to the amount of the settlement or most of the
20  terms of the settlement.  He objects mainly that he did not
21  see and have an opportunity to find and decide and approve the

Page 12

lancaster82205

22  final terms of the settlement and would have wanted to have

23  had other treatment.  Therefore, he objects to the statement

24  that he has approved the settlement.

25          He would ask that he be removed as a party signatory

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

14

1  to the settlement and would have wanted to have been, as Mr.

2  Jeroen van der veer was, dismissed.  The plaintiffs' response

3  itself in trying to justify their fees explains the task, in

4  trying to explain the benefits that they've brought to the

5  class the problems they were facing.

6          Though Mr. Thomas, as plan administrator, is clearly

7  a fiduciary, a matter he takes seriously and why any

8  allegations of his breaching those fiduciary duties is very

9  serious to him and any implication --

10          THE COURT:  Let me interrupt you.

11          There has been time, of course, since the papers were

12  filed.  Mr. Thomas, presumably with your assistance or other

13  counsel, has had the opportunity to review those papers and

14  let us assume for the moment that he did not have the

15  opportunity to either review or actually approve for execution

16  by his then counsel the proposed final settlement papers and

17  all of their facets.

18          Does he remain opposed to that settlement including

19  his present status in it, or is that not a fair question and

20  should I be measuring this from the time of the purported

21  execution of that consent rather than the latter?

22          MR. VESELKA:  I believe it's a fair question because

23  the court and various parties engage in these types of

Page 13

lancaster82205
24  litigation on a regular basis are used to proceeding in a

25  certain way. why Mr. Thomas persisted after seeing the terms

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

15

1  in wanting to raise the motion to reform is because he, as an

2  individual, and as a professional fiduciary, considered it a

3  serious matter that he was not given the opportunity to

4  participate in the final approval because in so doing, he had

5  hoped that he would have been able to negotiate a similar

6  treatment as Mr. Jeroen van der veer, if I'm pronouncing that

7  properly, which would he believes mattered significantly to

8  his professional standing.

9       If there were reasons for the benefit of the plan or

10  for reasons for benefit of his employer that he needed to be

11  in the settlement in these various ways, it should have been

12  presented to him to make his choice because he was not

13  presented with the final package to know the specific terms.

14  He never gave that approval.

15       Therefore, that's why we think it is still a matter,

16  even though it's outside the norm of this process, that it is

17  a matter of importance to him individually that the settlement

18  be reformed to reflect that he's not -- that he did not

19  authorize it in that form and he's not a party signatory to

20  it, and he would like to have it reflect that he be dismissed.

21       And the Court need not worry about Rule 23 notice

22  requirements because the Court only needs to provide such

23  notice as is necessary, and the entire class was given a

24  notice that presented a plan where he would be dismissed with

25  prejudice and released at the conclusion, under the terms of

Page 14

lancaster82205

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

16

1   the stipulation and settlement.

2          So rather he's reflected as having been dismissed in

3   the manner as Mr. Jeroen Van der Veer or in the manner as

4   presently written makes no substantive difference to members

5   of the class.  The fund will still flow to them, but it did

6   matter to him.

7          THE COURT:   All right.

8          I think it's bought out in the plaintiffs' papers, I

9   suppose is inherent in the argument you just made in support,

10  they say well, there is no damage to Mr. Thomas because he's

11  not being asked to pay any money.  Your point is there is no

12  adverse impact on the settlement of the settlement funds

13  because if he's released based upon lack of authority to have

14  the document executed on his behalf, then neither the fund nor

15  the settlement nor the certification of the class or anything

16  else is in peril either.  Is that your point?

17         MR. VESELKA:  Yes, your Honor.

18         THE COURT:   Okay.

19         MR. VESELKA:  In response to that specific point, the

20  technical language, it is obviously not the perception of any

21  of the parties on the subject, the technical language does

22  provide for him as one of the defendants to make the payments.

23  Now, obviously he's not paying $90 million.

24         This is one of the reasons he would like to not be

25  listed as a named defendant when it's the named defendant

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

lancaster82205

17

1   Shell. That payment is going to come from the corporate
2   defendant. That's understood by the parties, but that's not
3   the way it's drawn up. So that's one of the reasons that he
4   would like to be listed not as being at the time of the
5   settlement a named defendant as part of that stipulation.

6          The Court -- the stipulation of settlement itself,
7   one other argument to make, your Honor, was that the Court
8   can't change a settlement. Stipulation of settlement itself
9   reflects that the Court can reform or make changes because the
10  parties reserve the right to decide, depending upon what
11  changes or modifications are made, to determine whether
12  they're material and whether to go forward with the settlement
13  or not.

14         The negotiations themselves envision, and the Court
15  has the inherrent authority pursuant to Rule 23 to be able to
16  make those changes.

17         Finally, we'd like to draw attention to the Court the
18  decision of the Superior Court of New Jersey, Appellate
19  Division in Amatuzzo v. Kozmiuk, at 305 New Jersey Superior
20  469 and that's 703, Atlantic 2d., from 1997; the decision
21  where the Court said even though an attorney may have apparent
22  authority, that's only a presumption. The apparent authority
23  cannot come from actions, words soley of the attorney. There
24  must be the party itself that must provide grounds for the
25  apparently authority and only that would still only be

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

18

Page 16

lancaster82205

1  apparent authority. It's a presumption that can be overcome.

2       Mr. Thomas' affidavit which has been submitted to the

3  Court, which we would argue removes that presumption and that

4  that would provide justification under New Jersey authority

5  applicable to this stipulation of settlement to allow the

6  Court to make the reformation, to remove the deletion to his

7  having authorized the settlement and delete paragraph 58(b)

8  out.

9       THE COURT:  Thank you.

10      Before I hear on behalf of counsel either for the

11  plaintiffs or the defendants, counsel who appear here on

12  behalf of the other objectors, et cetera, do they take any

13  positions on the application on behalf of Mr. Thomas?

14      I hear none.

15      I'll hear from the plaintiffs in response to that

16  application.

17      MR. HARWOOD:  Again, unfortunately, this valuable

18  settlement has been sucked up into a dispute between Mr.

19  Thomas and his former counsel, the Cleary, Gottlieb firm.  At

20  the risk of sounding too colloquial, here's what's really

21  going on:  One of the named defendants was Mr. Jeroen Van der

22  Veer.  As the settlement process was coming to fruition, and

23  we were negotiating final round of settlement documents, we

24  were approached and asked to let Mr. Van der Veer out.  He's

25  in a different position, he had different responsibilities and

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

19

1  obligations and we did that and we said at the time, Mr. Van

2  der Veer, but nobody else.  Subsequently everybody else came,

Page 17

lancaster82205

3   as you might expect, and we said no.

4        We said specifically no to Mr. Thomas not because we

5   have it in for him, your Honor. He seems like a perfectly

6   nice gentleman, but he was a plan fiduciary. He was the only

7   named fiduciary in the case for the plans and everybody else

8   was a so-called de facto fiduciary. And had the motions to

9   dismiss been decided, he was certainly the most likely

10   defendant to remain in the case before all the other

11   defendants.

12        So he was given that knowledge. The settlement

13   memorandum of understanding was entered into and we completed

14   our additional and necessary discovery. Mr. Thomas at the

15   time was still represented by the Cleary firm. Mr. Thomas sat

16   for a deposition in New York, represented by the Cleary firm.

17        From our perspective, the Cleary firm had full

18   appearance and apparent authority to continue to negotiate and

19   to sign the documents on behalf of their client, Mr. Thomas,

20   and they did.

21        I think Mr. Thomas has maybe the largest case of

22   buyer's remorse I've ever come across, but he had misgivings,

23   but I don't understand what he wants because when the

24   settlement is approved, he's going to get a dismissal with

25   prejudice. He is not required to pay a single penny. All he

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

20

1   is required to do is to give us a mutual release, and as I

2   understand it, and as his papers make clear, he doesn't oppose

3   giving us that release. So I don't know how to go about

4   satisfying Mr. Thomas. As long as we get that mutual release,

Page 18

lancaster82205

5   we're satisfied and I think he is bound by the apparent

6   authority that his counsel had.  If the settlement can be

7   reformed and the mutual releases are forthcoming, we take no

8   position on that.

9           THE COURT:   As I recall also, the terms of the

10  settlement include a recitation of no acknowledgement of

11  liability whatsoever on behalf of any defendant, correct?

12          MR. HARWOOD:  Correct, your Honor.

13          There are other defendants who could also be

14  characterized as professional fiduciaries.  I believe Miss

15  Boynton was a fiduciary of the Polaroid ERISA plans.  He's not

16  being singled out and he doesn't stand alone.

17          THE COURT:   Remind me, when are the settlement funds

18  payable?  Are they being paid in a lump sum?

19          MR. HARWOOD:  A lump sum with interest, I think 30

20  days after the settlement is finally approved.  Thirty days

21  after the settlement becomes final, no longer appealable.

22          THE COURT:   Is it at that point that the dismissals

23  of the individual defendants will become final or do they

24  become final upon the Court's entry of an order concluding

25  today's proceedings?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

21

1           MR. HARWOOD:  Probably 30 days.

2           MR. FRIEDMAN:  I believe, your Honor, when the

3   settlement is no longer subject to appeal.

4           THE COURT:   Fine, thank you.

5           MR. HARWOOD:  One last point, your Honor.

6           The Amatuzzo case that was cited to you by counsel is
                            Page 19

lancaster82205

7  so distinguishable. The client voiced his vigorous objection,

8  refused to sign the settlement agreement. It was clear from

9  day one that he was not on board and counsel for plaintiffs

10  knew it. We did not.

11          Thank you, your Honor.

12          THE COURT:    Thank you.

13          Mr. Veselka, anything to add?

14          MR. VESELKA:    Very briefly.

15          I agree with Mr. Harwood that any concerns between

16  Mr. Thomas and his previous counsel are between them and are

17  not matters that need to be dealt with here.

18          The settlement itself is only signed on I believe

19  July 5, signed July 5, presented to the Court on July 8th.

20  Regardless of why or whether in the dispute with his previous

21  counsel he was entitled to see the final version and/or to see

22  if he could be dismissed as Mr. Jeroen Van der Veer was, at

23  the time he did not get that opportunity to present that and

24  to insist on it. That's why it's so important to him, because

25  he is a fiduciary.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

22

1          Now, in this release, this case is releasing and he

2  would be released even if this is granted, he would be covered

3  by the releases, as are the other fiduciaries which are

4  trustees which are fiduciaries, which are parties to the Texas

5  case. He's also a party to the Texas case. So he's going to

6  be covered by the releases there as well. He does, as they

7  stated, he does not object to giving the mutual release.

8          What he wants is merely to reflect paragraph 58(B)

                              Page 20

lancaster82205

 9  because he did not give approval, to preserve the sanctity of

10  the process of each individual involved in litigation, to be

11  not listed as a named defendant that's one of the people

12  making the payments and, therefore, we submit that

13  respectfully to the Court.

14          THE COURT:    Thank you.

15          Mr. Thomas' objection is denied, essentially on two

16  grounds.  Once again, I'll leave it to the parties to amplify

17  these remarks in the proposed findings of fact and conclusions

18  of law.

19          First, the Court determines that Mr. Thomas' prior

20  attorney was clothed with apparent authority to execute the

21  settlement agreement on his behalf.  Mr. Thomas also was

22  adequately informed of the nature and the state of the

23  proceedings leading up to the settlement agreement so that he

24  presumably was in a position to make his position very clear

25  to his own attorney if, indeed, there were objections to the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

23

 1  form of settlement and/or his particular treatment.

 2          As we know, the genesis of this argument is that he

 3  feels he should have been treated as Mr. Van der Veer was, who

 4  was dismissed even prior to the present stage.

 5          Secondly, the Court determines that there is no true

 6  tangible detriment enuring to Mr. Thomas as a result of the

 7  fact that he was not dismissed previously as opposed to

 8  remaining in this case as a named defendant through and

 9  including the time of the payment of the settlement funds from

10  other sources that would then lead to the final dismissal of

Page 21

lancaster82205

11  himself and all defendants.

12      In connection with that, as his counsel acknowledges,
13  he will receive the full benefit of the releases that are
14  extended to him and for that reason alone will carry no
15  baggage away from this litigation, certainly nothing tangible
16  or measurable.

17      Finally, the Court determines that Mr. Thomas is not
18  left without recourse. If he has sustained some injury, be it
19  to reputation, the need to incur additional expenses in order
20  to present himself to the Court or otherwise as a result of
21  the inappropriate actions of his prior attorneys without
22  authority, in fact, if indeed that is the case, he has
23  recourse against that attorney to be made whole.

24      That's where his main dispute lies, that's where his
25  opportunity for remedies lie and, accordingly, the application

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, NEWARK, N.J.

24

1  to have the settlement revised with regard to Mr. Thomas'
2  status before this Court is denied.

3      We'll now move ahead I believe to the final item on
4  today's list which is the objections that have been raised to
5  the attorneys' fees sought.

6      Before I do that, is that the one remaining item on
7  the menu? I believe it is based upon things that have been
8  tendered here.

9      I think at this point I'd like to hear on behalf of
10  U.S. Trust. Let's see what your position is on this and then
11  I'll permit others to be heard as the matter presses.

12      MR. STENGLEIN: Good morning. Mike Stenglein, U.S.
                    Page 22

lancaster82205

13   Trust.

14          Anything that I would say would really be just

15   repetitive of what's in our papers.  I will offer no

16   additional argument at this time.  If the Court has any

17   questions about our papers, I'd be happy to try to answer

18   them.

19          THE COURT:   All right.

20          Your view, I guess, essentially is that at the very

21   least this demand ought to be closely scrutinized in

22   connection with the population of ERISA class action

23   settlements with which you're acquainted.  This might appear

24   to be on the high side.  Is that a fair recap?

25          MR. STENGLEIN:   Well, it's a fair recap and I would

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

25

1   add to that that, and I think both parties agree, that also

2   securities class action settlements would also provide the

3   Court with information about what a reasonable attorney fee

4   award would be.

5          In the most recent analysis performed by NERA

6   suggests for a settlement this size, 26 percent is the

7   appropriate number.  Those two data points we wanted to put

8   before the Court for purposes of its decision process.

9          THE COURT:   All right.

10         Counsel on behalf of any of the objectors, Mr.

11   Veselka, do you wish to be heard on this issue?

12         MR. VESELKA:   No, your Honor.

13         THE COURT:   Thank you.

14         Mr. Tsai, do you wish to be heard further on this

lancaster82205

15  issue?

16          MR. TSAI:  No, your Honor.

17          THE COURT:  Nothing further.

18          Fine.  Anything on behalf of counsel for defendant

19  Boynton?

20          MR. BETTIGOLE:  Nothing.

21          MS. SENNETT:  Nothing, your Honor.

22          THE COURT:  Thank you.

23          Mr. DePalma, I'll hear from you on that point.

24          Mr. Friedman.

25          MR. FRIEDMAN:  Thank you, your Honor.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

26

1          I would begin I guess by saying there really appears

2  to be no dispute among any of the parties, including U.S.

3  Trust, that the Common Funds Doctrine applies to this fee

4  request and that the fees therefore should be based on a

5  percentage of the common fund.

6          As we say in our brief, the general range in this

7  circuit is 19 to 45 percent.  The Court has discretion where

8  to set the fee, but is to go through the seven Gunter factors.

9  The factor that U.S. Trust points to, of course, is only one

10  of those seven factors.  With respect to most of the other six

11  factors, they actually do address the factors and find that

12  those factors weigh in our favor.

13          With the Court's permission, I'd like to go fairly

14  quickly but through the seven factors because I think they're

15  all relevant and not just one.

16          THE COURT:  Please do.
                        Page 24

lancaster82205

17      MR. FRIEDMAN: The first factor is the size of the
18  fund and the number of people that are benefiting. That
19  factor we think is strongly in our favor. This is one of the
20  largest ERISA settlements ever achieved not only on an
21  absolute basis, but as a percentage of the class damages which
22  is a very significant issue.

23          As far as the number of people benefited, we have
24  over 40,000 people which is also a very significant number.
25  U.S. Trust seems to agree that that factor weighs in our

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

27

1   favor. They write in their objection "the fund is a large one
2   and the number of beneficiaries are many."

3           The next factor we get to is the presence or absence
4   of substantial objections to the settlement terms or the fee
5   request. Here we had over 42,000 notices and only three
6   actual class members have objected, which is about less than
7   one one-hundreth of a percent and those three class member
8   objections we think really don't even fall within the category
9   of being substantial.

10          We have Mr. Thomas' objection which is really an
11  effort to reform the settlement, and then we have U.S. Trust's
12  objection to the fee request which I won't say is not a
13  substantial issue or substantial reduction, but we think
14  they're wrong for reasons --

15          THE COURT:  I think they brought it out of what they
16  perceive is their duty given their position they're assigned.

17          MR. FRIEDMAN: Yes, they have that duty and I don't
18  begrudge it.

                    Page 25

lancaster82205

19          When you go through their objection, what you see is

20    the fund's a large one.  They say the number of beneficiaries

21    are many.

22          They also go through and note, and we appreciate

23    this, that the settlement was rapidly achieved; they recognize

24    "the skill of plaintiffs' counsel is evident and exemplary."

25    They characterize the underlying litigation as, quote unquote,

28

1     complex and they note that the settlement "was achieved with

2     diligence and speed."  These are all Gunter factors.  These

3     are all things that weigh in favor of the application.

4          Of course, ultimately both in their objection and

5     more importantly in their independent fiduciary's report, they

6     conclude the settlement is reasonable even net of attorneys'

7     fees, even net of full request, they think the settlement is

8     reasonable and the objection, I think they use the word

9     "fair."  Obviously, we as plaintiffs' counsel think these are

10    statements that the Court ought to take into account when

11    deciding the application.

12          With respect to the skill and efficiency of the

13    attorneys involved, which is the third Gunter factor,

14    plaintiffs' counsel in this case moved the case to resolution

15    with near record speed, and I would submit achieved a result

16    that really speaks for itself; 78 percent recovery which is

17    what we believe we achieved in this case.  We think is really

18    extraordinary and the absolute amount makes it one of the

19    highest ERISA settlement amounts, if not the highest

20    settlement, in the history of ERISA.

Page 26

lancaster82205

21      Again, as I said, U.S. Trust agrees that this factor

22  weighs in our favor, saying the skill of plaintiffs' counsel

23  is evident and exemplary and the settlement was achieved with

24  diligence and speed.

25      The fourth factor is complexity and duration of the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

0

29

1   litigation. Now, according to the Third Circuit's opinion in

2   G.M. Trucks, this factor is really intended to capture -- this

3   is language from the case, the probable costs in both time and

4   money of continued litigation.  Clearly, this ERISA case was

5   complex and because we were able to achieve such an early

6   settlement, it is necessarily the case that absent the

7   settlement, there's going to be a lot of continued litigation.

8       Again, U.S. Trust seems to agree this factor weighs

9   in our favor, recognizing that the underlying litigation was

10  complex and that the settlement was rapidly achieved.

11      These are all things they say in their papers.

12      THE COURT:   I don't think there's any doubt,

13  certainly not in my own mind, that had this litigation not

14  settled and eventually gone to the mat, it would have been an

15  extremely complex and difficult litigation, among other things

16  in terms of the assessment of fiduciary duties, whether or not

17  those duties were breached or abdicated and/or the

18  quantification of the relief affordable to respective class

19  members or a formula therefore.  No doubt about that.

20      MR. FRIEDMAN:  Okay.

21      THE COURT:   Please continue.

22      MR. FRIEDMAN:  Actually you've stolen a bit of my

Page 27

lancaster82205

23    thunder for the next factor which is the risk of nonpayment.

24    We invested millions of dollars and time in this case and

25    nearly a million dollars in real out-of-pocket expenses with

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

30

1    no guarantee that we'd ever see any recovery at all.

2           Specific risks to this case were particularly high

3    because the law in this area is still developing, but included

4    all of the issues that your Honor just laid out, as well as a

5    serious standing issue. Many of the defendants raised

6    standing issues not being U.S. citizens and of course there's

7    also the ever-present problem of motion practice, motions to

8    dismiss, briefs for summary judgment, the need to rely on

9    experts, appellate practice.

10          As your Honor may be aware, just last week in the

11   State Farm litigation in Illinois, plaintiffs' counsel who had

12   achieved a billion dollar verdict after trying it and then had

13   that verdict reduced by the appellate court, just in the

14   Illinois Supreme Court the class decertified and the entire

15   verdict thrown out. So a decade of litigation, millions and

16   millions and millions of dollars both in time and

17   out-of-pockets all gone. Those lawyers will not see a cent

18   after decades of litigation.

19          There's a real risk of nonpayment in any of these

20   kinds of cases, but for the reasons your Honor set forth, I

21   think were particularly high here.

22          Now, U.S. Trust doesn't address these risks, but

23   instead contend that our risk was, quote unquote, was

24   significantly reduced by the Davis Polk report, claiming that

Page 28

lancaster82205

25   the Davis Polk report provided us with a road map.   We would

31

1    respectfully suggest that the analysis there is wrong.

2           In this case, as your Honor knows, Shell restated the

3    amount of its proved oil reserves.  Now, that restatement

4    established that the accounting treatment was wrong and that

5    restatement, perhaps, reduced our risk somewhat because it did

6    establish that, in fact, the reserves were wrong.

7           The Davis Polk report then puts together a bunch of

8    e-mails which, in essence, establish or blames plaintiff in

9    the securities case will establish scienter.  Scienter is a

10   huge issue in the case, there is no doubt about that, but it's

11   not an issue.  Our issue's standing, existence of a fiduciary

12   duty, who breached the duty, perhaps negligence and damages,

13   the Davis Polk doesn't really help us with that stuff.

14          So in our case, in the ERISA case, the Davis Polk

15   report is really of minor, if any, significance.  Where it is

16   significant is in the 10b-5 securities litigation where they

17   have to fight over scienter, but we don't have that element of

18   our claim.

19          The sixth factor is time devoted to the case.   I

20   won't belabor that because I don't think anybody challenges

21   that.  We put in more than 18,670 hours, more than $6.8

22   million of lodestar and more than $726,000 in reasonable

23   out-of-pocket expenses, actual money out of our pockets.

24          This time was all expended in a concentrated time

25   period so that this case could be quickly concluded, which is

Page 29

lancaster82205

32

1   significant because it means that we were precluded from
2   taking on other work. We didn't sort of spend a few hours a
3   day on this case and slip in a bunch of other stuff.

4          THE COURT:   On the other hand, through its early
5   conclusion you're now free to take on other work whereas your
6   time might be otherwise consumed in this case for several
7   years, correct?

8          MR. FRIEDMAN:  That's true. That's true.

9          We do say in our papers for lodestar crosscheck
10  purposes, the result and multiplier of 4.4 which we show in
11  the papers is within the range and nobody is contesting that.

12         Where the rubber really seems to be hitting the road
13  is the seventh factor only which is the awards in similar
14  cases. Now, as we show in our brief and our reply brief, our
15  request of one-third is consistent with awards in similar
16  cases, including as we show in the reply papers, cases with
17  bigger funds than this one.

18         But even if we were wrong about that and I'll explain
19  why we're right, that's only one factor and it's not the be
20  all and end all of the analysis. For example, Judge Wolin
21  ruled in the Prudential litigation in his fee opinion on
22  remand from the Third Circuit, after the Third Circuit
23  remanded the fee back to him, Judge Wolin noted that the Third
24  Circuit held that the size of the recovery is not the only
25  factor in determining a fair fee award; other factors such as

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

Page 30

lancaster82205

33

1  quality of counsel are also very significant and come into
2  play at any given time and so Judge Wolin wrote, "at any given
3  level of recovery, the percentage fee that courts awarded has
4  varied." Quote, "there is no perfect correlation between the
5  appropriate percentage and size of the recovery."

6       We can't look only at the seventh factor.  Even if we
7  do, we think we're very, very strong on that factor.  U.S.
8  Trust's first argument is to the Court is don't look at the
9  full range of settlements that are out there in the universe,
10 put on the blinders and only look at the 15 ERISA class action
11 settlements, some but not even all of those having awarded
12 lower fees.  We think that's wrong for three reasons.

13      First, we don't think there's any reason in the
14 world, and U.S. Trust hasn't cited any, that the Court ought
15 to limit its analysis only to ERISA class actions.

16      Second, we think, and this is highlighted, we think a
17 15-case sample size is far too small.

18      Third, and perhaps most important, is that the U.S.
19 Trust's analysis just blindly pointing to these 15 cases fails
20 to account for the differences between those 15 cases and our
21 case here.  Unlike those cases, here the ERISA class is not
22 the tail being wagged by a 10b-5 dog.  Usually in these cases
23 the ERISA case just kind of hobbles along as a tail to the
24 securities case and gets settled when the defendants are ready
25 to settle the securities case.

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

34

Page 31

lancaster82205

1    Here, we pushed our case forward ahead of the
2  securities case, we got our briefing -- we got our
3  consolidated amended complaint on file and our briefing on the
4  motions to dismiss done while the securities plaintiffs were
5  still messing around filing and writing their own consolidated
6  amended complaint.  We pushed forward with discovery while
7  they were doing the brief on motions to dismiss and we got our
8  case settled before those plaintiffs ever even got a decision
9  or I think even completed briefing on their motions to
10  dismiss.  We pushed our case and we're not the tail of the
11  10b-5 dog which is different from the other cases.
12    Second, we got an unusually prompt settlement.
13    And, third, as I said before, we achieved a
14  settlement that is extraordinarily rich not only on an
15  absolute basis, but as a percentage of the class's losses.  So
16  we believe that we are entitled to be rewarded for these
17  accomplishments and to get a higher percentage than was
18  recognized in those other 15 ERISA cases.
19    U.S. Trust then argues in the alternative that even
20  if all securities cases are considered, and, Judge, we think
21  that all cases, not just all securities cases, all cases
22  should be considered, they say even if all securities cases
23  are considered, a NERA study found that fee awards in
24  securities class actions where the settlement was between 25
25  and $100 million, average 26 percent.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

35

1    Again, we think there's three problems with the
2  argument.  First, it ignores the specifics of those other

Page 32

lancaster82205

3   cases just like their ERISA argument, the 15-ERISA case

4   argument did.  For example, settlements in that range, 25 to

5   $100 million range typically are in huge, huge mega cases and,

6   therefore, reflect only a very small percentage of the class

7   damages.  There are cases where maybe the class lost a billion

8   dollars and a recovery of 25 or $100 million is mere pennies

9   on the dollar.

10          Here, we recovered 78 percent of the damages and as I

11  said, we think we deserve to be rewarded for that.  The later

12  dollars after all are the hardest dollars in negotiations to

13  get.  Those are the tough ones.  The defendants came in and

14  they knew what the damages were, they were arguing about the

15  market value of these cases.  Those last dollars are the tough

16  ones to get.

17          Second, the NERA study that U.S. Trust points to is

18  "contradicted by NERA's only slightly earlier study."  They

19  had a study a few years early in 1996, that finds that

20  "regardless of case size, fees average approximately 32

21  percent of the settlement."

22          "Third, U.S. Trust's reliance on the NERA study is

23  limited to averages."  It ignores the median, which is the

24  middle number if you were to lay them all out and the mode,

25  which would be the most frequent.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

36

1           The NERA study also ignores the median.  It does

2   address the mode, the most frequent.  The one U.S. Trust cites

3   to concedes that "33 percent is still the most frequent

4   percentage, requested in over 40 percent of cases."

Page 33

lancaster82205

5     Finally, in a separate but related argument, U.S.
6  Trust contends that the cases cited in our opening memorandum
7  are not entirely applicable because many of the cases cited
8  are smaller settlements. So we attempted to address that in
9  our reply brief by showing that there are any number of very
10  large settlements in which the Court awarded fees of at or
11  neared a third.

12     For example, there's a case from this district that's
13  very recent, within the last year, I think it was mid or late
14  November, before Judge Chesler, the Galanti v. Goodyear Tire &
15  Rubber case. That was a $300 million settlement,
16  substantially more than the settlement in this case. Judge
17  Chesler awarded a 30 percent or $90 million fee.

18     So as I said at the outset, we believe the Court
19  ought to look at all seven of the Gunter factors. Indeed,
20  although the fee is a matter in your Honor's discretion, I
21  think the Third Circuit requires that the Court go through all
22  seven of the Gunter factors. We think all seven of those
23  factors weigh in our favor.

24     Essentially, five or six out of the seven we think
25  U.S. Trust agrees weigh in our favor and even with respect to

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

37

1  comparables, I think when the Court really looks at them, the
2  Court will see that we did better than in those other cases.
3  So we think that we deserve to be on the high end, if indeed,
4  your Honor concludes we are on the high end.

5     THE COURT:   Thank you.

6     Any reply, counsel?

Page 34

lancaster82205

7        MR. STENGLEIN:  Just a short reply, your Honor.

8        We have attached the NERA study as exhibit 15,

9    actually 16 to our papers.  I'll just take issue with a couple

10   of points raised by Mr. Friedman.

11       He's making the assumption in here when he talks

12   about -- which is on page seven of the report, shows for

13   settlements of 25 to $100 million, 26 percent is the average

14   settlement -- average fee award.

15       He says -- he represented to the Court or I guess he

16   was assuming that in those settlements, in the NERA's study

17   that those percentages are based on settlements that are in

18   the billions of dollars.  No where in the NERA report is that

19   issue addressed, so that is for speculation.

20       It doesn't say, frankly, in here for the 26 percent

21   average that it finds for settlements of 25 to 100 million

22   what the claimed damages actually were in those cases, so that

23   is up to speculation.

24       Then as to his point on the NERA's settlement that

25   U.S. Trust doesn't address, that is as he refers to the mode,

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

38

1    he says -- he told the Court, and it's in his papers, that

2    this 40 percent requested number, the interesting point on

3    that is that NERA does conclude that in 40 percent of the

4    cases, counsel requests a 33-percent recovery.  It doesn't

5    mean that in 40 percent of the cases a 33-percent recovery is

6    granted.  In fact, NERA makes clear the 25 to $100 million

7    settlement range, that 26 percent recovery is granted.

8        That's all, your Honor.

Page 35

lancaster82205

9      THE COURT:    Thank you.

10         Court will take a recess until 11:30.    That clock is

11     of no use to you.    It's five minutes after 11.    We'll

12     reconvene at 11:30 and I'll have at least a brief oral

13     presentation and my decision on the counsel fee issue.

14         Thank you.

15         (Recess.)

16     THE COURT:    Remain seated, please, everyone.

17         Before concluding today on a more general note, I

18     will deal specifically with the application for counsel fees.

19         In doing so, I'm, indeed, consulting in depth the

20     particular factors set forth in the Third Circuit Gunter

21     opinion.    I realize these are not to be applied

22     formalistically, and I'll have more to say about that.

23         Let me take them in order.    The first is the

24     reference to the size of the fund and the number of persons

25     benefiting.    For the generation of a $90 million settlement

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

39

1     fund here, approximately 78 percent of the reasonable estimate

2     of punitive damages I believe prepared on the plaintiffs' own

3     behest, if my recollection serves me, it is considerable,

4     certainly weighs in favor of an appropriate award for

5     plaintiffs' counsel.

6         We also have more than 40,000 class members have

7     benefited.    That I think weighs perhaps on both sides of the

8     equation.

9         First, of course, there are a number of persons here

10     who are going to be benefiting by these recoveries, a sizable

lancaster82205

11  number who might otherwise have sustained losses, but

12  secondly, that also means that there are a large number of

13  persons who will be participating and who will be looking to

14  this fund to be made whole.

15      I think one has to be concerned, at least somewhat,

16  about the preservation of that portion of the fund which will

17  be available to them as opposed to counsel for the class who

18  are seeking an award as a percentage of the fund.

19      Secondly, the reaction of the class to the terms of

20  the settlement, including, of course, the proposed attorneys

21  fee of 33-and-a-third-percent of the $90 million.  Through the

22  absence of objections, with the few isolated instances that

23  have been addressed in this courtroom today, there has been

24  overwhelming approval or acknowledgement by class members of

25  the appropriateness of the settlement, including at least

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

40

1  inferentially, the amount of the fee requested.  It's not as

2  if dozens and dozens of objectors emerged here contesting the

3  amount of the fee and the impact that that fee would have on

4  the fund available for their recovery.

5      U.S. trustees -- U.S. Trust Company, excuse me, as

6  the independent fiduciary that it is in this matter, validly

7  raised some objection and considerations for the Court and I

8  have done so.  On the other hand, even the U.S. Trust

9  indicated that it had no overall objection to the terms of the

10  settlement, the adequacy of the recovery for the plaintiff

11  class, even on a net basis.  In other words, even a net of 60

12  million would, in U.S. Trust's view, be a good settlement of

Page 37

lancaster82205

13  the class.

14      Item number three, the skill and efficiencies of the

15  attorneys. First, of course, the Court notes that the

16  attorneys in the firms involved in this matter and they are

17  highly experienced and highly skilled in matters of this kind.

18  Moreover, in this case it showed. Those efforts were

19  vigorous, imaginative and prompt in reaching the settlement of

20  this matter with a minimal amount of discovery, for instance,

21  all that was needed to make all parties fully informed and

22  without getting into a full-blown battle on threshold motions

23  as a prelude to settlement which is also the case. It was not

24  necessary here.

25      So both skill and efficiency were brought to the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

41

1  table here by counsel, no doubt about that.

2      I've already commented briefly on the complexity of

3  this litigation and its likely duration if it had gone through

4  all phases to try, and almost necessarily these matters to at

5  least one level of appeals. The issues would have been

6  complex. The litigation would have been extensive. Among

7  other things, the establishment of damages would have been an

8  equally complex matter.

9      Item number five talks about the risk of nonpayment,

10  to wit:  What risks were taken by plaintiffs' counsel about

11  the possibility of pursuing this action vigorously, ultimately

12  though based on the contingent fee arrangement with no

13  ultimate compensation, plus of course a substantial outlay of

14  expenses are not likely recoverable either. There were,

Page 38

lancaster82205
15   indeed, factual and legal impediments to the success of the

16   plaintiffs here and also to the detriment of their damages.

17         Needless to say, also, there were uncertainties with

18   regard to the trial and appellate process. That being said,

19   while I agree with plaintiffs' counsel that the Davis Polk

20   report is not a roadmap to success here in the ERISA

21   litigation, it certainly did assist plaintiffs in achieving a

22   basis for the assessment of liability and in large measure at

23   least the assessment of losses due to the impact on the Shell

24   stock, from the activities of those in the Shell security

25   litigation.


JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

42

1          I note we're dealing here only with allegations in

2    that matter which remains pending.   I want to be cautious

3    there, but Davis Polk report surely was of some assistance

4    here and I think I can properly infer that that document,

5    perhaps among others, was a significant catalyst to the

6    settlement in this matter, even on behalf of the present

7    defendants.

8          Item number six talks in terms of the time devoted

9    and that's documented here. A sizable number of hours with

10   approximately $6 million plus in lodestar value, if the Court

11   were approaching the awarded fees on a lodestar basis rather

12   than as a proportion of the fund. Plaintiffs suggest that a

13   4.4 multiplier of this lodestar, if I were approaching the

14   case in this fashion, would have been appropriate here.  I'm

15   inclined to disagree somewhat on that point.

16         once again, albeit due to the abilities and the

Page 39

lancaster82205

17  diligence of counsel here, this case did settle in its earlier

18  stages. While I might be more inclined to apply a multiplier

19  of that sort to a lodestar in the case that went all the way

20  through to conclusion, I'm not sure that I would do so in a

21  case which settled early. I also don't feel that that

22  approach generates a disincentive to settlement.

23        We then get to the question of awards in similar

24  cases and all parties seem to acknowledge that that is, at

25  best, an inexact science. The statistics establish that a

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

43

1   mode for request in the population of cases comparable to the

2   case at bar is somewhere in the vicinity of 33-and-a-third

3   percent. The Court doesn't find that particularly surprising.

4   Indeed, of course, it has a traditional relationship to

5   contingent fee arrangements in any number of actions.

6         As U.S. Trust pointed out today, what's applied for

7   doesn't necessarily become awarded. The cases cited by all

8   parties to this Court would seem to generate recovery in a

9   range of somewhere between 19 and 45 percent. The ERISA

10  population of cases on which U.S. Trust asks the Court to

11  focus is not the only one considered but it surely was worth

12  considering.

13        As I mentioned before, this is not an exact science.

14  Much of course has to be left up to the Court's own experience

15  and feel for what is fair, because what we are ultimately put

16  to here is a question of what award of counsel fees is fair

17  and reasonable, not only to reflect the efforts of plaintiffs'

18  counsel, but also in terms of the residue of the fund to be

Page 40

lancaster82205
19  remaining for the class members.

20       The Court notes that in the Weiss case and that is
21  Weiss v. Mercedes-Benz of North America, at 899 F. Supp. 1297,
22  1995, the very same counsel before this Court on the
23  plaintiffs' side sought an award of 15 percent. Frankly, that
24  award was -- that application was rather modest and the Court
25  allowed it, although against a different quantification of the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

44

1  value of the settlement between that which had been tendered
2  by the plaintiffs.

3       The Court also notes that that fee was awarded over
4  and above the settlement fund or the settlements value.  In
5  other words, it was not taken out of the corpus of the fund
6  made available to the class members.

7       Thus, in this Court's view, considering all of the
8  Gunter factors, and once again realizing that it's ultimately
9  charge is fair and reasonable attorneys fee in this case, both
10  expressed in terms of the percentage allowed and of course the
11  absolute dollars of the recovery which are going to be
12  significant in any case, this Court allows attorneys fees of
13  25 percent against the $90 million or a figure of $22.5
14  million.

15       As I understand it, of course, there will be an
16  additional $1 million paid by defendants in expenses to
17  plaintiffs' counsel that is not to be taken from the fund but
18  is from an outside source.

19       I'll now turn back to the question of the order
20  approving the settlement in this case.  The Court determines

Page 41

lancaster82205
21  that the terms of settlement approved in all of its facets are

22  acceptable, fair, reasonable and are approved by this Court.

23          I have dealt with the respective objections tendered

24  here today and those ones stand and can be reflected in any

25  proposed findings of fact and conclusions of law submitted


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

45


1  here.

2          I considered the factors sometimes known as the

3  Girsch factors, also recited and dealt with seriatim in the

4  Weiss opinion and in doing so, have reached the decision which

5  I have here today with regard to the overall fairness and

6  acceptability of the settlement.

7          Accordingly, merely to summarize here without never

8  to be complete because the findings of fact and conclusions of

9  law obviously will be in greater depth, the Court certifies

10  the class that has been tendered here as an appropriate

11  settlement class, approves the settlement in all its aspects

12  and awards counsel fees of $22.5 million from the $90 million

13  settlement fund, plus the $1 million in expenses also sought.

14          As you know, my tenure on this bench is limited to

15  another nine days and for that reason, I would like to have

16  proposed findings of fact and conclusions of law and any

17  objections to them submitted promptly.  I would ask that the

18  plaintiffs and defendants, particularly since you have a

19  sizable familiarity with this matter, submit proposed findings

20  of fact and conclusions of law, as well as proposed finding

21  order or orders as the case may be, electronically filed with

22  the Court by the close of business on this coming Wednesday;

lancaster82205

23   that any objections from any corner either to form or content

24   of those papers shall also be electronically filed no later

25   than 12 noon on this Friday.  That will give the Court the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

46

1    opportunity to review those papers over the weekend and

2    presumably execute them with the proper terms the first of

3    next week.

4           Anything further before we adjourn on behalf of the

5    plaintiffs?

6           MR. HARWOOD:  Your Honor, we have the approved order

7    approving settlement and the judgment.  If your Honor pleases,

8    I can hand these up now.

9           THE COURT:   If you would hand those up now, and I

10   know I've seen them in various forms along the way.  I'm happy

11   to receive them and I can stop my inquiry.

12          MR. HARWOOD:  Paragraph 16 of the order approving the

13   judgment deals with attorneys' fees and there are appropriate

14   blanks in there.

15          THE COURT:   Fair enough.  I can complete them.

16          Anything further on behalf of defendants?

17          MS. ASHTON:  No, your Honor.

18          THE COURT:   Anything on behalf of other counsel?

19          MR. VESELKA:  No, your Honor.

20          MR. BETTIGOLE:  No.

21          MS. SENNETT:  No.

22          THE COURT:   We're adjourned.

23          (Matter concluded.)

24

lancaster82205

25

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

**EXHIBIT L**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



JAMES BOLLA, individually and on behalf of all others similarly situated,

    Plaintiff,

     v.

CITIGROUP INC., CITIBANK N.A., CHARLES PRINCE, THE PLANS ADMINISTRATIVE COMMITTEE OF CITIGROUP INC., THE 401(k) INVESTMENT COMMITTEE, and JOHN DOES 1 - 20,

    Defendants.

Civil Action No: 07 CV 10461



NOV 2 0 2007

U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR VIOLATIONS OF THE
## EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following based upon the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, a review of public filings by Citigroup Inc. ("Citigroup" or the "Company") with the United States Department of Labor and the Securities and Exchange Commission, press releases issued by the Company, media reports about the Company, and publicly available trading data relating to the price of Citigroup's securities.

## I. NATURE OF THE ACTION

1. Plaintiff brings this suit as a civil enforcement action under the Employee Retirement Income Security Act ("ERISA") §§ 502(a)(2), (3), 29 U.S.C. §§ 1132(a)(2), (3), for

relief on behalf of the Citigroup 401(k) Plan, and the Citibuilder 401(k) Plan for Puerto Rico (the "Plans"), 401(k) plans operated and established by Citigroup as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Citigroup is the Plans' "sponsor," within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

2.      Plaintiff brings this action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class of all participants and beneficiaries of the Plans, and on behalf of the Plans themselves, during the period January 1, 2007 through the present (the "Class Period"). Defendants are entities and persons acting in a fiduciary capacity or who assumed a fiduciary role in relation to the Plans.

3.      Plaintiff's claims arise from the failure of the Defendants to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence, in administering the Plans and the Plans' assets.

4.      Plaintiff alleges that Defendants allowed the imprudent investment of the Plans' assets in Citigroup common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices including, among other practices: (a) participating in the formation and management of off-balance-sheet structured investment vehicles ("Conduits" or "SIVs") without disclosing Citigroup's contingent liabilities or risks related thereto; (b) causing said Conduits and/or SIVs to issue billions of dollars worth of commercial paper and short term loans based on false and misleading statements; (c) marketing and extending subprime loans made on a "low documentation" basis, without adequate consideration of the borrower's ability to pay and with unreasonably high risk of borrower

default; (d) failing to adequately disclose Citigroup's subprime loan loss exposure to investors, including the Plans' participants; (e) operating without the requisite internal controls to determine appropriate loan loss provisions; (f) understating loan loss provisions that did not properly reflect the risk facing Citigroup; all of which caused Citigroup's financial statements to be misleading and which artificially inflated the value of shares of Citigroup stock. In short, during the Class Period, the Company was seriously mismanaged and faced dire financial crisis due to such mismanagement, which rendered Company stock an imprudent investment.

5.    As Citigroup's dire financial conditions became known to the market, its stock fell from $54.26, on June 19, 2007, to $34, at the close of the market on November 16, 2007 – a 37.3% decline in share price and a loss of approximately $100 billion in market value in less than 6 months.

6.    Plaintiff and the other participants and beneficiaries of the Plans owned Citigroup stock through the Plans and have suffered substantial losses. As of December 31, 2006, the Citigroup 401(k) Plan held $4.13 billion of Citigroup Stock, which amounted to 32% of the plan's total assets. Based on publicly available information, it appears that Defendants' breaches of fiduciary duties have caused the Plans to lose well over $1.3 billion dollars in retirement savings during the Class Period.

7.    Plaintiff's claims arise from the failure of the Defendants to exercise the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" in administering the Plans and the Plans' assets during the Class Period.

8.     In particular, Plaintiff alleges that Defendants breached their fiduciary duties to the participants of the Plans because they knew or should have known that the Company's securities were no longer a prudent investment, yet they failed to take steps to eliminate or reduce the amount of Company stock in the Plans, and failed to give Plaintiff and the Class complete and accurate information about Citigroup's loan loss exposure so they could make informed investment choices under the Plans.

9.     As a result of the Defendants' breaches alleged herein, the Plans suffered substantial losses.

10.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plans, Plaintiff brings this action as a class action of behalf of all participants and beneficiaries of the Plans.

## II.    JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to § 28 U.S.C. 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     This Court has personal jurisdiction over Defendants under ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2) because one or more of the Defendants may be found in this district. The Court also has personal jurisdiction over Defendants because the Company's principal executive offices are located in New York, New York.  Defendants systematically and continuously have done and continue to do business in this State, and the case arises out of Defendants' acts within this State.

13.     Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because

Defendants administer the Plans in this district, some or all of the actionable conduct for which relief is sought occurred in this district, and one or more of the Defendants may be found in this district.

## III.    THE PARTIES

**Plaintiff**

14.    Plaintiff James Bolla ("Plaintiff") is a resident of the state of Florida. He is a participant or beneficiary of the Citigroup 401(k) Plan within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and was a participant or beneficiary of the plan throughout the Class Period. He continues to hold shares of Company stock in his retirement account in the Citigroup 401(k) Plan and did so throughout the Class Period.

**Defendants**

### A.    Citigroup

15.    Defendant Citigroup is a business entity organized under the laws of the state of Delaware with its executive offices located at 70 Pine Street, New York, New York.

16.    Citigroup is a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries.

17.    Citigroup is the sponsor of the Plans within the meaning of ERISA, and itself exercised important fiduciary duties and responsibilities. Citigroup exercised ultimate decision-making authority for the administration and management of the Plans and Plans' assets. Thus, Citigroup is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. §

1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

18.    Citibank N.A. is the Sponsor of the Citigroup 401(k) Plan. Plan assets are held in a trust fund established under the Citigroup 401(k) Plan and are invested in one or more of the funds available for investment. Citibank N.A. is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

**B.    Director Defendants**

19.    Upon information and belief, the Citigroup Board of Directors ("Citigroup Board" or the "Board") has ultimate oversight over the Plans, and is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

20.    Defendant Charles Prince ("Prince") was at all times relevant hereto Chairman of the Board and Chief Executive Officer of Citigroup, until being forced to resign on November 4, 2007. Most of Prince's compensation package is tied to his performance at the Company. For example, during the year ended December 31, 2006, Prince received a bonus of $13.2 million

and stock awards amounting to $10.6 million, in addition to his base salary of $1 million. Upon

information and belief, Defendant Prince has ultimate oversight over the Plans, and is a fiduciary

of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises

discretionary authority or discretionary control respecting management of the Plans, exercises

authority or control respecting management or disposition of the Plans' assets, and/or exercises

discretionary authority or discretionary responsibility in the administration of the Plans.

21.     Plaintiff does not at this time name all persons who served as members of the

Board during the Class Period. Instead, Plaintiff only names the top executive officer of

Citigroup because as such, he had intimate knowledge of the Company's business operations and

practices and, therefore, knew or should have known the Company's stock was an imprudent

investment during the Class Period.

### C.     The Plans Administrative Committee of Citigroup Inc.

22.     The Plans Administrative Committee of Citigroup Inc. ("Administrative

Committee") is the Plan' Administrator and, upon information and belief, was responsible for

administering and managing the Plans on a day-to-day basis, and advising Citigroup and the

Citigroup Board regarding the Plans and Plans' assets. Therefore, the Administrative Committee

members are fiduciaries of the Plans within the meaning of ERISA in that they exercised

discretionary authority with respect to: (i) management and administration of the Plans; and/or

(ii) management and disposition of the Plans' assets.

### D.     The 401(k) Plan Investment Committee

23.     Upon information and belief, the 401(k) Plan Investment Committee was

responsible for choosing the Plans' investments and monitoring the performance of those funds.

Therefore, the 401(k) Plan Investment Committee members are fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

24.      Defendants John Does 1-20 are reserved for additional fiduciaries of the Plans. At the present time, certain fiduciaries are unknown to Plaintiff. Once their identities are discovered, Plaintiff will amend his Complaint to join them under their true names.

## IV.    THE PLANS

25.      By information and belief, the Plans are defined contribution plans covering eligible employees of the Company. They are "employee pension benefit plan[s]" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A). Further, they are "eligible individual account plan[s]" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1107(d)(3), and also are a "qualified cash or deferred arrangement[s]" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k). The Plans are not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plans.

26.      The amounts of employee and Company contributions were limited by pertinent provisions of the Internal Revenue Code. Participants directed employee and Company contributions to various investment options in the Plans. Most of these options were diversified mutual funds. However, the options also included the Citigroup Common Stock Fund.

27.      According to the Citigroup 401(k) Plan's Form 11-K Annual Report of the Citigroup 401(k) Plan, as of December 31, 2006, approximately $4.13 billion of the plan's

$12.92 billion of assets were invested in Citigroup common stock through the Citigroup Common Stock Fund.

## V.    DEFENDANTS' FIDUCIARY STATUS

28.    **Named Fiduciaries**. ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a definition, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

29.    **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Citigroup). ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, appointing Plan administrators, overseeing the Plan administrators, and making statements to participants with respect to the Company, its financial results and business prospects.

## VI.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

30.    ERISA is a comprehensive statute covering virtually all aspects of employee benefit plans, including retirement savings plans, such as the Plan. The goal of ERISA is to

protect the interests of Plan participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

31.     Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of the plan's management.

32.     ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

33.     ERISA also imposes on Defendants responsible for the Plans a duty of loyalty, requiring these Defendants to "discharge [their] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of ... providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1),(A),(i), 29 U.S.C. § 1104(a)(1),(A),(i).

34.     Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue

of their exercise of authority or control respecting the management of the Plans or disposition of

Plan assets, include but are not limited to:

a.      The duty to investigate and evaluate the merits of decisions affecting the

use and disposition of Plan assets;

b.      The duty to evaluate all investment decisions with "an eye single" to the

interests of Plan participants and beneficiaries;

c.      The duty to avoid placing themselves in a position where their acts as

officers, directors, or employees of the Company will prevent their

functioning with the complete loyalty to participants demanded of them as

trustees of a pension plan, and, if they find themselves in such a position,

to seek independent, unconflicted advice;

d.      The duty, under appropriate circumstances, to monitor or influence the

management of the companies in which the Plans own stock including,

where appropriate, the obligation to bring a derivative action if the

fiduciaries were or should have been aware that the officers and directors

of the entities whose stock was held by the Plans had breached fiduciary

duties owed their shareholders;

e.      To the extent that a party is responsible for appointing and removing

fiduciaries, the duty to monitor those persons who have been named;

f.      The duty to disclose and inform of any material adverse information about

the Company which duty entails, among other things: (1) a duty not to

make materially false and misleading statements or misinform Plan

participants; (2) an affirmative duty to inform Plan participants about

material adverse factors which were affecting the Company any time the

fiduciary knew or should have known, pursuant to his duty to investigate,

that failing to make such a disclosure might be harmful; (3) a duty to

convey complete and accurate information material to the circumstances of

plan participants and their beneficiaries; and (4) a duty to insure that

investments were not purchased at a price above what the Defendants, but

not the participants and beneficiaries, knew or should have known to be in

excess of fair market value as defined in the relevant Treasury regulations

and in most instances at a price which renders it improbable that the

investments will bring a fair return commensurate with the prevailing

rates; and

g.    When a plan is composed of various investment funds, the duty to inform

and disclose also includes the duty to impart to plan participants material

information which the fiduciary knows or should know is sufficient to the

average plan participant of the comparative risks associated with investing

in any particular investment.

35.    ERISA permits the fiduciary function to be shared among various individuals and

entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is

impossible to know which fiduciaries exercised which fiduciary functions. Based on the

information available to Plaintiff, the Defendants' fiduciary responsibilities were at least partially

allocated among Citigroup, the Administrative Committee, and the Investment Committee.

## VII.    FACTS BEARING ON FIDUCIARY DUTY

**A.    Citigroup Stock Was an Imprudent Investment for the Plans during the Class Period Because of the Company's Serious Mismanagement, Precipitous Decline in the Price of its Stock, and Dire Financial Condition.**

**1.    Background**

**a.    The Expansion of the Subprime Lending Industry**

36.    The mortgage lending business has changed dramatically since the 1970s with the

development of national markets for mortgages, technological changes, and the advent of

securitization.  In fact, the mortgage market has been the fastest growing securitization debt

market, larger than the market for U.S. Treasury bonds and notes.  Between 2004 and 2005, the

subprime mortgage lending industry grew from $120 billion to $625 billion.  Ruth Simon and

James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind- Subprime Mortgages

Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

37.    One of the products of this new mortgage market is phenomenal growth in

subprime lending.  The term "subprime" generally refers to "borrowers who do not qualify for

prime interest rates because they exhibit one or more of the following characteristics: weakened

credit histories typically characterized by payment delinquencies, previous charge-offs,

judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value

ratios."  Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.,

*Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee*

*on Financial Services,* U.S. House of Representatives: Subprime Mortgages. Mar. 27, 2007, *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070327/default.htm.

38.     At the end of 2006, subprime borrowers represented approximately 13-14% of the 43 million first-lien mortgage loans outstanding in the United States. Subprime lending has grown rapidly in recent years. In 1994, fewer than 5% of mortgage originations were subprime, but by 2005 about 20% of new mortgage loans were subprime.

39.     Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors. *See* Sandra L. Thompson, Dir., Div. Of Supervision and Consumer Prot., *Testimony Before the Committee on Mortgage Market Turmoil: Causes and Consequences,* Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/spmar22071.html.

40.     In 2004, as interest rates began to climb, the pool of potential prime borrowers looking to refinance began to dry up and lenders began extending loans to subprime borrowers with troubled credit histories in an effort to maintain or grow market share in a declining origination environment. Thus, between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.

41.     In order to take advantage of this new market, lenders began weakening their underwriting standards, including:

(a)     reducing the minimum credit score borrowers need to qualify for certain loans;

(b)    allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

(c)    introducing new products designed to lower borrowers' monthly payments for an initial period; and

(d)    allowing borrowers to take out loans with little, if any, documentation of income and assets.

*See* Ruth Simon, *Mortgage Lenders Loosen Standards-Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules,* Wall St. J., July 26, 2005, at D1.

42.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers which put them at greater risk of defaulting:

(a)    **No-documentation and low-documentation loans:**   Known in the industry as "liar loans," the practice of requiring little or no documentation from borrowers constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001. *See* Gretchen Morgenson, *Crisis Looms in Mortgages,* N.Y. Times, Mar. 11, 2007.  Moreover, industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and in 60% of the cases, borrowers had inflated their incomes by more than half. *Id.*

(b)    **Piggy-back loans:** These combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80% of the home's value without paying for private mortgage insurance.  As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82% of the underlying value of their property, markedly up from 48% in 2000. *See Id.;*

James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans- More Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Market May Suffer*, Wall St. J., Feb. 14, 2007, at A3.

(c) **Interest-only mortgages:** These allow borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.

(d) **Option adjustable-mortgages:** The most prevalent of which are hybrid adjustable rate mortgages ("ARMs"), the loans are marketed with promotional or "teaser" rates during the loans's introductory period that later balloon to much higher rates once the introductory period has ended.  ARMs currently account for between one-half and one-third of subprime mortgages.  *See* Testimony of Roger T. Cole, Director, Division of Banking Supervision and Regulation, The Federal Reserve Board, *Mortgage Markets,* Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, Mar. 22, 2007, *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm.

### b.    The Demise of the Subprime Lending Industry.

43.    In late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices were increasing risks for borrowers and lenders in overheated housing markets. *See* Simon, *Mortgage Lenders, supra.* As lenders were making it easier for borrowers to qualify for loans by such practices as described above, they were also greatly

increasing the likelihood that borrowers would be unable to make payments, and that defaults would rise.

44.    Of particular concern was the prevalence of adjustable-rate loans, which in combination with the lowered lending standards, were more likely to result in borrowers' early payment defaults.

45.    In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well. *Id.;* Testimony of Sandra L. Thompson, *supra.* The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.

46.    However, most subprime lenders failed to heed these and other warnings. Despite rising interest rates and general housing market cooling in 2005, lenders continued to offer borrowers credit under weakened lending standards. Many lenders kept introductory "teaser" rates low even after short-term interest rates began rising in June 2005. It was not until mid to late 2006 when lenders began to tighten up their terms.

47.    Thus, in mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time in 2002. By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely – as of October 2005, the delinquency rate was twice that recorded on new subprime loans a year earlier. *See* Simon & Hagerty, *More Borrowers, supra.*

48.    According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period.  Testimony of Sandra L. Thompson, *supra*.

49.    Subprime loans with ARMS accounted for the largest rise in delinquency rates, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006; whereas foreclosures rose from 1.5% to 2.7% during the same period. *Id.*

50.    In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency. *See* Simon & Hagerty, *More Borrowers, supra.*

51.    At the end of 2006, subprime loans were going into foreclosure at a faster pace than loans made in previous years, and in many cases the loans were "so bad right off the bat" and "so far beyond the borrower's ability to pay that giving the borrower more time to pay or restructuring the loan wouldn't help." *Id.*

52.    By at least January 2007, Citigroup became aware of an extraordinary increase in the default of its subprime loans and the heavy losses which the Company would inevitably recognize. Despite these troubles, Citigroup failed to disclose its subprime loan loss exposure. Instead, the Company slowly revealed its losses and loss exposure during the Class Period to blunt the impact and mask the depth and breath of the crisis.

### c.    Citigroup Fails to Adequately Disclose Contingent Liabilities With Respect to Off Balance Sheet Entities

53.    Conduits and SIVs are entities that banks use to issue commercial paper, which are usually highly rated, short-term notes that offer investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

54.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks profit from the SIVs by pocketing the spread between the rate by which they borrow money and the rate by which they lend money.

55.    The vehicles are often established in a tax haven and are run solely for investment purposes as opposed to typical corporate activities.

56.    Because most conduits or SIVs are off the-balance-sheet entities, it is difficult for investors to size up the financial risks they pose. Off-balance-sheet liabilities played a major role in the 2001 collapse of Enron Corp., and the makers of accounting rules have generally sought to get affiliated entities back on the balance sheets of the companies creating them.

57.    According to reports, Citigroup operates conduits and SIVs with assets totaling at least $160 billion. *See* David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on*, Wall St. J., Oct. 17, 2007.

58.    In order to raise proceeds for its SIVs, Citigroup touted to money market fund managers and other investors that the conduits were safe investments which use the proceeds from the issuance of commercial paper and short term notes to invest strictly in high quality debt securities. *See Capital Markets: Team Of The Month - Citigroup SIV Enters Uncharted Space - Citigroup Alternative Investments Last Month Launched A Pioneering Structured Investment Vehicle. It Boosts Leverage To The Subordinated Noteholder Without Really Increasing The R; structured investment vehicles*, The Banker, Oct. 1, 2004; *Citigroup creates bespoke SIV for mystery ABS investor; Structured investment vehicle; asset backed securities; Citigroup Inc.,* Euromoney Institutional Investor, Nov. 10, 2006.

59.    However, as described below, in fact, Citigroup's conduits invested in subprime

loans and, as a result, many investors are no longer willing to purchase commercial paper from

its SIVs. Because the conduits still owe money to commercial-paper holders, and they can't raise

money by selling new commercial paper, they are being forced to sell its assets at fire-sale prices

to pay off its debts. As a result, Citigroup's conduits are on the brink of collapse, subjecting the

Company to billions of dollars in liability as a result of investor lawsuits for causing the conduits

to issue debt based on materially false and misleading statements. Moreover, Citigroup may

have to move its conduits onto its balance sheet, and recognize billions of dollars in potential

liability that the Company had not fairly disclosed to investors in Citigroup common stock,

including Plan participants. *See* Peter Eavis, *Behind the Citigroup rescue*, Fortune, Oct. 15, 2007.

### 2.    Citigroup Was Aware of the Extraordinary High Default Rates of Its Subprime Assets and Failed to Provide Complete and Accurate Information to Participants Regarding the Company's Loan Loss Exposure

60.    On January 19, 2007, Citigroup announced its financial results for the year ended

December 31, 2006, and for the fourth quarter ended December 31, 2006. The Company

reported net income for the 2006 fourth quarter of $5.13 billion, record quarterly revenues of

$23.8 billion, record full year 2006 revenues of $89.6 Billion, and record full year 2006 income

from continuing operations of $21.2 Billion.

61.    In a press release issued by the Company, announcing its results, Defendant

Prince stated "Our results were highlighted by double-digit revenue growth in our corporate and

investment banking, wealth management and alternative investment businesses. In U.S.

consumer, we continued to see positive trends from our strategic actions."

62.     During a January 19, 2007 conference call with investors discussing the

Company's fourth quarter 2006 results, a UBS analyst questioned why loan loss reserves had not

changed when there had been a pick up in Citigroup's consumer loans. Citigroup's Chief

Financial Officer ("CFO") at the time, Sallie Krawcheck, stated that:

> "...we believe that we have adequate reserves, we believe we have
> the right level of reserve for what we are seeing in terms of the
> growth in the portfolio, what we see in terms of the embedded loss in
> the portfolio. And as the environment changes the complexion, the
> portfolio changes, etc., we review that. We have I guess to go along
> with the guys that have the pocket protectors or the Ph.D. guys who
> look at the reserves and we feel very good, very good about the level
> of them."

63.     On January 23, 2007, the Company announced that Citigroup's CFO, Krawcheck,

was reassigned to head the Company's brokerage and private banking business -- a lower profile

job with narrower responsibilities. The change put Krawcheck back in charge of the brokerage

business she ran two years ago. It also put her in charge of a division of Citigroup that accounted

for only 8 percent of the Company's net income.

64.     On February 9, 2007, Citigroup's shares fell 1.2% to $54.31 after Britain's HSBC

Holdings, Europe's largest bank, warned that bad debts from its U.S. mortgage lending business

would hurt results.

65.     On February 23, 2007, Citigroup filed its Form 10-K for the year ended December

31, 2006, with the SEC. The Company reported that it earned $21.2 billion from continuing

operations on revenues of $89.6 billion; income was up 7% from 2005, while diluted EPS from

continuing operations increased 11%, with the increment in the growth rate reflecting the benefit

from our share repurchase program; and net income, which includes discontinued operations,

was $21.5 billion, down 12% from the prior year, reflecting the absence of significant gains on

sales of businesses recorded in 2005.

66.     Commenting on its outlook for 2007, the Company stated in part:

> We enter 2007 with good business momentum, as we expect to see
> our investment initiatives generate increasing revenues, and are
> well-positioned to gain from our balanced approach to growth and
> competitive advantages.

> We expect to continue to achieve growth in loans, deposits and other
> customer activity resulting from our increased distribution points,
> expanded product offerings, and the impact from recent targeted
> acquisitions.

> In 2006, our international businesses contributed 43% of our income
> from continuing operations. We expect to continue to re-weight our
> revenue mix towards International Consumer, CIB and Global Wealth
> Management.

> Disciplined capital allocation will remain fundamental to our strategic
> process and we will have a sharp focus on expense management.

> Although there may be volatility in our results in any given year, over
> the long term our revenues are targeted to grow organically at a mid-
> to high-single-digit rate, with strong expense and credit management
> driving earnings and earnings per share growth at a faster level. We
> will seek to augment this growth rate over time through targeted
> acquisitions.

> Credit is broadly stable as 2007 begins; however, we are budgeting
> for a moderate deterioration of credit in 2007. In addition, the tax
> benefits we realized in 2006 will not be repeated in 2007, and we
> anticipate the effective tax rate to return to a more normalized rate of
> 30% to 31%, not the 27.3% recorded in 2006.

67.     In commenting on its U.S. Consumer Lending dividions, Citigroup stated in its

Form 10-K that "Provisions for loan losses and for benefits and claims increased primarily on

higher credit losses in the Real Estate Lending and Auto businesses, partially offset by higher

loan loss reserve releases of $63 million in the Real Estate business. Credit losses increased due to volume growth and seasoning in Real Estate, as well as volume growth in Autos."

68.    Citigroup did not disclose any problems with its subprime loan portfolio in its Form 10-K. In fact, the Company led investors to believe that its subprime loss exposure was minimal by stating that from 2004 to 2005 "Non-prime [subprime] mortgage originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers."

69.    On February 25, 2007, Citigroup announced that it replaced Sallie Krawcheck with Gary Crittenden. Gary Crittenden came to Citigroup from American Express Company, where he was the company's chief financial chief for the last six years.

70.    On April 11, 2007, Citigroup announced that it would eliminate about 17,000 jobs as part of a companywide restructuring to reduce costs and improve profit. According to news reports, Citigroup executives, including Defendant Prince, had been under pressure from investors and analysts to get a handle on the bank's burgeoning expenses, which grew 15 percent during 2006, twice the pace of revenue growth, and caused the Company's shares to lag behind those of other big money center banks. Although the Company knew that it would suffer massive losses as a result of its subprime exposure by at least January 2007, Defendant Prince was under intense pressure to delay this disclosure until he obtained control over Citigroup's expenses.

71.    On April 16, 2007, Citigroup reported net income for the 2007 first quarter of $5.01 billion, or $1.01 per share. In a press release announcing the results, Citigroup stated "U.S.

consumer revenue growth continued to trend positively, up 6%." Defendant Prince was quoted

as stating:

> We achieved these results while completing our structural expense
> review, which will help us become a leaner, more efficient
> organization and lower our rate of expense growth.  As we look
> ahead, our priorities are clear: we will invest to grow and integrate
> our businesses, take actions to improve efficiency and lower costs,
> and continue to build momentum across our franchises.

72.    Citigroup held a conference call with investors on April 16, 2007, to discuss the

Company's financial results for the first quarter of 2007.  When questioned by an analyst as to

whether $9 billion worth of loans held by Citigroup were no documentation or low

documentation subprime loans, Citigroup's CFO would not answer the question and implied that

said loans were profitable:

> - GLENN SCHORR, ANALYST, UBS: Thanks, it is UBS. On slide
> 6, the U.S consumer mortgage trend, in the footnote, you noted that
> it excludes $5 billion of first mortgages and almost $4 billion of
> second mortgages where you didn't have FICO and LTV data. Just
> curious on what type of loans that might be, why you don't have the
> data and how your gut is that that might change the results that you
> showed on the slide?
>
> GARY CRITTENDEN: We actually just finished preparing this data
> over the course of the last week or so and we don't have a
> comprehensive view that includes all of the -- the full scope of the
> portfolio. The underlying delinquency performance of the things that
> were excluded from the table have very good delinquency
> performance associated with them. So there was no -- if you look at
> the underlying performance of those mortgages that were excluded
> from the table with those that are included, there was just no
> underlying difference in the delinquency performance between the
> two.
>
> GLENN SCHORR: Got you. I would guess it is probably stuff that
> falls into that all [pay] no [doc]/low doc type of --.

GARY CRITTENDEN: You know, we don't use that nomenclature here and don't think about the business in that way.

GLENN SCHORR: Okay. But you don't have FICO and LTV scores on the loans? Okay. I'm good. I don't need a follow-up. Thanks.

GARY CRITTENDEN: Great. Thanks.

73.     In the April 16, 2007, conference call, Citigroup's CEO, Defendant Prince, told analysts that he was pleased the bank had achieved "positive operating leverage" in the first quarter, with revenue up 12% more than the 10% rise in expenses, in an attempt to please investors who had been pressing for expense control. "It feels good to me to see that progress," Prince said. "We are delivering on our plan."

74.     Excluding an $871 million after-tax charge relating to the Company's restructuring plan, the Company's profit was $1.18 per share for the first quarter of 2007, which beat analyst estimates of $1.10.  Citigroup stock reached a high of $53.59 on the news, a 3.9% increase from is closing price of $51.60 on April 13, 2007.

75.     Citigroup's comments about its operations led investors to believe that Citigroup's subprime loan loss exposure was minimal.  Paul Nolte, director of investments at Hinsdale Associates, a money management firm was quoted as stating "One of the question marks coming into earnings season has been the mortgage issue, and Citigroup making positive comments about its business has lent some strength to the overall market." Rob Kelley and Grace Wong, *Stocks soar on earnings, deals*, CNNMoney.com, April 16, 2007.

76.     On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter ended March 31, 2007, in which the Company reported income from continuing operations of $5.01 billion in the first quarter of 2007. The Company also reported in part:

Customer volume growth was strong, with average loans up 14%, average deposits up 19%, average interest-earning assets up 25%, and client assets under fee-based management up 12% from year-ago levels. U.S. debt, equity and equity-related underwriting increased 21% from year-ago levels. Branch activity included the opening of 99 branches during the quarter (48 internationally and 51 in the U.S.). U.S. Cards accounts were up 14% and purchase sales were up 6%.

***

Net interest revenue increased 8% from last year as higher deposit and loan balances were offset by pressure on net interest margins. Net interest margin in the first quarter of 2007 was 2.46%, down 39 basis points from the first quarter of 2006...

Operating expenses increased 17% from the first quarter of 2006. Excluding the restructuring charge in 2007 and the 2006 initial adoption of SFAS 123(R), expenses were up 12% from the prior year. The relationship between revenue growth and expense growth, excluding the aforementioned impact of restructuring and SFAS 123(R), improved during the quarter. As our Structural Expense Review takes shape, we expect the pace of year-over-year expense growth (excluding acquisitions) to continue to moderate through 2007.

***

Credit costs increased $1.3 billion from a year ago, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to build loan loss reserves. The $597 million net build compares to a net reserve release of $154 million in the prior-year period. The build was primarily due to increased reserves to reflect: a change in estimate of loan losses inherent in the initial tenor portion of the Consumer Loan Portfolio; portfolio growth, and increased delinquencies in second mortgages, in the U.S. Consumer Lending mortgage portfolio; and portfolio growth in Markets & Banking, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The Global Consumer loss rate was 1.69%, a 23 basis-point increase from the first quarter of 2006.

77.    On June 12, 2007, the media reported that a large hedge fund controlled by The

Bear Stearns Companies, Inc. ("Bear Stearns") has fallen 23% from the start of the year through

late April. "The fund, called the High-Grade Structured Credit Strategies Enhanced Leverage Fund, [was] widely exposed to subprime mortgages, or home loans to borrowers with weak credit histories." Kate Kelly and Serena Ng, *Bear Stearns Fund Hurt by Subprime Loans*, Wall St. J., June 12, 2007.

78.     Before the market opened, on June 20, 2007, the media reported that two Bear Stearns hedge funds that held more than $20 billion of investments, mostly in complex securities made up of bonds backed by subprime mortgages were close to being shut down as a rescue plan fell apart in a drama that could have wide-ranging consequences for Wall Street and investors. Kate Kelly, Serena Ng and David Reilly, *Two Big Funds At Bear Stearns Face Shutdown --- As Rescue Plan Falters Amid Subprime Woes, Merrill Asserts Claims*, Wall St. J., June 20, 2007. On this news, investors correctly speculated that Citigroup may have similar problems, and the Company's common stock tumbled from its close of $54.26 on June 19, 2007 to close at $51.15 on June 25, 2007 – a 5.7% decline in less than a week.

79.     Before the close of the market on July 20, 2007, Citigroup reported net income for the 2007 second quarter of $6.23 billion, or $1.24 per share, both up 18%. In a press release announcing the results Defendant Price stated:

> We continued to generate revenue and volume growth in our U.S. consumer franchise, while making excellent progress in re-weighting Citi towards our other businesses, especially our international franchises, where revenues and net income increased over 30%. Our capital markets-driven businesses performed extremely well and international consumer revenues and volumes grew at a double-digit pace.

80.     On a July 20, 2007 conference call with investors discussing its second quarter 2007 results, Citigroup was forced to reveal that it had been actively managing down its

subprime exposure "some time" and had reduced its exposure "over the last six months." During the second quarter of 2007, Citigroup's profits from consumer banking fell 15 percent, to $2.7 billion, as credit costs increased by $934 million. Citigroup increased its loan loss reserves by $465 million citing higher delinquencies in citing second mortgages in consumer lending. Citigroup also announced that it expects to see continued deterioration in consumer-credit quality through the year's second half, and Citigroup probably will make "meaningful additions" to its loss reserves.

81.     After Citigroup reported that it will probably suffer meaningful losses in the second half of 2007, its stock steeply declined over the next week from a close of $51.19 on July 19, 2007 to a close of $46.97 on July 27, 2007 – an 8.2% decline, wiping out approximately $20.8 billion in market share.

82.     On August 3, 2007, Citigroup filed is Form 10-Q for the second quarter ended June 30, 2007. Citigroup reported in part:

> Income from continuing operations rose 18% to $6.226 billion and was the highest ever recorded by the Company. Diluted EPS from continuing operations was also up 18%.
>
> ***
>
> Customer volume growth was strong, with average loans up 16%, average deposits up 20%, and average interest-earning assets up 32%. International Cards purchase sales were up 31%, while U.S. Cards sales were up 6%. In Global Wealth Management, client assets under fee-based management were up 40% from year-ago levels, and client assets in Alternative Investments grew 55%. Branch activity included the opening or acquisition of 160 new branches during the quarter (136 internationally and 24 in the U.S.).
>
> ***

Operating expenses increased 16% from the second quarter of 2006 driven by increased business volumes and acquisitions (which contributed 4%). Expense growth was partially offset by savings from our Structural Expense Initiatives and the release of $300 million of litigation reserves reflecting our continued progress in favorably resolving WorldCom/Research Litigation matters. The relationship between revenue growth and expense growth continued to improve during the quarter with positive operating leverage of 4%.

\*\*\*

Credit costs increased $934 million or 59%, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period. The build in U.S. Consumer was primarily due to increased reserves to reflect: higher delinquencies in second mortgages in U.S. ConsumerLending, a change in estimate of loan losses inherent in the U.S. Cards portfolio, and portfolio growth. The increase in International Consumer primarily reflected portfolio growth, an increase in past due accounts and portfolio seasoning in Mexico cards, higher net credit losses in Japan consumer finance, and the impact of recent acquisitions. The Global Consumer loss rate was 1.56%, an 8 basis-point increase from the second quarter of 2006. Corporate cash-basis loans declined 25% from year-ago levels to $599 million.

83.     On October 1, 2007, as previously warned, Citigroup announced that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment are expected to have an adverse impact on third quarter financial results. Citi estimated that it would report a decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third quarter results. The Company's stated losses included a $1.4 billion write-off in Citigroup's $57 billion portfolio of highly leveraged loans, a loss of about $1.3 billion on the value of securities backed by subprime loans, and a loss of $600 million in fixed-income credit trading. Citigroup also announced that consumer credit costs rose $2.6

billion, mostly due to a boost in loan-loss reserves. Citigroup's shares actually rallied after the October 1, 2007 profit warning, as investors were cheered by Defendant Prince's comments that markets were recovering and Citigroup expected a "return to a normal earnings environment in the fourth quarter."

84.    On October 15, 2007, Citigroup reported its poor financial results for the third quarter of 2007 and announced write-offs that were half a billion dollars more than the Company had forecast only two weeks earlier. Citigroup's third-quarter results included a $1.35 billion pretax write-down in the value of leveraged loans, $1.56 billion of pretax losses tied to loans and subprime mortgages that were to be repackaged and sold to investors, $636 million in pretax fixed-income trading losses and $2.98 billion in increased consumer credit costs.

85.    On October 13, 2007, the media reported that a number of banks, including Citigroup, had discussions with the United States Treasury Department regarding the creation of to create a super fund to create liquidity for SIVs and conduits that were facing liquidity problems. According to reports, many investors had stopped buying commercial paper sold by these structures because they were concerned that the vehicles were exposed to subprime loans. As a result, the vehicles could not raise proceeds to pay off their debts. Also, the vehicles could not immediately sell their assets without suffering a loss.

86.    The purpose of the proposed super fund wass to purchase troubled SIVs' assets and eventually resell them in an effort to prevent discount fire sales. "Some bankers objected to the plan, calling it an escape hatch for Citigroup, which has more SIVs than any other bank." Carrick Mollenkamp, Deborah Solomon and Robin Sidel, Rescue Readied By Banks Is Bet To Spur Market, Wall St. J., Oct. 15, 2007. According to a Reuters article, dated October 21, 2007,

and entitled *Banks launch reform drive in wake of credit crisis,* "[s]ome bankers have criticised the U.S. fund rescue plan as inappropriate because it risked dragging out problems instead of tackling them head-on." The Reuters article stated that Deutsche Bank AG's chief executive officer, Josef Ackermann, rejected the idea and advised financial actors burdened with illiquid assets to write down their value now while the financial sector was strong and not to drag any uncertainty that has made banks become fearful to lend to one another.

87.    On October 16, 2007, Henry M. Paulson, Jr., U.S. Treasury secretary, said that the conduct of some mortgage market participants had been "shameful" and called for consideration of a nationwide licensing and monitoring system for mortgage brokers. *Secretary Paulson Speaks on Current Housing and Mortgage Market Developments,* US Fed News, Oct. 16, 2007. Mr. Paulson also warned caution over banks' exposure to off-balance sheet vehicles, such as Citigroup's conduit vehicles. Mr. Paulson stated that "[o]ur bank regulators must evaluate regulatory capital requirements applicable to bank exposures to off-balance sheet vehicles," and that the U.S. Treasury would "review the accounting rules" for these special purpose entities. *Id.*

88.    In connection with the SIV reports, the media reported that Citigroup "has nearly \$160 billion in SIVs and conduits, but its shareholders wouldn't get a clear view of this from reading the bank's balance sheet." David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on,* Wall St. J., Oct. 17, 2007.

89.    It was also reported by the media that "Citigroup is the largest player in the SIV market with seven funds holding about \$80 billion in assets" and that SIV "investors are skeptical" about the SIVs and that "[i]nvestors complained that the SIVs were not as reliable as they had been billed." Carrick Mollenkamp, Deborah Solomon, Robin Sidel and Valerie

Bauerlein, *SIVs Fueled Debt Boom, But Now Banks Scramble To Prop Up the Funds*, Wall St. J.,

Oct. 18, 2007.

90.    After the Company disclosed $500 million in additional losses and media reports

surfaced about Citigroup's potential multi-billion dollar exposure to off balance sheet SIVs and

conduits, Citigroup's common stock price fell from a close of $47.87 on Friday, October 12,

2007, to a close of $46.24 on October 15, 2007 – a 3.4% decline. The Company's stock price

continued to tumble over the next few days to $42.61 on October 19, 2007 -- a 10.9% decline --

wiping out approximately $25 billion in market value over a 5 day period.

91.    Citigroup's shares fell another 6.8% on November 1, 2007 after Credit Suisse and

CIBC World Markets downgraded the Company's stock on concern that Citigroup might have to

cut its dividend to boost its capital, amid reports that Citigroup would be required to disclose

billions more in losses. Citigroup shares fell $2.85 to $38.51, their lowest level since May 2003

and their biggest one-day drop since September 2002.

92.    On November 2, 2007, after the market closed, the media reported that

Citigroup's Board would hold an emergency meeting over the weekend, where Defendant Prince

would resign.

93.    On November 3, 2007, the media reported that "[t]he SEC [was] reviewing how

Citigroup accounted for certain off-balance-sheet transactions that are at the heart of a

banking-industry rescue plan, according to people familiar with the matter." Robin Sidel,

Monica Langley and Gregory Zuckerman, *Citigroup CEO Plans to Resign As Losses Grow ---

Bank's Board to Meet With Prince on Sunday; SEC Queries Accounting*, Wall St. J., Nov. 3.

2007. The article also reported that "[t]he SEC is also taking a broad look at how brokerage

firms valued assets tied to high-risk mortgages and whether they were timely in their disclosure of losses to investors." *Id.*

94.    On November 4, 2007, Citigroup announced that its CEO, Defendant Prince resigned. The Company also announced "significant declines" in the fair value of approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business. The Company estimated that the reduction in revenues attributable to these declines ranged from approximately $8 billion to $11 billion. That would far surpass the roughly $2.2 billion in mortgage-related writedowns and trading losses that Citigroup reported in its third-quarter earnings last month.

95.    After the market opened on November 5, 2007, Citigroup's stock fell to $35.60.

96.    On November 5, 2007, Citigroup filed its Form 10-Q for the quarter ended September 30, 2007, with the SEC. Citigroup disclosed in its Form 10-Q that it provided a $10 billion credit line to its SIVs of which $7.6 billion of credit had been drawn upon as of October 31, 2007.

97.    On November 19, 2007, Goldman Sachs Group analysts recommended that investors sell their stock in Citigroup Inc., saying the giant bank faces more write-downs of mortgage-related exposures and may have to cut its dividend to shore up its eroded capital ratios. Goldman estimated Citigroup will have to book $15 billion in write-downs over the next two quarters.

98.    In all, as Citigroup slowly revealed its dire financial conditions, its stock fell from $54.26, on June 19, 2007, to $34, at the close of the market on November 16, 2007. This amounts to a 37.3% decline in share price and a loss of approximately $100 billion in market

value in less than six months. Citigroup stock continues to fall, reaching a low of $32 on November 19, 2007.

## VIII. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A. Defendants' Knowledge of Citigroup's Stock Risk and Subsequent Communication with Plan Participants and Beneficiaries

99. Because of Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

100. Because of the access to this information, the Defendants knew or should have known that Citigroup's common stock was an imprudent investment during the Class Period.

101. Upon information and belief, the Defendants regularly communicated with employees, including Plan participants and beneficiaries, about Citigroup's financial performance, future financial and business prospects, and the attractiveness of Citigroup stock.

102. Despite the Defendants' knowledge of Citigroup's risky business practices during the Class Period, the Company fostered a positive attitude toward Citigroup as a Plan investment. Management touted strong Company performance and stock benefits. Employees continually heard positive news about Citigroup's growth, were led to believe that Citigroup stock was a good investment, and that the Plans were prudently managed.

103.    Moreover, Citigroup publicly repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be false and misleading.

104.    As fiduciaries, the Defendants had a duty to provide participants with complete and accurate information regarding the Plans' investment options, including the Citigroup Common Stock Fund. Despite these duties, however, the Defendants failed to provide Plan participants with complete and accurate information regarding Citigroup stock, such that the participants could appreciate the true risks presented by investments in the stock and could make informed decisions regarding investments in the Citigroup Common Stock Fund.

105.    Employees never received any information from the Company or any other Plan fiduciary that indicated that the Company's stock was not a prudent investment for their funds remaining in the Plans.

106.    Citigroup employees and Plan participants were led to believe that Citigroup stock was a prudent investment and that the Plans were managed properly. These misleading communications regarding the performance of Citigroup stock and its true value caused Plaintiff and the Class to invest in the Citigroup Common Stock Fund and to maintain that investment to their detriment.

107.    Moreover, the Defendants knew or should have known certain basic facts about the characteristics and behavior of Plan participants, well-recognized in the 401(k) literature and the trade press, concerning investments in company stock, including that:

        a.    Out of loyalty, employees tend to invest in company stock;

        b.    Employees tend not to change their investment option allocations in the

plan once made; and

c.    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

108.    Even though the Defendants knew or should have known these facts, and even though they knew of the high concentration of Plan participant funds invested in the Citigroup Common Stock Fund, they did nothing to address these risks and circumstances.

109.    Defendants' concealment of material non-public information, as well as their improper influence on Plan participants, caused Plaintiff and the Class to invest in Citigroup stock and retain their investment in the stock. The investment decisions of the Plaintiff and the Class were dependent on the misrepresentations and omissions of the Defendants.

**B.    Conflicts of Interest**

110.    Prince had a strong incentive for the participants of the Plan to invest heavily in Citigroup stock because his compensation was closely tied to the performance of Citigroup's stock price.

111.    In addition, the Administrative and Investment Committee members were dominated and/or controlled by Citigroup and Defendant Prince. Their salaries and bonuses were dependent upon obedience to Citigroup and Defendant Prince.

112.    These conflicts of interest forced the Defendants to choose between serving their own interests or serving the interests of the Plan participants and beneficiaries. Although ERISA requires that the Defendants serve the participants and beneficiaries with loyalty and prudence, the Defendants failed to do so.

C.    **Causation**

113.    The Plans suffered well over $1 billion in losses because a substantial amount of the Plans' assets were imprudently allowed to be put at great risk by the Defendants, through investment by the Plans in Citigroup common stock during the Class Period, and in breach of Defendants' fiduciary duties.

114.    Had the Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Citigroup common stock and divesting the Plans of Company stock offered by the Plans when such investment alternative became imprudent, the Plans would have avoided all of the losses that it suffered through its investment in Company common stock.

D.    **Remedies for Defendants' Breach of Fiduciary Duties**

115.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been so heavily invested in Company stock. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

116.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

117.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in

the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been had the plan been properly administered.

118.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above, in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

119.    Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## IX.    CLASS ACTION ALLEGATIONS

120.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class consisting of all participants or beneficiaries of the Plans and their beneficiaries, excluding the Defendants, for whose accounts the fiduciaries of the Plans made or maintained investments in Citigroup stock

through the Plans during the Class Period, from January 1, 2007 through the present. Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director or partner of any Defendant or any entity in which a Defendant has a controlling interest and the heirs, successors or assigns of any of the foregoing.

121.    This action is properly maintainable as a class action because:

A.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members are unknown by Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class. According to the Citigroup 401(k) Plan's Form 5500 Annual Report for the year ended December 31, 2005, the plan had 157,504 participants with account balances at the end of the year.

B.    Plaintiff's claims are typical of those of the Class because Plaintiff and members of the Class suffered similar harm and damages as a result of Defendants' systematic unlawful and wrongful conduct described herein. Absent a class action, members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

C.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in complex class action and ERISA litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent.

D.    A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner making declaratory and injunctive relief to the Class as a whole appropriate.

122.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

      a.    Whether ERISA applies to the claims at issue;

      b.    Whether Defendants owe and owed fiduciary duties to the members of the Class;

      c.    The nature of the fiduciary duties Defendants owe or owed to members of the Class;

      d.    Whether Defendants breached their fiduciary duties; and

      e.    The extent of losses sustained by members of the Class and/or the Plan and the appropriate measure of relief.

123.    Plaintiff anticipates no difficulties in the management of this action as a class action.

## X.    ERISA § 404(C) DEFENSE INAPPLICABLE

124.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

125.    ERISA § 404(c) does not apply here for several reasons. First, ERISA § 404(c) does not and cannot provide any defense to the Plans' fiduciaries' imprudent decision to select and continue offering Citigroup stock in the Plan, as that decision was not made or controlled by the participants. See Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550).

126.    Second, even as to participant directed investment in Citigroup stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Citigroup stock. See 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Citigroup stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

127.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the

Plans, the Plaintiff, and the Class for losses caused by the Plans' investment in Citigroup stock is

established upon proof that such investments were or became imprudent and resulted in losses in

the value of the assets in the Plans during the Class Period.

## COUNT I
### For Breach of Fiduciary Duty or Knowing Participation Therein
### (Against All Defendants)

128.    Plaintiff incorporates the foregoing paragraphs herein by reference.

129.    The Plan is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.*, and

Plaintiff and the Class are participants and/or beneficiaries in the Plan. Each of the Defendants is

a fiduciary or co-fiduciary with respect to the Plans pursuant to the provisions of ERISA. As

co-fiduciaries, each of the Defendants is liable for the other's conduct.

130.    Defendants violated their fiduciary duties of loyalty and prudence by: (1) failing to

adequately investigate and monitor the merits of the investments in Company stock; (2) failing to

take steps to eliminate or reduce the amount of Company stock in the Plans; and (3) failing to

give plaintiffs and the Class accurate information about Citigroup regarding its business practices

so they could make informed investment choices under the Plans.

131.    At all times relevant to the allegations raised herein, each of the Defendants was a

co-fiduciary of the others. Each Defendant knowingly participated in the fiduciary breaches

described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure

to comply with the provisions of ERISA, and/or had knowledge of the breaches of its

co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

132.    As a result of Defendants' breach of fiduciary duties, Plaintiff and the Class, as well as the Plans, suffered damages, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiff and the Class for these losses.

## COUNT II
### For Violations of ERISA Disclosure Requirements
### (Against All Defendants)

133.    Plaintiff incorporates the foregoing paragraphs herein by reference.

134.    Defendants failed to advise Plaintiff and the Class that their investment in Citigroup stock was at substantial risk as a result of the Company's business practices and its exposure to massive penalties and/or fines. Defendants also failed to provide Plaintiff and the Class with accurate, truthful, or complete information about the Company's operations and illegal generation of revenue.

135.    Unbeknownst to Plaintiff and the Class, but known to Defendants, Citigroup's undisclosed risk of impaired financial condition was not revealed during the relevant time period. Because of the disparity in knowledge between Defendants, Plaintiff, and the Class, Plaintiff and the Class relied on Defendants to provide them with accurate and complete information about Citigroup, which was material to the suitability of Company stock as a prudent investment option.

136.    By failing to convey complete and accurate information to Plaintiff and the Class, Defendants violated their affirmative duty to disclose sufficient information to apprise Plaintiff and the Class of the risks associated with investment in Company stock when Defendants knew or should have known that the failure to disclose such material information would result in damages to Plaintiff and the Class.

137.    As a result of Defendants' failure to disclose and inform, Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiff and the Class for these losses.

## COUNT III
### For Failure to Monitor Fiduciaries
### (Against Citigroup and Defendant Prince)

138.    Plaintiff incorporates the foregoing paragraphs herein by reference.

139.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

140.    Upon information and belief, at all relevant times, the scope of the fiduciary duties of Citigroup and Defendant Prince included the responsibility to appoint, and, thus, monitor the performance of the Administrative Committee.

141.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

142.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees

were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

143.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

144.    Citigroup and Defendant Prince breached their fiduciary monitoring duties by, among other things: (a) failing altogether to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of the appointees imprudent action; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Citigroup's highly risky and inappropriate business and inflated revenue from illegal activities, and the likely impact of such practices on the value of the Plan's investment in Citigroup stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed decisions with respect to the Plans' assets; and (d) failing to remove appointees named herein whose performance was inadequate in that they continued to make and maintain huge investments in Citigroup stock during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

145.    As a result of Citigroup and Defendant Prince failure to monitor fiduciaries,

Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial.

Defendant Prince is personally liable to Plaintiff and the Class for these losses.

**COUNT IV**
**For Breach of Duty to Avoid Conflicts of Interest**
**(Against All Defendants)**

146.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

147.    At all relevant times, as alleged above, all Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

148.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a

duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the

interest of the participants and beneficiaries and for the exclusive purpose of providing benefits

to participants and its beneficiaries.

149.    Defendants breached their duty to avoid conflicts of interest and to promptly

resolve them by, inter alia: failing to engage independent fiduciaries who could make

independent judgments concerning the Plans' investment in the Citigroup Common Stock Fund;

failing to notify appropriate federal agencies, including the United States Department of Labor,

of the facts and transactions which made Citigroup Stock an unsuitable investment for the Plans;

failing to take such other steps as were necessary to ensure that participants' interests were

loyally and prudently served; with respect to each of these above failures, doing so in order to

prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the

interests of the Company, their co-defendants, and themselves above the interests of the participants with respect to the Plans' investment in Company Stock.

150.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

151.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V
### Co-Fiduciary Liability
### (Against Citigroup and Prince)

152.    Plaintiffs incorporate by this reference the allegations above.

153.    This Count alleges co-fiduciary liability against the following Defendants: Citigroup and Prince (collectively, the "Co- Fiduciary Defendants").

154.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

155.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

156.    Knowledge of a Breach and Failure to Remedy: ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Citigroup and Defendant Prince knew of the breaches by other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

157.    Citigroup, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Citigroup as a matter of law.

158.    Defendant Prince, by virtue of his position at Citigroup, participated in and/or knew about the Company's highly risky and inappropriate business and as well as their consequences, including the artificial inflation of the value of Citigroup stock.

159.    Because Citigroup and Defendant Prince knew of the Company's inappropriate business practices, they also knew: a) that the members of Administrative and Investment Committees were breaching their duties by continuing to invest in Company stock; and b) that the members of the Administrative and Investment Committees were breaching their duties by providing incomplete and inaccurate information to participants. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Citigroup's loan loss exposures, and obfuscating the risks posed to the Company, and, thus, to the Plans.

160.    **Knowing Participation in a Breach**: ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Citigroup, as a de facto fiduciary as alleged above, participated in all aspects of the fiduciary breaches of the other Defendants. Likewise, Defendant Prince knowingly participated in the breaches of the members of the Administrative and Investment Committees because, as alleged above, they had actual knowledge of the Company's misconduct, ignoring their oversight responsibilities (as Directors), and permitted the members of the Administrative and Investment Committees to breach their duties.

161.    **Enabling a Breach**: ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

162.    Citigroup and Defendant Prince's failure to monitor the members of the Administrative and Investment Committees enabled those committees to breach their duties.

163.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost well over a billion dollars of retirement savings.

164.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans

caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable

relief as appropriate.

## COUNT VI
### Knowing Participation in a Breach of Fiduciary Duty
### (Against All Defendants)

165.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

166.    To the extent that Citigroup is found not to have been fiduciary or to have acted in

a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Citigroup

knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a

fiduciary capacity and as such is liable for equitable relief as a result of participating in such

breaches.

167.    Citigroup benefitted from the breaches by discharging its obligations to make

contributions to the Plans in amounts specified by the Plans, contributing Citigroup stock to the

Plans while the value of the stock was inflated as the result of Citigroup's highly risky and

improper business practices, and providing the market with materially misleading statements and

omissions. Accordingly, Citigroup may be required to disgorge this benefit or a constructive

trust should be imposed on treasury shares of Citigroup stock which would have been contributed

to the Plans, but for Citigroup's participation in the foregoing breaches of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.    Determining that this is a proper class action to be certified under Rule 23 and

appointing Plaintiff class representative on behalf of the Class;

b.   Declaring that Defendants have violated the duties, responsibilities, and obligations  imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

c.   Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Fed. R. Civ. P. 64 and 65;

d.   Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement and/or other remedial relief;

e.   Allowing a trial by jury to the extent permitted by law;

f.   Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and post judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

g.   Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York

November 19, 2007

Respectfully submitted,

By: _____

Marian P. Rosner (MR-0410)
Robert Finkel (RF-2373)
Andrew Lencyk (AL-4329)
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel. (212) 759.4600
*Attorneys for Plaintiff*

**EXHIBIT M**

Aside from the need to replace a class representative, formal intervention by class members is infrequent. Intervention is not necessary for a class member to pursue an appeal after objecting to a class settlement.[852] Class members in Rule 23(b)(3) actions may, however, appear by their own attorneys, subject to the court's power to adopt appropriate controls regarding the organization of counsel.

## 21.27 Appointment of Class Counsel

.271 Criteria for Appointment  278
.272 Approaches to Selecting Counsel  279
.273 Procedures for Appointment  282

Rules 23(c)(1)(B) and 23(g) recognize that the certification decision and order require judicial appointment of counsel for the class and any subclasses. This section deals with that process. Sections 21.7 and 14 discuss the procedures for reviewing and awarding attorney fees for class counsel.

Unlike other civil litigation, many class action suits do not involve a client who chooses a lawyer, negotiates the terms of the engagement, and monitors the lawyer's performance. Those tasks, by default, fall to the judge, who creates the class by certifying it and must supervise those who conduct the litigation on behalf of the class. The judge must ensure that the lawyer seeking appointment as class counsel will fairly and adequately represent the interests of the class.[853] If the certification decision includes the creation of subclasses reflecting divergent interests among class members, each subclass must have separate counsel to represent its interests.[854]

### 21.271 Criteria for Appointment

Rule 23(g) sets out the criteria and procedures for appointment of class counsel. In every case, the judge must inquire into the work counsel has done in investigating and identifying the particular case; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; the resources counsel will commit to representing the class; and any other factors that bear on the attorney's ability to represent the class fairly and adequately. This last category may include the ability to coordinate the litigation with other state and federal

---

852. Devlin v. Scardelletti, 536 U.S. 1, 14 (2002) (holding that "nonnamed class members . . . who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening").

853. Fed. R. Civ. P. 23(g)(1)(B).

854. Fed. R. Civ. P. 23(g)(1)(A) committee note.

class and individual actions involving the same subject matter. Those seeking appointment as class counsel must identify related litigation in which they are participating. It is important for the judge to ensure that counsel does not have a conflict with class interests.[855]

In many cases, the lawyers who filed the suit will be the obvious or only choice to be appointed counsel for the class. In such cases, the judge's task is to determine whether the applicant is able to provide adequate representation for the class in light of the Rule 23(g)(1)(C) factors.

The judge must choose the class counsel when more than one class action has been filed and consolidated or centralized, or more than one lawyer seeks the appointment. The term "appoint" here means to "select" as well as to "designate" the lawyer as class counsel. If there are multiple applicants, the court's task is to select the applicant best able to represent the interests of the class. No single factor is dispositive in evaluating prospective class counsel. In addition to those listed above, relevant considerations might include

- involvement in parallel cases in other courts;
- any existing attorney–client relationship with a named party; and
- fee and expense arrangements that may accompany the proposed appointment.

### 21.272 Approaches to Selecting Counsel

There are several methods for selecting among competing applicants. By far the most common is the so-called "private ordering" approach: The lawyers agree who should be lead class counsel and the court approves the selection after a review to ensure that the counsel selected is adequate to represent the class interests.[856] Counsel may agree to designate a particular lead class counsel in exchange for commitments to share the legal work and fees. To guard against overstaffing and unnecessary fees,[857] the court should order the attorneys to produce for court examination any agreements they have made relating to fees or costs.[858] See section 21.631.

---

855. For an overview of possible conflicts of interest and other abuses (such as the "reverse auction" settlement in which defendant seeks to settle with counsel willing to accept the lowest offer), see sources cited *supra* note 737 and see *infra* sections 21.611–21.612.

856. *See* Third Circuit Task Force Report on Selection of Class Counsel, 74 Temp. L. Rev. 689, 693–94 (2001) [hereinafter Third Circuit 2001 Task Force Report]; *see generally supra* section 14.

857. *See, e.g., In re* Fine Paper Antitrust Litig., 98 F.R.D. 48 (E.D. Pa. 1983), *modified,* 751 F.2d 562 (3d Cir. 1984).

858. *See* Fed. R. Civ. P. 23(h) committee note; *see also* Fed. R. Civ. P. 23(e)(2) (settlement approval); Fed. R. Civ. P. 54(d)(2)(B) (attorney fees motions).

In the "selection from competing counsel" approach, the judge selects from counsel who have filed actions, are unable to agree on a lead class counsel, and are competing for appointment. The lawyer best able to represent the class's interests may emerge from an examination of the factors listed in Rule 23(g)(1)(C), as well as other factors, such as those delineated above.

A third and relatively novel approach, competitive bidding, entails inviting applicants for appointment as class counsel to submit competing bids. The fees to be awarded are one of the many factors in the selection.[859] Rules 23(g)(1)(iii) and 23(g)(2)(C) expressly permit the court to consider fee arrangements in appointing counsel. Some judges propose a fee structure as a framework for comparing bids for different percentages at different levels of recovery.[860]

Judges in antitrust and securities class actions have used competitive bidding to select counsel and to establish in advance a rate or formula for calculating attorney fees. Studies suggest that bidding may be more appropriate when

- prospective damages are relatively high;
- the chances of success are relatively predictable;
- prefiling investigative work was conducted by governmental agencies or others, so that the lawyers' foundational work is minimal; and
- the bidding process does not directly conflict with statutory or policy goals.

Bidding remains an experimental approach to selecting counsel and establishing presumptive fee levels.[861]

---

859. *See* Third Circuit 2001 Task Force Report, *supra* note 856, at 715–22; Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study (Federal Judicial Center Aug. 29, 2001), *reprinted in* 209 F.R.D. 519 (2002); *see also In re* Auction Houses Antitrust Litig., 197 F.R.D. 71 (S.D.N.Y. 2000); *In re* Amino Acid Lysine Antitrust Litig., 918 F. Supp. 1190 (N.D. Ill. 1996); *In re* Wells Fargo Sec. Litig., 156 F.R.D. 223 (N.D. Cal.), *later proceedings at* 157 F.R.D. 467 (N.D. Cal. 1994); *In re* Oracle Sec. Litig., 131 F.R.D. 688 (N.D. Cal.), *later proceedings at* 132 F.R.D. 538 (N.D. Cal. 1990), *and* 136 F.R.D. 639 (N.D. Cal. 1991); *supra* section 10.224. *See generally* Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation 99–101 (Federal Judicial Center 1994); Steven A. Burns, Note, *Setting Class Action Attorneys' Fees: Reform Efforts Raise Ethical Concerns*, 6 Geo. J. Legal Ethics 1161 (1993).

860. For examples of fee structures that were used in the bidding cases, see Hooper & Leary, *supra* note 859, at 34–45, reprinted in 209 F.R.D. at 561–73 (documenting key features of the various bidding approaches used in all twelve bidding cases identified in this descriptive study).

861. *See generally* Hooper & Leary, *supra* note 859; Third Circuit 2001 Task Force Report, *supra* note 856.

Cases in which liability is relatively clear and the amount of damages relatively predictable may be particularly good candidates for *ex ante* fee setting. Even if there is no court-ordered competition, a court may consider asking counsel to submit fee proposals to help analyze which application is best able to represent the class. In any case in which the judge does not appoint as class counsel the attorneys who investigated and filed the case, those attorneys may be entitled to compensation based on work performed. See section 14.12.

The Private Securities Litigation Reform Act of 1995 mandates an "empowered-plaintiff" approach to appointment of counsel in securities class actions.[862] This statute-based model provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."[863] Section 31.3 provides a useful analogy for similar class actions brought by sophisticated plaintiffs with large losses or sizeable claims.

The order that appoints counsel might specify some of the criteria the judge expects to use in determining a fee award. The order can include provisions that will affect the fees *ex ante*[864] as part of the appointment process, even in jurisdictions that require a searching and detailed *ex post* review of the fee award at the end of the case. For example, the court can clarify whether it will use the percentage or lodestar method or a combination of the two in calculating fees. The judge can also specify terms that may reduce duplicative work, unnecessary hours, and unnecessary costs, such as agreements on the numbers of lawyers who may appear at depositions or agreements on the types of permissible expenses. See section 14.211. With the percentage-of-fund method for calculating attorney fee awards, such detailed limitations are less important since the maximum fee award is fixed at a reasonable percentage of the class recovery, no matter how many lawyers work to produce it. Even under a percentage-of-fund approach, however, consider controlling litigation

862. Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended at 15 U.S.C. §§ 77z-1, 78u-4 to 78u-5 (2000)). For a discussion of the underpinnings of the empowered plaintiff model, see generally Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053 (1995).

863. 15 U.S.C. §§ 77z-1(a)(3)(B)(v), 78u-4(a)(3)(B)(v) (2000).

864. At least one court of appeals has expressed a preference for establishing the terms of appointment *ex ante*. *See In re* Synthroid Mktg. Litig., 264 F.3d 712, 718–19 (7th Cir. 2001) ("The best time to determine [a market] rate is the beginning of the case, not the end . . . ."). Another court of appeals has ruled that *ex ante* consideration of the terms of appointing counsel is not a substitute for *ex post* review of fees that were calculated using a formula established at the outset of the litigation. *In re* Cendant Corp. Prides Litig., 243 F.3d 722, 736–37 (3d Cir. 2001).

expenses that would ordinarily be deducted from the award to the class before fees are calculated. Many courts use the lodestar method as a cross-check on the reasonableness of the fee awarded under a percentage-of-fund approach. See section 14.122.

If no applicant would provide adequate representation, the judge may refuse to certify the class. If the class appears otherwise certifiable, however, refusal to certify solely on a finding of inadequate representation is very problematic. One alternative is to allow a reasonable time period for other attorneys to seek appointment.

### 21.273 Procedures for Appointment

If only one lawyer seeks appointment as class counsel, or if the parties agree who should be class counsel or lead class counsel, the application is generally submitted as part of the certification motion. If competing applications are likely, a reasonable period after commencement of the action should be allowed for attorneys to file class counsel applications. Competing applications are likely where more than one class action has been filed or other attorneys have filed individual actions on behalf of members of the proposed class. To facilitate comparison among applications, consider ordering applicants to follow a common format designed to elicit information about the court's appointment criterion. Any order of appointment should include a statement of the reasons for the appointment. Section 10.2 considers appointment of liaison counsel and committees of counsel in complex class action cases or cases resulting from the consolidation of different classes or subclasses.

## 21.28 Interlocutory Appeals of Certification Decisions

Rule 23(f) provides that a court of appeals may permit parties to appeal a district court order granting or denying class certification if application to the court of appeals is made within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or court of appeals so orders. Whether to grant an interlocutory appeal lies within the discretion of the court of appeals. The reported opinions produce a rough consensus[865] that interlocutory review should not be granted unless one or

---

865. *See* Prado-Steiman *ex rel.* Prado v. Bush, 221 F.3d 1266 (11th Cir. 2000); Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288 (1st Cir. 2000); Blair v. Equifax Check Servs., Inc., 181 F.3d 832 (7th Cir. 1999); *but cf.* Isaacs v. Sprint Corp., 261 F.3d 679 (7th Cir. 2001). Other courts, however, have indicated a more expansive standard for granting interlocutory appeals. *See, e.g., Isaacs,* 261 F.3d at 681 (expressing doubt that creating an exhaustive list of factors to

# 21.6  Settlements

.61 Judicial Role in Reviewing a Proposed Class Action Settlement  308
    .611 Issues Relating to Cases Certified for Trial and Later Settled  312
    .612 Issues Relating to Cases Certified and Settled at the Same Time  313
.62 Criteria for Evaluating a Proposed Settlement  315
.63 Procedures for Reviewing a Proposed Settlement  318
    .631 Obtaining Information  318
    .632 Preliminary Fairness Review  320
    .633 Notice of Fairness Hearing  321
    .634 Fairness Hearing  322
    .635 Findings and Conclusions  322
.64 Role of Other Participants in Settlement Review  323
    .641 Role of Class Counsel in Settlement  323
    .642 Role of Class Representatives in Settlement  325
    .643 Role of Objectors in Settlement  326
    .644 Role of Magistrate Judges, Special Masters, and Other Judicial Adjuncts in
        Settlement  329
.65 Issues Raised by Partial or Conditional Settlements  329
    .651 Partial Settlements  329
    .652 Conditional Settlements  330
.66 Settlement Administration  331
    .661 Claims Administrator or Special Master  332
    .662 Undistributed Funds  333

## 21.61  Judicial Role in Reviewing a Proposed Class Action Settlement

.611 Issues Relating to Cases Certified for Trial and Later Settled  312
.612 Issues Relating to Cases Certified and Settled at the Same Time  313

This section deals with judicial review of the fairness, reasonableness, and adequacy of proposed settlements in class actions. (Section 13 discusses settlement in complex litigation generally; section 22.9 discusses settlement in the context of mass tort litigation; and section 31.8 discusses settlement in the context of securities class action litigation. Section 21.132 discusses issues relating to certification standards for settlement classes.)

Whether a class action is certified for settlement or certified for trial and later settled, the judge must determine that the settlement terms are fair, adequate, and reasonable. Rule 23(e)(1)(A) mandates judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or

defenses of a certified class."[948] Rule 23.1 contains a similar directive for shareholder derivative actions.

The judicial role in reviewing a proposed settlement is critical, but limited to approving the proposed settlement, disapproving it, or imposing conditions on it. The judge cannot rewrite the agreement.[949] A judge's statement of conditions for approval, reasons for disapproval, or discussion of reservations about proposed settlement terms, however, might lead the parties to revise the agreement. See section 13.14. The parties might be willing to make changes before the notice of the settlement agreement is sent to the class members if the judge makes such suggestions at the preliminary approval stage.[950] Even after notice of a proposed settlement is sent, a judge's statement of concerns about the settlement during the fairness hearing might stimulate the parties to renegotiate in order to avoid possible rejection by the judge.[951] If the fairness hearing leads to substantial changes adversely affecting some members of the class, additional notice, followed by an opportunity to be heard, might be necessary.

To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation. Judicial review must be exacting and thorough. The task is demanding because the adversariness of litigation is often lost after the agreement to settle. The settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks. If objectors do not emerge, there may be no lawyers or litigants criticizing the settlement or seeking to expose flaws or abuses. Even if objectors are present, they might simply seek to be treated differently than the class as a whole, rather than advocating for class-

948. Rule 23(e) does not require court approval when the parties voluntarily dismiss class allegations before certification. However, in certain situations in which a voluntary dismissal might represent an abuse of the class action process, the court should inquire into the circumstances behind the dismissal. *See* discussion *supra* section 21.312 and text accompanying notes 905–06.

949. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998) ("The settlement must stand or fall in its entirety."); *but cf. In re* Auction Houses Antitrust Litig., No. 00 Civ. 0648, 2001 WL 170792, at *18 (S.D.N.Y. Feb. 22, 2001) (conditioning approval of a settlement on parties' adopting changes specified by the district court).

950. Romstadt v. Apple Computer, Inc., 948 F. Supp. 701, 707 (N.D. Ohio 1996) (noting that a "proposed agreement is more readily alterable" and that "[t]he choice facing the court and parties is not limited to the binary alternatives of approval or rejection").

951. *See, e.g.,* Bowling v. Pfizer, Inc. 143 F.R.D. 138 (S.D. Ohio 1992) (raising questions about proposed settlement and continuing fairness hearing); Bowling v. Pfizer, Inc., 143 F.R.D. 141, 146 (S.D. Ohio 1992) (approving revised settlement); *see also* Jay Tidmarsh, Mass Tort Settlement Class Actions: Five Case Studies 35, 38 (Federal Judicial Center 1998).

wide interests. The lack of significant opposition may mean that the settlement meets the requirements of fairness, reasonableness, and adequacy. On the other hand, it might signify no more than inertia by class members or it may indicate success on counsel's part in obtaining, from likely opponents and critics, agreements not to object. Whether or not there are objectors or opponents to the proposed settlement, the court must make an independent analysis of the settlement terms.

Factors that moved the parties to settle can impede the judge's efforts to evaluate the terms of the proposed settlement, to appraise the strength of the class's position, and to understand the nature of the negotiations. Because there is typically no client with the motivation, knowledge, and resources to protect its own interests, the judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation.

There are a number of recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements:

- conducting a "reverse auction," in which a defendant selects among attorneys for competing classes and negotiates an agreement with the attorneys who are willing to accept the lowest class recovery (typically in exchange for generous attorney fees);[952]

- granting class members illusory nonmonetary benefits, such as discount coupons for more of defendants' product, while granting substantial monetary attorney fee awards;[953]

- filing or voluntarily dismissing class allegations for strategic purposes (for example, to facilitate shopping for a favorable forum or to obtain a settlement for the named plaintiffs and their attorneys that is disproportionate to the merits of their respective claims);[954]

---

952. *Coffee, supra* note 737, at 1354, 1370–73; *see, e.g.,* Blair v. Equifax Check Servs., Inc., 181 F.3d 832, 839 (7th Cir. 1999) (suggesting that "[p]erhaps [defendant] found a plaintiff (or lawyer) willing to sell out the class"); *see also* Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283 (7th Cir. 2002) (finding that "[a]lthough there is no proof that the settlement was actually collusive in the reverse-auction sense, the circumstances demanded closer scrutiny than the district judge gave it"); Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877, 882 (7th Cir. 2000) (rejecting class settlement because "Crawford and his attorney were paid handsomely to go away; the other class members received nothing").

953. *See, e.g., In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 818–19 (3d Cir. 1995) (rejecting as unfair a settlement based on $1,000 nontransferable coupon redeemable only upon purchase of new GM truck); *see generally* FJC Empirical Study of Class Actions, *supra* note 769, at 77–78, 183–85; Note, *supra* note 737, at 816–17.

954. Diaz v. Trust Territory of Pac. Islands, 876 F.2d 1401, 1408 (9th Cir. 1989); Shelton v. Pargo, Inc., 582 F.2d 1298, 1303, 1314 (4th Cir. 1978) (holding that the Rule 23(e) notice

- imposing such strict eligibility conditions or cumbersome claims procedures that many members will be unlikely to claim benefits, particularly if the settlement provides that the unclaimed portions of the fund will revert to the defendants;[955]

- treating similarly situated class members differently (for example, by settling objectors' claims at significantly higher rates than class members' claims);[956]

- releasing claims against parties who did not contribute to the class settlement;[957]

- releasing claims of parties who received no compensation in the settlement;[958]

- setting attorney fees based on a very high value ascribed to nonmonetary relief awarded to the class, such as medical monitoring injunctions or coupons, or calculating the fee based on the allocated settle-

requirement does not apply to a precertification dismissal that does not bind the class, but that "the court must, after a careful hearing, determine what 'claims are being compromised' between the plaintiff and defendant and whether the settling plaintiff has used the class action claim for unfair personal aggrandizement in the settlement, with prejudice to absent putative class members"; 3 Conte & Newberg, *supra* note 908, § 8:19. In many instances, notice and court approval of a voluntary dismissal will not be given or obtainable because the members of the proposed class will not yet have been determined. *Shelton*, 582 F.2d at 1303.

955. *See, e.g.,* Reynolds, 288 F.3d at 282–83; *see also* Deborah R. Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain 427–30 (2000) [hereinafter RAND Class Action Report] (reporting actual distribution of benefits in ten case studies, in three of which class members claimed less than half the funds).

956. Gibson, *supra* note 792, at 154–55 (payment for dismissal of objectors' appeal regarding Rule 23(b)(1)(B) mandatory class); Tidmarsh, *supra* note 951, at 40–41 (objectors entered into private fee-sharing arrangements; opt-out cases settled for much higher sums than class members received).

957. *See, e.g., In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 221 F.3d 870, 873 (6th Cir. 2000) (decertifying a limited fund settlement class because some of the released parties did not qualify for "limited fund" certification); *see also In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985 (S.D. Ohio 2001) (approving a Rule 23(b)(3) opt-out settlement).

958. Molski v. Gleich, 318 F.3d 937 (9th Cir. 2003) (finding that settlement released individual damage claims without compensating class members other than class representative); Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877, 882 (7th Cir. 2000) (finding that only the class representative received compensation); Bowling v. Pfizer, Inc., 143 F.R.D. 141, 169–70 (S.D. Ohio 1992) (concluding that objection concerning lack of compensation for release of claims for loss of consortium became moot by addition of $10 million fund for spouses of class members).

ment funds, rather than the funds actually claimed by and distributed to class members;[959] and

- assessing class members for attorney fees in excess of the amount of damages awarded to each individual.[960]

In addition, although Rule 23(e) no longer requires court approval of a settlement or voluntary dismissal of individual claims as long as the settlement does not bind the class, the settlement of individual claims can represent an abuse of the class action process. For example, a party might plead class allegations to promote forum-shopping or to extract an unreasonably high settlement for the sole benefit of potential class representatives and their attorneys. Use of the court's supervisory authority to police the conduct of proposed class actions under Rule 23(d) may be appropriate in such circumstances.[961]

### 21.611 Issues Relating to Cases Certified for Trial and Later Settled

When a Rule 23(b)(3) class is certified for trial, the decision whether to opt out might have to be made well before the nature and scope of liability and damages are understood. Settlement may be reached only after the opportunity to request exclusion has expired and after changes in class members' circumstances and other aspects of the litigation have occurred. Rule 23(e)(3) permits the court to refuse to approve a settlement unless it affords a new opportunity to request exclusion at a time when class members can make an informed decision based on the proposed settlement terms.[962]

This second opt-out opportunity helps to provide the supervising court the "structural assurance of fairness," called for in *Amchem Products Inc.* This part of Rule 23(e)(3) affects only cases in which the class is certified and the

---

959. *See supra* section 14.121.

960. The only reported example of this egregious practice is *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1349 (7th Cir. 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) (class member received an award of $2.19, but $91.33 was deducted from class member's bank account for attorney fees).

961. *See supra* notes 904–10 and accompanying text. Prior to the change on this issue in Rule 23(e), some courts subjected precertification requests for dismissal to rigorous review. For an example of the Rule 23(e) analysis of the district court in the dismissal (pursuant to diplomatic settlement) of major German Holocaust-related litigation, see *In re Nazi Era Cases Against German Defendants Litigation*, 198 F.R.D. 429 (D.N.J. 2000).

962. Providing a second opportunity to opt out may be appropriate "if the earlier opportunity . . . provided with the certification notice has expired by the time of the settlement notice" and if there have been "changes in the information available to class members since expiration of the first opportunity to elect exclusion." Rule 23(e)(3) committee note. See also text at note 238 for a description of an organized opt-out campaign.

# EXHIBIT N

**Bloomberg.com**

Updated: New York, Jan 04 14:21
London, Jan 04 19:21

▸BloombergAnywhere | ▸SoftwareSupport | ▸Feedback   LOGIN/REGISTER

Tokyo, Jan 05 04:21

Search News [_____] GO!

Enter Symbol [_____] QUOTE CHART NEWS ▸SYMBOL LOOKUP    Stocks Fall on U.S. Outlook; Topix Has Worst New Year Opening on Record

Sentiment Aggressive Fund
Exclusively available at www.FXCM.com
Past performance is not indicative of future results.
Since inception (July - October 2007) Up **52.2%**
LEARN MORE

FXCM
WWW.FXCM.COM
CURRENCY TRADING INVOLVES SIGNIFICANT RISK OF LOSS

■ HOME | ■ NEWS | ■ MARKET DATA | ■ INVESTMENT TOOLS | ■ TV and RADIO    ■ ABOUT BLOOMBERG | ■ CAREERS | ■ CONTACT US

**news**

- Exclusive
- Worldwide
- Regions
- Markets
- Economy
- Politics
- Industries
- Opinion
- Invest
- Sports
- Muse
- Spend
- Audio/Video Reports
- Bloomberg Markets Magazine
- Special Report

**RESOURCES**

- Bloomberg TV
- Bloomberg Radio
- Bloomberg Podcasts
- Bloomberg Press

## Citigroup May Cut Dividend by 40%, Goldman Sachs Says (Update4)

By Adam Haigh and Elizabeth Hester



No More Photos/Details

Dec. 27 (Bloomberg) -- Citigroup Inc., the biggest U.S. bank, may cut its dividend 40 percent to preserve capital and write down more fixed-income securities than it has told investors to expect, according to Goldman Sachs Group Inc.

JPMorgan Chase & Co., the third-largest U.S. bank by assets, may write off $3.4 billion in fixed-income securities in response to the collapse of the subprime mortgage market, double Goldman's previous estimate, analysts led by William Tanona said in a report on the companies dated Dec. 26.

Citigroup is trying to preserve capital and may be forced to write off $18.7 billion in collateralized debt obligations, up from its Nov. 4 estimate of as much as $11 billion, Tanona wrote in the report. The New York-based bank, which paid out 54 cents each quarter this year, will have to raise $6.2 billion in extra capital to reach its target, he wrote. JPMorgan would still have about $5 billion in CDO exposure after its writedown, he said.

``It will be a couple of quarters before the current credit crisis is fully digested by the markets,'' wrote Tanona, who has a ``sell'' rating on Citigroup's stock and a ``neutral'' rating on JPMorgan. ``Given the magnitude of the writedowns we assume and Citi's remaining exposure, we believe the firm has a serious need to preserve or raise additional capital.''

Citigroup Chief Executive Officer Charles O. ``Chuck'' Prince III stepped down last month and the bank got a $7.5 billion investment from Abu Dhabi's sovereign wealth fund after predicting further losses.

Merrill Estimate

Writedowns at the biggest banks are still likely to be ``significantly larger than investors are anticipating,'' wrote Tanona, who also doubled his estimate for charges at New York- based Merrill Lynch & Co., the third-largest U.S. securities firm by market value.

Citigroup, which has fallen 47 percent this year in New York trading, dropped 71 cents to $29.74 on the New York Stock Exchange at 9:41 a.m. JPMorgan, down 7.9 percent this year, fell 46 cents to $44.48.

Citigroup tumbled 8.1 percent on Nov. 1 after CIBC World Markets analyst Meredith Whitney said it may have to trim its dividend. Deutsche Bank AG analyst Michael Mayo also predicted a dividend cut, saying the investment from Abu Dhabi is ``probably not enough'' to absorb credit losses.

The company pays a dividend equal to 7.1 percent of its stock price, more than

Related Media on Demand

- 12/11 Whitney Says Citigroup Will Have to Cut Dividend

- Foerster Calls for `Major Surgery' on Citigroup Dividend



**NIGHT TALK**
with Mike Schneider
*weeknights @*
*8pm and 10pm ET*
*on Bloomberg TV*
One on one with the world's most interesting people.

More News

- Employment in U.S. Increases Less Than Forecast; Jobless Rate Climbs to 5%

- U.S. Stocks Tumble as Jobs Report Signals U.S. Growth Slowing; Intel Drops

- Treasuries Post Best Start to a Year Since 2001 After Jobless Rate Rises

twice the 3.3 percent yield of the average financial stock in the Standard & Poor's 500 Index. Executives have said they intend to maintain the payout.

**CDO Investments**

The biggest financial institutions have had to mark down more than $80 billion after a surge in U.S. subprime mortgage defaults prompted investors to shun higher-risk debt. Citigroup, which picked former Morgan Stanley President Vikram Pandit to succeed Prince, will still have about $24.5 billion in CDO investments after the writedown, Goldman said.

Tanona estimated that Merrill, which replaced CEO Stan O'Neal with John Thain, may write off $11.5 billion, compared with an earlier estimate of $6 billion.

``Many of the December year-end firms are likely to be more aggressive with their marks,'' Tanona wrote. ``Particularly those with high levels of exposure such as Citi and Merrill Lynch, both of whom have new CEOs at their helms.''

Separately, Sanford C. Bernstein & Co. analyst Brad Hintz estimated in a note dated today that Merrill will have a CDO- related writedown of $10 billion in the fourth quarter.

To contact the reporters on this story: Adam Haigh in London at ahaigh1@bloomberg.net ; Elizabeth Hester in New York at ehester@bloomberg.net .

*Last Updated: December 27, 2007 10:02 EST*

News tools   ✉ Email this article 🖨 Printer friendly format
Advertisement: Learn to trade currency

Sponsored links

**Fed Killing the Dollar?**
Learn How to Profit From the Credit Crisis! Mulitply Money up to 30x
MoneyAndMarkets.com

**See Todays Mortgage Rates**
$180,000 Mortgage for $999/mo. Calculate Your New Mortgage Payment
www.Mortgage-Rates.lowermybills.com

**Alternative Energy Stocks**
3 Ways to Harness the Power of Alternative Energy Stocks. Read Now
www.WhiskeyandGunpowder.com/Energy

**Oil & Gas Investment**
Oil & gas rig to move on site. Investment opportunity still open.
FossilOilandGas.com



**For Immediate Release**
**Citigroup Inc. (NYSE: C)**
**December 13, 2007**

### Citi Commits Support Facility for Citi-Advised SIVs

NEW YORK - Citi announced today that it has committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investment Vehicles ("SIVs").

This action is a response to the recently announced ratings review for possible downgrade by Moody's and S&P of the outstanding senior debt of the SIVs, and the continued reduction of liquidity in the SIV related asset-backed commercial paper and medium-term note markets. These markets are the traditional funding sources for the SIVs. Citi's actions today are designed to support the current ratings of the SIVs' senior debt and to allow the SIVs to continue to pursue their current orderly asset reduction plan. As a result of this commitment, Citi will consolidate the SIVs' assets and liabilities onto its balance sheet under applicable accounting rules.

Several key factors further contributed to Citi's decision to make this commitment:

- The SIVs continue to successfully pursue alternative funding strategies, primarily asset reductions, to meet maturing debt obligations. The SIV assets (net of cash and cash equivalents) have been reduced from $87 billion in August 2007 to $49 billion currently, while maintaining the overall high credit quality of the portfolio. Citi expects orderly asset reductions will be sufficient to meet liquidity requirements through the end of 2008, which currently total $35 billion. Consequently, Citi expects little or no funding requirement from the facility.

- As assets continue to be sold, Citi's risk exposure, and the capital ratio impact from consolidation, will be reduced accordingly.

- Given the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited. Approximately 54% of the SIV assets are rated triple-A and 43% double-A by Moody's, with no direct exposure to sub-prime assets and immaterial indirect sub-prime exposure of $51 million. In addition, the junior notes, which have a current market value of $2.5 billion, are in the first loss position.

- Taking into account this commitment, Citi still expects to return to its targeted capital ratios by the end of the second quarter of 2008. Based on September 30, 2007 capital ratio disclosures and applying the current asset levels in the SIVs, the estimated impact of this action would have been approximately 16 basis point decline in the Tier 1 capital ratio and approximately 12 basis point decline in the TCE/RWMA ratio.

"Our team has made great progress managing the SIVs in a very difficult environment. After considering a full range of funding options, this commitment is the best outcome for Citi and the SIVs," said Vikram Pandit, Citi's Chief Executive Officer.

The terms of this committed facility will be finalized in early 2008 and will reflect market terms.

The commitment is independent of the "Master Liquidity Enhancement Conduit" ("M-LEC"). Citi continues to support the formation of the M-LEC, which is an initiative that involves Citi and other financial institutions.

Attached are additional fact sheets regarding the SIVs and the committed support facility.

###

Citi, the leading global financial services company, has some 200 million customer accounts and does business in more than 100 countries, providing consumers, corporations, governments and institutions with a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, and wealth management. Citi's major brand names include Citibank, CitiFinancial, Primerica, Smith Barney and Banamex. Additional information may be found at www.citigroup.com or www.citi.com.

Certain statements in this document are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act. These statements are based on management's current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ materially from those included in these statements due to a variety of factors. More information about these factors is contained in Citigroup's filings with the Securities and Exchange Commission.

| Media Contacts: | Christina Pretto | (212) 559-9560 |
| | Michael Hanretta | (212) 559-9466 |
| | Shannon Bell | (212) 793-6206 |
| | | |
| Investors: | Arthur Tildesley | (212) 559-2718 |
| | | |
| Fixed Income Investors: | Maurice Raichelson | (212) 559-5091 |

2

# ADDITIONAL FACTS ON THE CITI-ADVISED SIVs

**Profile of the SIV assets and liabilities as of December 12, 2007:**

| | Average Asset Mix | Average Credit Quality [1,2] | | |
| | | Aaa | Aa | A |
|---|---|---|---|---|
| **Financial Institutions Debt** | **60%** | **14%** | **43%** | **3%** |
| **Sovereign Debt** | **1%** | **1%** | | |
| **Structured Finance:** | | | | |
| MBS - Non-U.S. residential | 12% | 12% | | |
| CBOs, CLOs, CDOs | 6 | 6 | | |
| MBS - U.S. residential | 7 | 7 | | |
| CMBS | 3 | 3 | | |
| Student loans | 5 | 5 | | |
| Credit cards | 5 | 5 | | |
| Other | 1 | 1 | | |
| **Total Structured Finance** | **39%** | **39%** | | |
| **Total Assets** | **100%** | **54%** | **43%** | **3%** |

- The weighted average maturity of the assets is 3.7 years

(1) Based on Moody's ratings.

(2) The SIVs have no direct exposure to U.S. sub-prime assets and have approximately $51 million of indirect exposure to sub-prime assets through CDOs which are AAA rated and carry credit enhancements.

| | Amount Outstanding | Average Rating | Average Maturity |
|---|---|---|---|
| Commercial Paper | $10B | A-1+/P-1 | 2.4 months |
| Medium Term Notes | 48B | AAA/Aaa | 10.1 months |

## OTHER INFORMATION

- Through asset reductions, the SIVs have partially repaid the previously disclosed $10 billion commitment to purchase commercial paper. As a result, Citi now holds $7.2 billion of commercial paper issued by the SIVs as of December 12, 2007. Citi expects the SIVs to fully repay the commercial paper at or before the last maturity date in mid-March 2008. Following the final maturity date, the new facility is expected to be the sole commitment by Citi to the SIVs.

- The Citi-advised SIVs are: Beta, Centauri, Dorada, Five, Sedna, Vetra and Zela.

3

## ADDITIONAL FACTS ON THE COMMITTED SUPPORT FACILITY

**FINANCIAL AND ACCOUNTING IMPACT**

- From an accounting perspective:

  - Upon consolidation and on an ongoing basis, the SIV assets and liabilities will be accounted for at fair value.

  - Any losses resulting from changes in the market values of the assets and liabilities are first borne by the junior note holders up to the value of their investments, which had a market value of $2.5 billion on December 12, 2007.

  - The total value of the assets and liabilities on December 12, 2007, were each $62 billion, which includes cash and cash equivalents of $13 billion in the assets and the $2.5 billion of junior notes in the liabilities.

- From an economic perspective:

  - The size and terms of the facility will be determined in early 2008 and will reflect market terms.

  - The size of the facility will vary through the life of the facility and will depend on a number of factors, including the SIVs' repayment of maturing debt obligations.

4